## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER, a membership organization; UNDOCUBLACK NETWORK, a membership organization; DAVID KROMA; MOMOLU BONGAY; OTHELLO A.S.C. DENNIS; YATTA KIAZOLU; CHRISTINA WILSON; JERRYDEAN SIMPSON; C.B., AL. K., D.D., D.K., AI. K., AD. K. by and through their father and next friend DAVID KROMA; O.D., and A.D., by and through their father and next friend OTHELLO A.S.C. DENNIS; O.S. by and through his mother and next friend JERRYDEAN SIMPSON, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| | ) Civil Action No. |
| v. | ) |
| | ) |
| DONALD J. TRUMP, President of the United States in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN NIELSEN, Secretary of the Department of Homeland Security in her official capacity, | )<br>)<br>)<br>) **COMPLAINT**<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

## INTRODUCTION

1.      Plaintiffs bring this action to challenge the Trump Administration's imminent
termination of Deferred Enforced Departure (DED) for thousands of Liberians lawfully
residing, working, and raising U.S. citizen children in the United States, many for nearly three
decades. DED is a life-saving humanitarian program providing immigration relief and
protection to foreign nationals whose countries of origin have experienced armed conflict, civil
unrest, natural disasters, or public health crises. Liberian nationals were first granted DED in
1999, but the Trump administration will abruptly terminate it on March 31, 2019.  This
termination is not based on an objective or reasoned assessment of current conditions in Liberia.
Rather, it is part of an overarching immigration agenda by the Trump Administration to forcibly
remove non-white, non-European immigrant families from the United States.  Evidence of this
discriminatory agenda is abundant. *See, e.g., Ramos v. Nielsen*, Order Granting Plaintiffs'
Motion For Preliminary Injunction, 18-CV-1554 (N.D. Cal. 2018) at 27-37 (cataloguing
"evidence that President Trump harbors an animus against non-white, non-European aliens").
Accordingly, Plaintiffs respectfully ask this Court to grant declaratory relief making clear that
the termination of DED for Liberia is unconstitutional. Additionally, Plaintiffs respectfully
request injunctive relief preventing the Trump Administration from arbitrarily separating
Liberian parents from their U.S. citizen children, and improperly removing families who have
lawfully lived, worked, and raised children in the United States for nearly three decades.

2.      Plaintiffs African Communities Together (ACT) and the UndocuBlack Network
(UndocuBlack) are membership-based non-profit organizations that serve Liberian families
living across the United States.  Plaintiffs David Kroma, Momolu Bongay, Othello A.S.C.
Dennis, Yatta Kiazolu, Christina Wilson, and Jerrydean Simpson are DED beneficiaries from

Liberia who have resided in the United States for decades. Plaintiffs C.B, AL. K, D.D, D.K, AI. K, AD. K, O.D., A.D., and O.S are U.S citizen children of DED beneficiaries who will be separated from their parent if the termination is allowed to go into effect.

3.      Liberia, one of the first African republics, has a long and complex relationship with the United States that stems from our legacy of enslavement and efforts to colonize Africa. Through the American Colonization Society, a Congressionally-funded organization, thousands of freed slaves were sent to Africa in the 1800s prior to the Civil War to "rid" the United States of "a useless and pernicious, if not dangerous portion of its population."[1] Many of those forced to Africa eventually established settlements in what would become Liberia.

4.      Since the 1980s, Liberia has experienced a series of internal armed conflicts and the largest outbreak of the Ebola virus in history, which has killed, displaced, or harmed thousands of Liberians. Knowing that the conditions in Liberia were unsafe, for almost thirty years the U.S. government has repeatedly granted life-saving immigration protection and relief – including parole and DED – for Liberian immigrants living in the United States.

5.      DED is a status conferred by the President which ensures that beneficiaries are not subject to immigration detention and removal. DED permits Liberian nationals to legally reside and work in the United States instead of returning to unsafe conditions in a country overwhelmed by armed conflict and the Ebola epidemic. There are approximately over 60,000

---

[1] James Ciment, *American in Africa*, Slate (Sept. 23, 2014), https://slate.com/news-and-politics/2014/09/ebola-in-liberia-america-owes-the-west-african-nation-founded-by-free-blacks-a-special-debt.html.

Liberians in the United States.[23]  DED currently protects an estimated 4,000 Liberians.[4]

6.     With life-saving DED protection, Liberians have thrived in the United States and are contributing members of society. They are economically productive, paying taxes, and giving back to their communities. They are important figures in local economies and contribute to vital industries such as healthcare and social services. They have purchased homes and enrolled their children in local schools.

7.     Liberian DED holders have established strong ties to the United States. After residing in the United States for nearly three decades, they have created families here. Many DED holders are raising U.S. citizen children who have lived in the United States for their entire lives.[5]

8.     The Trump Administration's purported justification for ending the DED program is that "conditions in Liberia have improved."[6]  However, conditions in Liberia have not improved; to the contrary, they remain dire. The weak Liberian economy is still recovering from armed conflicts as well as the devastation of resources caused by the outbreak of the Ebola epidemic.[7] This confluence of factors strongly suggests that Liberia is unable to manage the safe return of thousands of its nationals.

---

[2] U.S. Census Bureau, 2011-2015 American Community Survey 5-Year Estimates,
https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_SPT/B01003//popgroup~308.

[3] U.S. Census Bureau, 2011-2015 American Community Survey 5-Year Estimates,
https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_SPT_B05001&prodTyp e=table.

[4] Marie Solis, *Trump Leaves 4,000 Liberians at Risk of Deportation with End to Immigration Program*, Newsweek (Mar. 27, 2018), https://www.newsweek.com/more-4000-liberian-immigrants-risk-deportation-soon-unless-trump-renews-ded-861744.

[5] Presidential Memorandum for the Secretary of State and the Secretary of Homeland Security, White House (Mar. 27, 2018), https://www.whitehouse.gov/presidential-actions/presidential-memorandum-secretary-state-secretary-homeland-security/

[6] *Id.*

[7] Center for Disease Control and Prevention, *Ebola Epidemic — Liberia, March–October 2014*,
Morbidity and Mortality Weekly Report (Nov. 14, 2014),
https://www.cdc.gov/mmwr/preview/mmwrhtml/mm63e1114a4.htm (noting that the Ebola epidemic started in March 2014).

9.      The Trump Administration's stated justification for ending DED protection for Liberians is a proxy for racial and national origin discrimination. It is a pretext for the discriminatory immigration agenda advanced by the Trump Administration. During both his campaign and tenure in office, Defendant Trump has made overt statements and taken concrete actions demonstrating animus against immigrants of color. The Trump Administration has adopted deleterious immigration policies directly targeting immigrants of color. The push to cancel Deferred Action for Childhood Arrivals (DACA) and Temporary Protected Status (TPS); the forced separation of migrant children from their parents at the border; and the unlawful detention of migrant children have all specifically and systemically targeted immigrants of color. These drastic policy measures are a direct result of Defendant Trump's blatant discrimination against immigrants of color.

10.     Defendant Trump has called countries on the African continent "shithole countries,"[8] and questioned why the United States has immigrants from those countries instead of immigrants from predominantly white countries such as Norway.[9]

11.     Defendant Trump has ridiculed and mocked African people for purportedly living in "huts."[10]

12.     Defendant Trump has stoked racial hostility and unreasonable fear about Black

---

[8] Jose Dawsey, *Trump Derides Protections for Immigrants From 'Shithole' Countries*, Washington Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.5b7a6bea2459 ("Why are we having all these people from shithole countries come here?" Trump said…").
[9] *Id.* ("Trump then suggested that the United States should instead bring more people from countries such as Norway…").
[10] Michael Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, New York Times (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html?module=inline.

people in Africa by spreading false claims of "attacks on white farmers in South Africa."[11]

13.     While referring to Africa, Defendant Trump has described activities in "Narnbia," a country that does not exist.[12]

14.     Defendant Trump's order terminating DED for Liberia, if allowed to go into effect, will cause irreparable harm to Liberian DED holders and their U.S. citizen children. Implementing Defendant Trump's order will force Liberians and their U.S. citizen children to uproot the lives they have created in the United States. Their U.S. citizen children also face an untenable decision: stay in the United States and be separated from their Liberian parents or move to an unsafe country. This Hobson's choice is made even harsher because Liberian law forbids dual citizenship. U.S. citizen children of DED beneficiaries, if forced to relocate to Liberia, will need to renounce their U.S. citizenship to legally work and to enjoy the rights conferred on Liberian citizens.  For these U.S. citizen children, the Trump Administration has set up an impossible and unconstitutional choice: lose your parents or lose your citizenship. Under the U.S. Constitution, they are entitled to have both.

15.     Defendant Trump's imminent termination of DED violates the rights of Liberian DED holders and their U.S. citizen children under the U.S. Constitution. This denial of constitutional rights shamefully emulates the dark period of American-Liberian history when the U.S. federal government sought to rid the United States of people it found undesirable and threatening based on their race and identity. Now, hundreds of years later, Plaintiffs find themselves in an identical position: targeted for immigration detention and removal on the basis

---

[11] Kimon de Greef & Palko Karasz, *Trump Cites False Claims of Widespread Attacks on White Farmers in South Africa*, New York Times (Aug. 23, 2018), https://www.nytimes.com/2018/08/23/world/africa/trump-south-africa-white-farmers.html.
[12] *Where is 'Nambia'? President Trump 'Invents' African Country*, BBC (Sept. 21, 2017), https://www.bbc.com/news/world-africa-41345577.

of their race, ethnicity, and national origin. Accordingly, Plaintiffs respectfully ask this Court to preserve the status quo; to rule that Defendant Trump's discriminatory DED cancellation order violates the Due Process and Equal Protection guarantees of the U.S. Constitution; and to enjoin the termination of this life-saving humanitarian program.

## PARTIES

### A. Plaintiffs

16.    Plaintiff African Communities Together (ACT) is a membership-based non-profit organization created and operated by African immigrants. The organization provides services to African immigrants throughout the United States, including Massachusetts. Created in 2012, ACT has approximately 3,000 members, a national network, and organizational chapters. ACT's membership includes Liberian DED beneficiaries, their families, and their U.S. citizen children.

17.    Each year, ACT assists hundreds of African immigrants through free immigration, legal, and employment services. ACT organizes monthly leadership trainings for African immigrants empowering them to become leaders on civil rights issues. ACT also mobilizes immigrant communities to engage on issues affecting African immigrants. ACT's members have opportunities to interface with civic and political leaders.

18.    Defendant Trump's DED cancellation order has directly harmed ACT and its membership. Liberian DED holders affiliated with ACT will be uprooted from their communities and forced to abandon their homes as soon as DED is terminated. They will be imminently subjected to the harms and indignities inherent in immigration detention and removal. This prospect has generated tremendous uncertainty and fear. This is deeply traumatizing for Liberian DED holders and their families, including their U.S. citizen children.

7

19.     ACT has diverted and continues to divert staff and resources to address the deleterious effect of the DED cancellation order.

20.     ACT has diverted and continues to divert staff and resources to respond to inquiries concerning DED termination from affected Liberians and from community groups, associations, churches, and service providers in Liberian communities.

21.     ACT has diverted and continues to divert staff and resources for public education and outreach concerning the significance of DED cancellation, including coordination of nationwide conference calls to connect with and provide updates to the affected Liberian community.

22.     ACT has diverted and continues to divert staff and resources for policy analysis and advocacy to raise awareness of the hardships imposed on Liberians by the abrupt DED cancellation order. ACT staff has travelled to Washington, D.C. to encourage legislators to protect Liberians through DED. In February, ACT mobilized Liberian DED holders to participate in a public march in Washington, D.C. and to meet with members of Congress.

23.     ACT has diverted and continues to divert staff and resources for local advocacy and engagement on DED issues, including policy advocacy with the New York City Mayor's Office of Immigrant Affairs and the Philadelphia Immigrant Affairs Unit concerning the adverse impact of the DED cancellation order.

24.     Plaintiff UndocuBlack Network ("UndocuBlack") is a membership-based non-profit organization dedicated to serving Black immigrants. Created in 2016, UndocuBlack serves thousands of immigrants through organizational chapters and a national network across approximately thirty states, including Massachusetts. UndocuBlack's membership includes Liberian DED holders, their families, and their U.S. citizen children.

25.     UndocuBlack advocates on behalf of currently and formerly undocumented Black immigrants; facilitates a community for its members; and provides its members access to resources, including information and materials concerning legal issues, mental wellness, health services, housing, and education opportunities.

26.     Defendant Trump's DED cancellation order has directly harmed UndocuBlack and its membership. The organization's Liberian members have been living in fear and uncertainty. They are scared about the cancellation of DED.

27.     DED members are concerned about the wellbeing and care of their children if they are detained and deported to Liberia. DED members have also expressed concerns to UndocuBlack staff about their mortgages, bank accounts, and pensions. UndocuBlack has diverted and continues to divert resources and staff time to address these concerns conducting trainings and disseminating resources to DED holders.

28.     With the imminent termination of DED, UndocuBlack's members are increasingly wary of engaging with the organization and accessing services. If the termination of DED goes into effect, UndocuBlack will lose the participation of members who have been developed and trained – using significant organizational resources – for advocacy projects and community engagements.

29.     UndocuBlack has diverted and continues to divert resources and staff time to accompany DED holders to immigration appointments and providing mental health support to those traumatized by the prospect of being torn apart from their families and forcibly returned to unsafe conditions in Liberia.

30.     UndocuBlack has diverted and continues to divert resources and staff time for policy advocacy related to DED cancellation, including Congressional briefings, programmatic

activities in Washington, D.C., and training Liberian DED holders for lobby visits.

31.    Plaintiff David Kroma is a Liberian immigrant who has lawfully resided in the United States for the last twenty (20) years. He is a healthcare worker residing in Worcester, Massachusetts, where he owns his home. He is currently living in the United States as a DED holder.

32.    Mr. Kroma has been working at the Worcester Recovery Center and Hospital since 2001. Over the years, he has been promoted. He works with patients who have mental and physical disabilities. Mr. Kroma also volunteers in the community.

33.    During his two decades in the United States, Mr. Kroma has started a family. His six U.S. citizen children range in age from four to fifteen.

34.    All of Mr. Kroma's children were born in Massachusetts.

35.    All of Mr. Kroma's school age children attend public schools in Worcester, Massachusetts.

36.    None of Mr. Kroma's children have ever been to Liberia.

37.    Plaintiff C. B., a minor son of Mr. Kroma, is 15 years-old. He plays basketball at school. He depends on his father for financial and emotional support. The imminent termination of the DED program has caused him anxiety and fear.

38.    Plaintiff AL. K., a minor daughter of Mr. Kroma, is 11 years-old. She is a shy student, but she loves school and enjoys singing with her friends. She depends on her father for financial and emotional support. The imminent termination of the DED program has caused her anxiety and fear.

39.    Plaintiff D. D., a minor son of Mr. Kroma, is 10 years-old. He plays basketball, and he loves to ride his bike around his neighborhood. He depends on his father for financial

and emotional support. The imminent termination of the DED program has caused him anxiety and fear.

40.     Plaintiff D. K., a minor daughter of Mr. Kroma, is 7 years-old. She loves singing and dancing, and wants to grow up to be a professional dancer. She depends on her father for financial and emotional support. The imminent termination of the DED program has caused her anxiety and fear.

41.     Plaintiff AI. K., a minor son of Mr. Kroma, is four years-old. He is the twin brother of Plaintiff AD. K., a minor son of Mr. Kroma. The twins will start kindergarten next year. They love soccer and enjoy playing with monster trucks. They both depend on their father for financial and emotional support. The imminent termination of the DED program has caused them anxiety and fear.

42.     Plaintiff Momolo Bongay is a Liberian immigrant who has resided in the United States for eighteen (18) years. Through his work, Mr. Bongay assists patients providing much needed healthcare. He resides in Worcester, Massachusetts, and he is a DED holder.

43.     Mr. Bongay is a new husband, having recently married.

44.     Mr. Bongay fled to the United States seeking safety after his sister was killed during an armed conflict in Liberia. Over the past three years, Mr. Bongay has lost relatives to the Ebola epidemic in Liberia.

45.     If DED is terminated, Mr. Bongay will be forced to forfeit his job, leave his home, and be separated from his new wife.

46.     Plaintiff Othello A.S.C Dennis is a Liberian immigrant who has resided in the United States for the last twenty (20) years.  He is a social worker living in Worcester. He is currently in the United States as a DED holder.

47.     During his two decades in the United States, Mr. Dennis has started a family. He has two 9 year-old sons born in Massachusetts.

48.     Both of Mr. Dennis's children attend public schools in Worcester, Massachusetts.

49.     None of Mr. Dennis's children have ever been to Liberia.

50.     After beginning his career in manufacturing, Mr. Dennis transitioned to social work in 2005. He most recently worked as a social worker through Catholic Charities in Worcester, Massachusetts. As a social worker, Mr. Dennis helps people in the community, including those struggling with homelessness or addiction. Mr. Dennis actively volunteers with Angel's Net Foundation, where he helps young students achieve success in school.

51.     Mr. Dennis has a number of medical conditions for which he receives specialized medical care and treatment in Worcester, Massachusetts. He reasonably fears that if forced to return to Liberia, he would be unable to access the life-saving treatment he requires.

52.     Plaintiff A. D., a son of Mr. Dennis, is nine years-old. He has never been to Liberia. He depends on his father for financial and emotional support. The imminent termination of the DED program has caused him anxiety and fear.

53.     Plaintiff O. D., a son of Mr. Dennis, is nine years-old. He has never been to Liberia. He depends on his father for financial and emotional support. The imminent termination of the DED program has caused him anxiety and fear.

54.     Plaintiff Yatta Kiazolu is a Liberian immigrant who has lawfully resided in the United States since she was six (6) years old. She has been in the United States for twenty-two (22) years. She is a PhD student in history at the University of California, Los Angeles (UCLA), and resides in Los Angeles, California. Ms. Kiazolu is a DED holder.

55.     Ms. Kiazolu was born to Liberian parents in Botswana. Her parents move back to

Liberia during the height of the civil war, but they sent Ms. Kiazolu to the United States for her safety. She grew up in Delaware, where she attended public schools. The last time she was in Liberia, she was four years-old.

56.    In 2013, Ms. Kiazolu started the PhD program in the Department of History at UCLA. Her dissertation will focus on the African diaspora during the 20th century in the United States. Ms. Kiazolu tutored at the Social Justice Learning Institute, and has taught history courses as an adjunct professor at California State University, Long Beach and Delaware State University.

57.    Ms. Kiazolu has experienced great stress and anxiety because of the cancellation of the DED program. If forced to leave the United States, she would be uprooting her life from the only country she knows.

58.    Plaintiff Christina Wilson is a Liberian national who has lawfully resided in the United States for seventeen (17) years. Ms. Wilson resides in Minnesota. She is a DED holder.

59.    Ms. Wilson attended a nursing assistant school. She has been employed as a nursing assistant for sixteen years at the St. Therese Nursing Home in Minnesota, where she takes care of elderly patients. Ms. Wilson is passionate about taking care of America's aging population.

60.    Ms. Wilson is active in her community. She participates in community meetings and activities. She also reads the holy scripture at her church.

61.    The cancellation of the DED program would irreparably harm and devastate Ms. Wilson, a survivor of war terror. The prospect of returning to Liberia strikes terror deep in her heart. Ms. Wilson fled Liberia during the civil war. One of her brothers was jailed for his human rights activities which were critical of former Liberian warlord and president Charles Taylor. In

Liberia, another one of her brothers was disappeared, one of her nieces was shot, and her mother was attacked. Ms. Wilson lost all of her possessions when her home was burned to the ground by arsonists. Her personal and family experiences demonstrate that conditions in Liberia are unstable and unsafe. She has also heard accounts of people in Liberia being targeted, attacked, and killed because they used to live in the United States.

62.     Ms. Wilson is a diabetic who requires medical care and treatment, and she will be unable to access adequate healthcare in Liberia.

63.     Ms. Wilson has trouble sleeping because she is afraid and unsure about her future and wellbeing.

64.     Plaintiff Jerrydean Simpson is a Liberian immigrant who has resided in the United States for twenty (20) years. She is a senior member service sales representative at Navy Federal Credit Union in Maryland. While working full time, she is also studying Business Administration at University of Maryland, University College. She resides in Clarksburg, Maryland, where she owns her home. Ms. Simpson is a DED holder.

65.     Ms. Simpson was born in Monrovia, Liberia. During the violent civil war, her family was at risk because her father served in the military under the administration overthrown by Liberian warlord and president Charles Taylor. In 1998, she was visiting relatives in the United States when there was an armed uprising in Liberia that prevented her from safely returning to her home. She remained in the United States.

66.     Ms. Simpson is experiencing stress and anxiety because of the cancellation of the DED program. She is concerned about unsafe conditions in Liberia.

67.     Plaintiff O.S., a son of Ms. Simpson, is twelve years old and a U.S. citizen. He has a nineteen year old sister, also a child of Ms. Simpson and also a U.S. citizen. Neither of

14

Ms. Simpson's children have ever been to Liberia. Ms. Simpson is their only source of emotional and financial support.

68.      Ms. Simpson's son and daughter are experiencing emotional distress. They have panic attacks. Plaintiff O.S. is having trouble focusing in school.  He is concerned about being separated from his mother. They do not want to move to Liberia because the United States is their home.

*B. Defendants*

69.      Defendant Donald J. Trump is currently President of the United States. He assumed his presidency on January 20, 2017. As chief executive, President Trump oversees all executive agencies and cabinet members, including Defendant U.S. Department of Homeland Security (DHS) and Defendant Kirstjen Nielsen. He is sued in his official capacity.

70.      Defendant DHS is a department of the Executive Branch of the United States government. DHS and its component agencies, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, and U.S. Citizenship and Immigration Services, have the authority to administer and enforce U.S. immigration laws and policies, including the termination of DED protection for Liberians.

71.      Defendant Nielsen has been Secretary of Homeland Security since December 6, 2017, and is currently DHS's senior official. Defendant Nielsen is responsible for DHS oversight and for implementing and enforcing immigration laws and policies. She is sued in her official capacity.

## JURISDICTION AND VENUE

72.      The Court has proper jurisdiction over this matter under 28 U.S.C. § 1331.

73.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## FACTS

74.     DED is a life-saving humanitarian program providing immigration relief and

protection to foreign nationals whose countries of origin have experienced war, civil unrest,

natural disasters, or public health crises. The President is empowered to order DHS and

immigration enforcement officials to refrain from removing DED recipients from the United

States.[13] Past DED designations have ranged from one year to five years, but presidents may

renew or extend the length of a DED designation. Liberian DED has been renewed by

Republican and Democrat administrations. DED beneficiaries may also be granted employment

authorization.[14]

75.     DED involves an intensive vetting process. Liberians are ineligible for the

program if they have been convicted of any felony or more than one misdemeanor.

76.     Since 1990, most DED directives followed an expired TPS designation.[15]  Similar

to DED, TPS is a form of humanitarian relief that prevents the removal of foreign nationals

because of armed conflict, civil unrest, or natural disasters.[16]

77.     During previous administrations, DED was granted to immigrants from China,

countries in the Persian Gulf, El Salvador, and Haiti. For each group of DED recipients, in

anticipation of the termination or after the termination of these DED programs, Congress passed

various acts creating a path for those who had resided and worked in the U.S. as DED

beneficiaries to become legal permanent residents.

---

[13] U.S. Customs and Immigration Services, Deferred Enforced Departure,
https://www.uscis.gov/humanitarian/temporary-protected-status/deferred-enforced-departure (last updated Mar. 30, 2018).
[14] Congressional Research Service (CRS), Temporary Protected Status: Overview and Current Issues, RS20844, at 3-4 (Oct. 10, 2018).
[15] *Id.* at 4-5. Unlike the basis of authority for granting a DED order, the authority for granting TPS arises from the Immigration and Nationality Act of 1990, 8 U.S.C. § 1254a. The Secretary of DHS maintains the authority to make a TPS designation after consultation with certain agencies in the U.S. government.
[16] *Id.* at 2.

*DED Status for Liberian Nationals*

78.     Currently, Liberia is the only country whose citizens are subject to a DED order. The Liberian DED program stems from the decision to grant Liberians TPS at different periods beginning in 1991. On March 21, 1991, Attorney General Dick Thornburgh designated Liberia as a TPS country because of "ongoing armed conflict within Liberia," and "extraordinary and temporary conditions in Liberia that prevent... nationals of Liberia from returning to Liberia in safety."[17] This TPS designation ran until March 27, 1992.[18]

79.     After Attorney General Thornburgh's initial TPS designation, other Attorneys General extended the TPS determination for Liberians until 1999.[19] On July 30, 1999, Attorney General Janet Reno terminated TPS for Liberia with September 28, 1999 as the expiration date.[20] Attorney General Reno's termination cited the U.S. Department of State's recommendation that "sufficient grounds to recommend a further extension of TPS for Liberia do not exist," even though "conditions in Liberia remain difficult."[21]

80.     This termination also marked the first DED designation for Liberians. On September 27, 1999, President Bill Clinton directed Attorney General Reno to defer enforced departure of Liberians until September 29, 2000.[22] President Clinton concluded that the fragile conditions in Liberia provided compelling reasons to assign Liberians DED status.[23]

---

[17] Notice of Designation of Liberia Under Temporary Protected Status Program, 56 Fed. Reg. 12746 (Mar. 27, 1991). https://www.justice.gov/sites/default/files/eoir/legacy/2014/12/01/fr27mar91_post.pdf.
[18] *Id.*
[19] U.S. Dep't of Justice, Temporary Protected Status, https://www.justice.gov/eoir/temporary-protected-status#Lib (last updated Mar. 1, 2019).
[20] Termination of Designation of Liberia Under Temporary Protected Status Program, 64 Fed. Reg. 41463 (July 30, 1999), https://www.justice.gov/sites/default/files/eoir/legacy/2002/09/09/fr30jy99N.pdf.
[21] *Id.*
[22] Presidential Memorandum on Measures Regarding Certain Liberians in the United States, Sept. 28, 2000, https://www.justice.gov/sites/default/files/eoir/legacy/2004/04/22/pd02oc00.pdf.
[23] *Id.*

17

81.     On September 28, 2000, President Clinton extended DED status for another year noting:

> I am concerned that a decision by our Government to deport Liberians who have enjoyed the protection of our country for many years could cause the involuntary repatriation of many thousands of Liberian refugees from other nations in West Africa. This would severely burden Liberia and cause instability in Liberia and in the region.[24]

82.     Liberian DED has been supported by both Republican and Democrat administrations. On September 25, 2001, President George W. Bush extended DED status for Liberians until September 29, 2002.[25] In a memorandum directing the Attorney General to defer enforced departure, President Bush acknowledged that there continues to be compelling reasons "…not to deport these Liberians at this time. In particular, there is a significant risk that such a decision would cause the involuntary repatriation of many thousands of Liberian refugees in West Africa, causing instability in Liberia and the region."[26]

83.     On September 26, 2002, Attorney General John Ashcroft designated Liberia as a TPS country because of ongoing armed conflict that forced approximately 75,000 people to flee Liberia, and displaced at least 120,000 Liberians.[27] In making his assessment, Attorney General Ashcroft relied on analysis prepared by the U.S. Department of State and the Resourced Information Center of the Immigration and Naturalization Service (INS).[28] A memorandum from the Department of State concluded that involuntarily repatriating Liberian nationals would pose a serious risk to their personal safety because the government and rebel forces were

---

[24] *Id.*

[25] Presidential Memorandum on Measures Regarding Certain Liberians in the United States, Sept. 25, 2001, https://www.justice.gov/sites/default/files/eoir/legacy/2002/09/09/pd01oc01.pdf.

[26] Presidential Statement on House of Representatives Action on the Defense Authorization Bill, Sept. 25, 2001, https://www.justice.gov/sites/default/files/eoir/legacy/2002/09/09/pd01oc01.pdf.

[27] Designation of Liberia Under the Temporary Protected Status Program, 67 Fed. Reg. 61,665 (Oct. 1, 2002), https://www.gpo.gov/fdsys/pkg/FR-2002-10-01/pdf/02-24992.pdf.

[28] *Id.*

committing serious human rights abuses, and the country's vital services such as food, sanitation, shelter, and health were on the verge of collapse.[29] INS similarly noted the grave human rights violations, widespread displacement, and the humanitarian crisis in Liberia.[30] This TPS program ran from October 1, 2002 until October 1, 2003.[31]

84.     The DHS Secretary extended the TPS program related to the civil conflict in Liberia until October 1, 2004. On July 28, 2004, DHS Secretary Tom Ridge concluded that the conditions that prompted the TPS designation originally assigned by Attorney General Ashcroft no longer existed.[32] But Secretary Ridge re-designated TPS based on "extraordinary and temporary conditions in Liberia that prevent the safe return of certain nationals of Liberia," for a one-year period until October 1, 2005.[33] DHS again extended TPS until October 1, 2006.[34]

85.     On September 6, 2006, DHS Secretary Michael Chertoff determined that TPS designation should be terminated, and that the termination would take effect on October 1, 2007. Secretary Chertoff noted that the extraordinary and temporary conditions that prevented the safe return of Liberian nationals were no longer applicable.[35]

86.     However, on September 12, 2007, President Bush granted DED status to Liberians for 18 months until March 21, 2009.[36] In a memorandum to DHS, President Bush

---

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] Termination and Re-Designation of Liberia for Temporary Protected Status, 69 Fed. Reg. 52,297 (Aug. 25, 2004), https://www.federalregister.gov/documents/2004/08/25/04-19448/termination-and-re-designation-of-liberia-for-temporary-protected-status.

[33] *Id.*

[34] Extension of the Designation of Liberia for Temporary Protected Status, 70 Fed. Reg. 48176 (Aug. 16, 2005), https://www.justice.gov/sites/default/files/eoir/legacy/2005/08/17/fr16aug05.pdf.

[35] Termination of the Designation of Liberia for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Liberia TPS Beneficiaries, 71 Fed. Reg. 55,000 (Sept. 20, 2006), https://www.federalregister.gov/documents/2006/09/20/06-7785/termination-of-the-designation-of-liberia-for-temporary-protected-status-automatic-extension-of.

[36] Dep't Homeland Security, Fact Sheet: Liberians Provided Deferred Enforced Departure (DED) (Sept. 12, 2007), https://www.uscis.gov/sites/default/files/files/pressrelease/LiberiaFS_07Sep12.pdf; *see also* Automatic Extension of Employment Authorization and Related Documentation for Liberians Provided Deferred Enforced Departure, 72

ordered DED because "the political and economic situation in Liberia continues to be fragile."[37]

President Bush concluded that "Liberia is struggling to implement reconstruction and economic

stabilization programs for the population, including the thousands of former Liberian refugees

who have returned from the West African region and elsewhere."[38]

87.    On March 20, 2009, President Barack Obama extended DED for Liberians  for

another year until March 31, 2010.[39] In the following years, President Obama again extended

DED for 18–24.[40] In September 2014, President Obama issued another DED order for a 24-

month DED designation lasting from October 1, 2014 to September 30, 2016.[41]

88.    During this DED period, in March 2014, the first Ebola virus infection was

detected in Liberia, during the largest and longest Ebola epidemic in history.[42]

---

Fed. Reg. 53,596 (Sept. 19, 2007), https://www.federalregister.gov/documents/2007/09/19/07-4645/automatic-extension-of-employment-authorization-and-related-documentation-for-liberians-provided.

[37] Presidential Memorandum for the Secretary of Homeland Security (Sept. 12, 2007), https://georgewbush-whitehouse.archives.gov/news/releases/2007/09/20070912-10.html.

[38] *Id.*

[39] Presidential Memorandum Regarding Deferred Enforced Departure for Liberians (Mar. 23, 2009), https://obamawhitehouse.archives.gov/the-press-office/presidential-memorandum-regarding-deferred-enforced-departure-liberians.

[40] Filing Procedures and Automatic Extension of Employment Authorization and Related Documentation for Liberians Provided Deferred Enforced Departure, 75 Fed. Reg. 15,715 (Mar. 30, 2010), https://www.federalregister.gov/documents/2010/03/30/2010-7115/filing-procedures-and-automatic-extension-of-employment-authorization-and-related-documentation-for; Presidential Memorandum— Deferred Enforced Departure for Liberians (Mar. 19, 2010) http://www.tlcafrica.com/DED2010.pdf.; Filing Procedures for Employment Authorization and Automatic Extension of Existing Employment Authorization Documents for Liberians Provided Deferred Enforced Departure, 76 Fed. Reg. 53,145 (Aug. 25, 2011), https://www.federalregister.gov/documents/2011/08/25/2011-21842/filing-procedures-for-employment-authorization-and-automatic-extension-of-existing-employment; Filing Procedures for Employment Authorization and Automatic Extension of Existing Employment Authorization Documents for Liberians Eligible for Deferred Enforced Departure, 76 Fed. Reg. 53,145 (Mar. 21, 2013), https://www.federalregister.gov/documents/2013/03/21/2013-06519/filing-procedures-for-employment-authorization-and-automatic-extension-of-existing-employment; Filing Procedures for Employment Authorization and Automatic Extension of Existing Employment Authorization Documents for Liberians Eligible for Deferred Enforced Departure, 79 Fed. Reg. 59,286 (Oct. 1, 2014), https://www.federalregister.gov/documents/2014/10/01/2014-23507/filing-procedures-for-employment-authorization-and-automatic-extension-of-existing-employment.

[41] Filing Procedures for Employment Authorization and Automatic Extension of Existing Employment Authorization Documents for Liberians Eligible for Deferred Enforced Departure, 79 Fed. Reg. 59,286 (Oct. 1, 2014), https://www.federalregister.gov/documents/2014/10/01/2014-23507/filing-procedures-for-employment-authorization-and-automatic-extension-of-existing-employment.

[42] Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report (MMWR) (Nov. 14, 2014), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm63e1114a4.htm.

89.     "Ebola is a traumatic illness both in terms of symptom severity and mortality rates. Those affected are likely to experience psychological effects due to the traumatic course of the infection, fear of death and experience of witnessing others dying."[43]

90.     The Centers for Disease Control and Prevention issued a release stating that by November 2, 2014, "Liberia had reported the largest number of cases (6,525) and deaths (2,697) among the three affected countries of West Africa with ongoing transmission."[44]

91.     Due to the Ebola epidemic, on November 21, 2014, DHS Secretary Jeh Johnson granted a new TPS designation for Liberia for a period of 18 months until May 21, 2016. [45] Secretary Johnson noted that the Ebola epidemic in Liberia remained dire, and that the health crisis overwhelmed Liberia's already weak healthcare system.[46] Attempts to curb transmission also threatened food shortages.[47]

92.     Secretary Johnson then extended TPS for six months from May 22, 2016 until November 21, 2016.[48] He concluded that although Liberia was free of Ebola transmission, the country was facing recovery challenges such as rebuilding its fragile healthcare system and securing an adequate food supply.[49]

---

[43] World Health Organization, *Psychosocial effects of an Ebola outbreak at individual, community and international levels*, https://www.who.int/bulletin/volumes/94/3/15-158543/en/.

[44] *Id.*

[45] Designation of Liberia for Temporary Protected Status, 79 Fed. Reg. 69502 (Nov. 21, 2014), https://www.federalregister.gov/documents/2014/11/21/2014-27772/designation-of-liberia-for-temporary-protected-status.

[46] *Id.*

[47] *Id.*

[48] Extension of the Designation of Liberia for Temporary Protected Status, 81 Fed. Reg. 15328 (Mar. 22, 2016). https://www.federalregister.gov/documents/2016/03/22/2016-06328/extension-of-the-designation-of-liberia-for-temporary-protected-status.

[49] *Id.*

93.     On September 26, 2016, Secretary Johnson published his decision to terminate

TPS on May 21, 2017 because the country conditions no longer supported TPS determination.[50]

That same day, President Obama extended DED to Liberians from October 1, 2016 until March

31, 2018.[51] This was the last DED order before Defendant Trump assumed the presidency.

*President Trump's History of Racial Animus*

94.     Defendant Trump has a history of bigoted remarks and actions that make clear

that he holds racial animus against immigrants of color.

95.     In 2015, Defendant Trump announced his campaign for the presidency by

describing Mexican nationals in blatantly racist terms :

> When Mexico sends its people, they're not sending their best. They're not sending
> you. They're not sending you. They're sending people that have lots of problems,
> and they're bringing those problems with us. They're bringing drugs. They're
> bringing crime. They're rapists.[52]

96.     In another statement, Trump also declared: "What can be simpler or more

accurately stated? The Mexican Government is forcing their most unwanted people into the

United States. They are, in many cases, criminals, drug dealers, rapists, etc."[53]

---

[50] Six Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination, 81 Fed. Reg. 66059 (Sept. 26, 2016). https://www.federalregister.gov/documents/2016/09/26/2016-23250/six-month-extension-of-temporary-protected-status-benefits-for-orderly-transition-before-termination.

[51] Memorandum to the Sec'y of Homeland Security, from the President, Sept. 28, 2016, https://obamawhitehouse.archives.gov/the-press-office/2016/09/28/presidential-memorandum-deferred-enforced-departure-liberians; Filing Procedures for Employment Authorization and Automatic Extension of Existing Employment Authorization Documents for Liberians Eligible for Deferred Enforced Departure, 81 Fed. Reg. 67,366 (Sept. 30, 2016), https://www.federalregister.gov/documents/2016/09/30/2016-23798/filing-procedures-for-employment-authorization-and-automatic-extension-of-existing-employment.

[52] Washington Post Staff, *Full Text: Donald Trump Announces a Presidential Bid*, Washington Post, Jun. 16, 2015, https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.450b6efca4b3.

[53] Eugene Scott, *Trump's History of Making Offensive Comments about Nonwhite Immigrants*, Washington Post, Jan. 11, 2018, https://www.washingtonpost.com/news/the-fix/wp/2018/01/11/trumps-history-of-controversial-remarks-about-nonwhite-immigrants/?utm_term=.3e95d1658762.

97.    Trump continued to insult and belittle immigrants of color after he began h is presidency, further demonstrating his animus towards them. The New York Times reported that in June 2017, he participated in a policy meeting regarding immigration matters.[54] According to officials interviewed by the New York Times, during the meeting, President Trump read aloud from a document listing the number of immigrants that had received visas in 2017.[55] The president complained that more than 2,500 were from Afghanistan, which he called a "terrorist haven."[56] He "grumbled" that the 15,000 people from Haiti "all have AIDS."[57] President Trump also read that 40,000 immigrants came from Nigeria.[58] Two officials who participated in the meeting recalled that President Trump stated that once the Nigerian immigrants had seen the United States, they would never "go back to their huts" in Africa.[59]

98.    During a speech in December 2017, President Trump criticized the Diversity Visa Program as a "joke".[60] According to the Washington Post, the State Department awards 50,000 visas through this program each year, and most of the recipients are from African nations.[61] President Trump complained of the program, saying: "They give us their worst people, put them in a bin... they're picking the worst of the worst, congratulations you're going to the U.S."[62]

99.    Even more telling were statements made by President Trump in the months leading to his memorandum announcing the termination of DED for Liberia. The Washington

---

[54] Michael D. Shear and Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, NY Times, Dec. 23 2017, https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html?_r=0.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] Eugene Scott, *Trump's History of Making Offensive Comments about Nonwhite Immigrants*, Washington Post, Jan. 11, 2018, https://www.washingtonpost.com/news/the-fix/wp/2018/01/11/trumps-history-of-controversial-remarks-about-nonwhite-immigrants/?utm_term=.3e95d1658762.
[62] *Id.*

Post reported that in January 2018, President Trump was at a meeting discussing immigrants

from Haiti, El Salvador, and African countries as part of a bipartisan immigration deal.[63]

According to participants in the meeting, Trump, while referencing Haiti, El Salvador, and

African countries said, "Why are we having all these people from shithole countries come

here?"[64] He also said, "why do we need more Haitians," and wanted Haitians removed from an

immigration deal; specifically, when discussing Haitians, President Trump said "Take them

out."[65]

100.    Donald Trump's prejudicial view of predominantly Black countries as "shithole

countries" predates his presidency.  On February 27, 2019, President Trump's former attorney,

Michael Cohen, testified before Congress that Trump asked him if he "could name a country

run by a black person that wasn't a 'shithole.'"[66] Although the exact date of this statement is

unknown, Cohen testified that this occurred "when Barack Obama was President of the United

States."[67]

101.    In direct contrast to the statements he made about African and Latin American

countries, President Trump suggested that the United States bring in more immigrants from

predominantly white countries such as Norway instead of the aforementioned "shithole

---

[63] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, Washington Post, Jan. 12,
2018, https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-
in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.197963a10340.
[64] *Id.*
[65] *Id.*
[66] *Michael Cohen's prepared statement to the House Committee on Oversight and Reform*, Washington Post, Feb.
27, 2019, at 10-11, https://www.washingtonpost.com/michael-cohen-s-prepared-statement-to-the-house-committee-
on-oversight-and-reform/d2cdc193-2f0c-44bb-b2f8-e7dadddf545e_note.html?questionId=a194ac05-9c53-4be2-
868d-777713d7c30e&utm_term=.4a1162e75aaf.
[67] *Id.*

countries."[68] Lawmakers present in the meeting were shocked by President Trump's statements.[69]

102.    Seven days after these statements, the Department of Homeland Security cancelled TPS for immigrants from Haiti, El Salvador, Nicaragua, and Sudan. A few months later, on March 27, 2018, President Trump terminated the DED program for Liberians.[70]  A federal court has currently enjoined the TPS terminations, finding sufficient "evidence that President Trump harbors an animus against non-white, non-European aliens" to grant a preliminary injunction. *See Ramos v. Nielsen*, 18-CV-1554 (N.D. Cal. 2018).

*Trump Administration Terminates DED Program for Liberians*

103.    Although thousands of Liberians have resided in the United States for over twenty years protected under TPS and DED designations made during multiple administrations, Defendant Trump abruptly terminated the DED program. On March 27, 2018, Defendant Trump released a presidential memorandum directing DHS to terminate DED effective on March 31, 2019.[71] The president stated that he made this decision "through consultation with appropriate executive departments and agencies and [his] advisors."[72] On information and belief, these agencies and advisors included Defendant DHS and Defendant Nielsen.

104.    Although Defendant Trump acknowledged that Liberia suffered economic damage because of the Ebola epidemic, he claimed that the conditions in the country had

---

[68] Julia Hirschfeld Davis et al, *Trump Alarms Lawmakers with Disparaging Words for Haiti and Africa*, NY Times (Jan. 11, 2018), https://www.nytimes.com/2018/01/11/us/politics/trump-shithole-countries.html
[69] *Id.*
[70] Presidential Memorandum for the Secretary of State and the Secretary of Homeland Security (Mar. 27, 2018), https://www.whitehouse.gov/presidential-actions/presidential-memorandum-secretary-state-secretary-homeland-security/.
[71] *Id.*
[72] *Id.*

improved because Liberia "is no longer experiencing armed conflict and has made significant progress in restoring stability and democratic governance."[73]

105.    The President's unsubstantiated claims are mere pretext. There is extensively corroborated evidence that the situation in Liberia remains dire. According to Defendant Trump's own State Department, significant human rights abuses are prevalent throughout Liberia. This includes "extrajudicial killings by police; police abuse, harassment, and intimidation of detainees and others; arbitrary arrest and detention; press harassment; official corruption; lack of accountability in cases of violence against women and children, including rape, domestic violence, and female genital mutilation/cutting (FGM/C); criminalization of same-sex sexual conduct; and trafficking in persons." [74] "Impunity remained a serious problem for individuals who committed atrocities during the civil wars, as well as for those responsible for current and continuing crimes, despite intermittent and limited government attempts to investigate and prosecute officials accused of current abuses, whether in the security forces or elsewhere in the government. Corruption at all levels of government continued to undermine public trust in state institutions." [75]

106.    Taken together, these factors demonstrate that the conditions in Liberia justify an extension of DED and more significantly, that Defendant Trump's stated justifications for cancellation are pretextual.

107.    Additionally, the Trump Administration has asserted no national security interest for terminating the Liberian DED program, and indeed, none could exist.  The beneficiaries of

---

[73] *Id.*
[74] U.S. Dep't of State, Liberia 2017 Human Rights Report, https://www.state.gov/documents/organization/277259.pdf.
[75] *Id.*

the program have lived in the United States for decades and are all known to and extensively vetted by the government.

108.    DED protects four thousand Liberians. There is no evidence that these hardworking immigrants, who have lived and raised U.S. citizen children for decades, are having an adverse impact on our country.

109.    The conditions in Liberia demonstrate the President's true motive for ending DED. Defendant Trump's long history of disparaging comments against Africans indicate that a far more ominous reason catalyzed his decision to terminate DED: the president's discriminatory and prejudicial attitudes towards immigrants of color.

110.    Defendant Trump's racial animus has also influenced the agencies, advisors, and policymakers that work under his control. Upon information and belief, Defendant Trump's discriminatory attitudes influenced consultations with agencies and advisors under his charge.

111.    The Trump Administration's claim that conditions in Liberia have improved to the point of justifying the termination of DED, is also a departure from the regular process used to terminate of DED programs for other foreign nationals. In every past administration that evaluated Liberian DED a decision was made to extend the program. This includes extensions granted, at times, when there was no active armed conflict. The Trump Administration's cancellation is, therefore, a sharp departure from longstanding practice.

112.    The Trump Administration also departs from past practice insofar as DED was terminated without consulting Liberian government officials. Previously, under the Clinton Administration, the INS permitted the expiration of DED for Salvadoran nationals after

consulting with both U.S. agencies and government officials from El Salvador.[76] In contrast, nothing in President Trump's memorandum terminating DED referenced any consultation with Liberian government officials.

113.    Additionally, multiple heavily-investigated articles and reports make clear that Liberia cannot handle the immediate return of thousands of Liberian nationals due to its weak economy and limited infrastructure. These conditions largely mirror those considered by previous administrations when Liberians were granted TPS or DED. According to USA Today's GDP analysis, Liberia is the poorest country in the world.[77] The return of Liberian nationals would also harm the Liberian economy given the country's dependence on money sent by those living outside of the country. Most of the remittances are sent from Liberians living in the United States.[78] In 2015, Liberians in the United States sent roughly $328 million in remittances.[79] In 2016, remittances accounted for roughly 31% of Liberia's GDP.[80]

114.    Even more telling is information provided by Congress and U.S. agencies that confirm Liberia's struggling economy and limited infrastructure.  Shortly before Defendant Trump announced the termination of DED in March 2018, members of Congress issued a bipartisan letter urging that DED be extended for at least another three years.[81] The letter recognized that:

---

[76] News Release, American Immigration Lawyers Association (Dec. 2, 1994) https://www.aila.org/infonet/ins-ded-for-salvadorans-expires.

[77] John Harrington, From the Solomon Islands to Liberia: These are the 25 poorest countries in the world, *USA Today*, Nov. 29, 2018, https://www.usatoday.com/story/money/2018/11/29/poorest-countries-world-2018/38429473/.
[78] GAO, Remittances to Fragile Countries, Mar. 2018, at 14-15, https://www.gao.gov/assets/700/690546.pdf.
[79] *Id.*
[80] Rishi Iyengar, *Migrant workers will send home $450 billion this year*, *CNN Business*, Jun. 15, 2017, https://money.cnn.com/2017/06/15/news/economy/migrant-workers-global-remittances/index.html.
[81] Press Release, *50+ Bipartisan Members of Congress Urge Trump to Extend Deferred Enforced Departure (DED) for Liberians*, America's Voice, Mar. 26, 2018, https://americasvoice.org/press_releases/50-bipartisan-members-congress-urge-trump-extend/.

> [T]here are still serious concerns about the nation's ability to maintain peace and deliver essential services to its population. A flood of Liberians from the United States could overburden the country's limited infrastructure and reverse the advances the nation of Liberia has made. It would also stem the crucial socio-economic investment and assistance that Liberians in our country provide through remittances to their relatives in Liberia.[82]

115.    On March 1, 2019, fifty members of Congress sent President Trump a letter urging him to reinstate DED immediately to "prevent anxiety and legal uncertainty within our Liberian-American communities."[83] The letter expressed concerns that

> While few in number, an influx of Liberians from the United States could overburden the country's limited infrastructure and reverse the nascent advances that the Liberian people and government have made. Deporting this population would also prevent its members from contributing to the crucial private sector investment and socio-economic assistance that they have long provided in the form of remittances to their relatives in Liberia.[84]

116.    Indeed, information provided by the Trump Administration's own agencies cast doubt on the President's conclusions about the program. USAID's profile on the effects of the Ebola epidemic in Guinea, Sierra Leone, and Liberia outlines how the virus "derailed lives and livelihoods in some of the most vulnerable countries in world" and continues "to have direct, negative impacts in all three countries."[85] These negative impacts include "a retraction in previous development gains; severely disrupted economic and social activity; and a decline in the delivery of essential government services."[86]

117.    The U.S. Department of State has also reported on the adverse economic effects of the Ebola outbreak. For example, in July 2018, the State Department acknowledged that "the Ebola epidemic and the concurrent global downturn in prices of Liberia's principal exports have

---

[82] *Id.*

[83] Press Release, *50 Members of Congress Call for Extension of Protected Status for Liberians Living in the United States*, Congressional Offices of Donald M. Payne (Mar. 1, 2019), https://payne.house.gov/press-release/50-members-congress-call-extension-protected-status-liberians-living-united-states.

[84] *Id.*

[85] Ebola: The Recovery, USAID, https://www.usaid.gov/ebola (last updated May 22, 2018).

[86] *Id.*

also slowed economic growth, drained the government's resources, and delayed development projects."[87]

118.    The State Department has even cautioned U.S. travelers not to rely on the healthcare infrastructure in Liberia:

> Hospitals and medical facilities in Liberia are poorly equipped and are incapable of providing many services. Emergency services comparable to those in the United States or Europe are non-existent, and the blood supply is unreliable and unsafe for transfusion. For serious medical problems, you should consider traveling to the United States, Europe, or South Africa for treatment. Within Liberia, medicines are scarce, often beyond expiration dates, possibly counterfeit, and generally unavailable in most areas. [88]

119.    The Central Intelligence Agency's (CIA) Factbook for Liberia notes that the Ebola epidemic forced the Liberian government to divert "scarce resources to combat the spread of the virus, reducing funds available for needed public investment."[89]  The CIA also recognizes that Liberia is a low-income country that relies heavily on remittances from its diaspora.[90]

120.    Apart from the U.S. government, a World Bank report from October 2018 explained that more than half of all Liberians live in poverty and that the Liberian economy is still "struggling to recover fully from the effects of multiple shocks in recent years; namely, Ebola Virus Disease (EVD) outbreak, collapse of commodity prices, UNMIL withdrawal and the perception of risk associated with the political transition." [91]

---

[87] U.S. Dep't of State, Bureau of African Affairs, *U.S. Relations with Libya: Fact Sheet*, Jul. 20, 2018, https://www.state.gov/r/pa/ei/bgn/6618.htm.
[88] U.S. Dep't of State, Bureau of Consular Affairs, *Liberia International Travel Information*, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Liberia.html (last updated Jan. 7, 2019).
[89] Central Intelligence Agency World Factbook, *Economy: Liberia*, https://www.cia.gov/library/publications/the-world-factbook/geos/li.html (last updated Feb. 17, 2019).
[90] *Id.*
[91] World Bank Group, Political and Security Update [Liberia], https://www.worldbank.org/en/country/liberia/overview (last updated Oct. 12, 2018).

121.    Additionally, the human rights situation in Liberia calls into question the ability of Liberian DED holders to safely return to the country. As noted above, the State Department's most recent human rights report on Liberia details:

> The most significant human rights issues included extrajudicial killings by police; police abuse, harassment, and intimidation of detainees and others; arbitrary arrest and detention; press harassment; official corruption; lack of accountability in cases of violence against women and children, including rape, domestic violence, and female genital mutilation/cutting (FGM/C); criminalization of same-sex sexual conduct; and trafficking in persons. Impunity remained a serious problem for individuals who committed atrocities during the civil wars, as well as for those responsible for current and continuing crimes, despite intermittent and limited government attempts to investigate and prosecute officials accused of current abuses, whether in the security forces or elsewhere in the government. Corruption at all levels of government continued to undermine public trust in state institutions.[92]

122.    LGBTI individuals also face risks in the country. Liberian law prohibits sexual activity among same-sex partners. The State Department's human rights report also shared reports that LGBTI individuals faced "difficulty in obtaining redress for crimes committed against them, including at police stations, because those accused of criminal acts used the victim's LGBTI status as a defense."[93]

123.    Additionally, the Trump Administration failed to consider the effect of Liberian law on the U.S. citizen children of DED holders including Plaintiffs C.B, AL. K, D.D, D.K, AI. K, AD. K, O.D., A.D., and O.S. These U.S. citizen children face the unconstitutional choice of remaining in the United States while being separated from their Liberian parents or relocating to an unsafe country.

---

[92] U.S. Dep't of State, Bureau of Democracy, Human Rights and Labor, *Liberia 2017 Human Rights Report*, at 1 https://www.state.gov/documents/organization/277259.pdf.
[93] *Id.* at 29.

124.    Liberia forbids dual citizenship.[94]  Any U.S. citizen child of a Liberian DED

holder must renounce his or her U.S. citizenship to enjoy the rights conferred on Liberian

citizens.[95]

*Harmful Effects of Defendants' Discriminatory Actions*

125.    Defendant Trump's pattern of discriminatory comments towards immigrants from

African countries conveys a clear, painful message: immigrants from these countries are

undesirable based on their race, ethnicity and national origin. The president does not want

immigrants of color in the United States, but he welcomes immigration from predominantly

white countries such as Norway.

126.    Because of these discriminatory attitudes, Defendants Trump and DHS have made

immigration decisions that target immigrants of color and would result in their detention and

removal from the United States. This includes the termination of DED for Liberians who were

granted humanitarian relief by previous administrations.

127.    The termination of DED has violated the constitutional rights of Liberian DED

holders and their U.S. citizen children. Additionally, the termination of DED has harmed or will

imminently harm the dignity and wellbeing of Liberian DED holders and their U.S. citizen

children, including Plaintiffs.

128.    Liberian DED holders will be forced to leave the United States after legally

residing in the country for decades. Many are home owners, economically productive taxpayers,

and active in their communities. They will be forced to abandon the assets they have built here

through hard work, including their property and pensions.

---

[94] Robtel Neajai Pailey, *The Struggles for Liberian Citizenship*, Al Jazeera (Jan. 29, 2019),
https://www.aljazeera.com/indepth/opinion/struggles-liberian-citizenship-190128050949269.html
[95] *Id.*

129.    Many Liberians living in the United States – including terror survivor Plaintiff

Wilson – fled Liberia because they were targeted and persecuted during the civil war. Notorious

and brutal warlords are now part of the Liberian government. For example, Prince Johnson, a

former rebel leader who was allied with convicted war criminal Charles Taylor and whose

threats to arrest foreigners led U.S. marines to evacuate the U.S. Embassy in Monrovia during

the civil war,[96] is now a Liberian senator who has influenced the election of the past two

Liberian presidents, and has actively blocked efforts to establish a war crimes tribunal in

Liberia.[97]  George Boley, an ex-warlord who was deported from the United States in 2012 for

extrajudicial killings and recruitment of child soldiers, now serves in Liberia's House of

Representatives.[98] Many Liberian DED holders, particularly those whose families were active in

previous administrations, face violent retaliation if they return to Liberia.

130.    The U.S. citizen children of Liberian DED holders also face extreme hardship.

They face the searing and unconstitutional decision of either being separated from their

parent(s) and remaining in the United States, or moving with their parent(s) to Liberia, a

country that is unsafe and foreign to them. None of the U.S. citizen Plaintiffs have ever been to

Liberia.

131.    Furthermore, U.S. citizen children who relocate to Liberia may face legal

difficulties that could affect their ability to survive in the new country. For example, Liberian

---

[96] Eric Schmitt, Man in the News; A Foe to Be Feared: Prince Yormie Johnson, Sept. 11, 1990, https://www.nytimes.com/1990/09/11/world/man-in-the-news-a-foe-to-be-feared-prince-yormie-johnson.html.
[97] Alvin Worzi, *Is Prince Johnson still a kingmaker?*, LIBERIAN OBSERVER, Oct. 25, 2017, https://www.liberianobserver.com/news/is-prince-johnson-still-a-kingmaker/.
[98] News Release, U.S. Immigration and Customs Enforcement, Liberian human rights violator removed from US (Mar. 29, 2012) (https://www.ice.gov/news/releases/liberian-human-rights-violator-removed-us); John H. T. Stewart, *George Boley sues GoL for pension benefits*, LIBERIAN OBSERVER (Sept. 10, 2018), https://www.liberianobserver.com/news/george-boley-sues-gol-for-pension-benefits/.

law forbids dual citizenship, meaning that any U.S. citizen child of a Liberian DED holder must

renounce his or her U.S. citizenship to enjoy the rights conferred on Liberian citizens.[99]

132.    The termination of DED will also harm local economies and industries throughout

the United States. For example, a large number of Liberians in the United States reside in

Massachusetts and Minnesota. After President Trump announced the termination of DED,

Minnesota Governor Mark Dayton sent a letter to President Trump urging him to reconsider his

decision. Governor Dayton described how a large number of Liberian Americans in Minnesota

work in the healthcare industry, and if they are forced to leave the country, there will be a

workforce crisis in the state's health care industry.[100] Similar outcomes are expected in

Massachusetts, where many Liberians work in the healthcare industry including Plaintiffs

Kroma and Bongay.

133.    Finally, Plaintiffs would lose access to life-saving medical care and effectively be

sentenced to die of diseases and medical conditions that would be easily prevented, treated, or

even cured in the United States.

## CLAIMS

## COUNT 1

### Violation of Equal Protection – Fifth Amendment

### Against Defendant Trump by All DED-Holding Plaintiffs

134.    Plaintiffs incorporate by reference all allegations stated above.

135.    The Due Process Clause of the Fifth Amendment incorporates a guarantee of

equal protection and prohibits unjustified discrimination by federal actors. *Bolling v. Sharpe*,

---

[99] George Weah vows to change Liberia's citizenship laws, BBC News, Jan. 30, 2018,
https://www.bbc.com/news/world-africa-42871741.
[100] *Minnesota Governor's Letter to Trump: Reinstate DED for Liberians, Find Pathway for Dreamers*, Fox 9, Mar.
29, 2018, http://www.fox9.com/news/minnesota-governor-liberians-ded-trump-letter.

347 U.S. 497, 498–99 (1954). Equal-protection principles under the Fourteenth Amendment apply to federal actors under the Fifth Amendment. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

136.   Defendant Trump's decision to terminate DED for Liberian immigrants living in the United States violates the Fifth Amendment because it constitutes intentional discrimination against Liberians on the basis of race, ethnicity, and/or national origin. President Trump's decision marked an unjustified departure from the longstanding practice of extending DED due to destabilizing conditions in Liberia. Instead, this decision was motivated by discrimination against immigrants of color, and Black immigrants in particular, including Liberians. Government conduct violates equal protection guarantees if a discriminatory purpose was a motivating factor. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

137.   A discriminatory purpose may be inferred from Defendant Trump's departure from the practice of previous administrations; the fact that conditions in Liberia favor extending DED instead of terminating the program; the fact that the decision affects one race more heavily than another; the sequence of events leading to the decision; contemporaneous statements of decision-makers; other actions targeting immigrants of color; and the historical background of the decision. These factors are probative of intentional discrimination. *See id.* at 266-68.

138.   An inference of race, ethnicity, and/or national origin discrimination is supported by Defendant Trump's disparaging statements against immigrants of color as discussed in the paragraphs above. His discriminatory attitudes motivated his decision to cancel DED.

139.    As a direct and proximate result of the termination of DED by Defendant Trump and/or his agents, Plaintiffs have been or will be imminently deprived of their rights under the Fifth Amendment to the U.S. Constitution.

## COUNT 2

### Violation of Due Process (Irrational Government Action) – Fifth Amendment

### Against Defendant Trump by All DED-Holding Plaintiffs

140.    Plaintiffs incorporate by reference all allegations as stated above.

141.    The Due Process Clause of the Fifth Amendment prohibits irrational government action. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 532-33 (1973).

142.    Defendant Trump failed to carry out his duties consistent with the Due Process requirements of the Fifth Amendment.

143.    Defendant Trump's discriminatory decision to terminate DED for Liberians deprives Plaintiffs of the appropriate and non-discriminatory process due to them under the law.

## COUNT 3

### Violation of Due Process (Right to Family Integrity)– Fifth Amendment

### Against All Defendants by U.S. Citizen Children Plaintiffs

144.    Plaintiffs incorporate by reference all allegations as stated above.

145.    The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law." Const. amend. V.

146.    The guarantee against the deprivation of liberty without due process bars the government from infringing on certain "fundamental" liberty interests, regardless of the procedures involved, unless the action is "narrowly tailored to serve a compelling state

interest." *Reno v. Flores*, 507 U.S. 292, 301–02 (1993). Four such fundamental rights are implicated here.

147.    First, the Plaintiffs here who are school-aged U.S. citizens have a right to live in the United States. To compel them to live abroad at any time, let alone in their formative years, would deny them a core aspect of their liberty protected by the Fifth Amendment. *See, e.g.*, *Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922).

148.    Second, for at least so long as these U.S. citizen Plaintiffs remain minors, they have a fundamental right protected by both the First and Fifth Amendments to live with and be raised by their parents. *E.g.*, *Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977); *Board of Dirs. v. Rotary Club*, 481 U.S. 537, 545 (1987).

149.    Third, the government's decision to end the lawful immigration status of their parents impinges upon the U.S. citizen Plaintiffs' constitutionally-protected liberty interests. These U.S. citizen children have a legally cognizable interest in not being compelled to choose between two alternatives when each option will deprive them of a substantial, constitutionally-protected aspect of liberty. *See United States v. Jackson*, 390 U.S. 570 (1968); *cf. New York v. United States*, 505 U.S. 144, 176 (1992).

150.    Fourth, if forcibly removed to Liberia with their parents, U.S. citizen Plaintiffs will be forced to give up their U.S. citizenship because Liberia does not recognize dual citizenship. U.S. citizen Plaintiffs were born in the United States and have an absolute and fundamental right to their citizenship under the Fifth and Fourteenth Amendments.

151.    In abridging these fundamental constitutional rights, Defendants have articulated no substantial governmental interest and have failed to tailor their action to promote any legitimate interest they may have. Nowhere in the memorandum announcing the termination of

DED have Defendants identified any risk to the interests of the United States that would follow from allowing the school-aged U.S. citizen children to remain in the United States with their DED holder parents until the children reach the age of majority.

152.    Plaintiffs suffer irreparable injury resulting from the termination of the DED designations.

## COUNT 4

### Declaratory Judgment 28 U.S.C. § 2201

### Against All Defendants by All Plaintiffs

153.    Plaintiffs incorporate by reference all allegations as stated above.

154.    For the reasons stated above, Defendants violated the U.S. Constitution and other laws.

155.    Plaintiffs seek a declaration to that effect.

156.    Defendants' illegal actions have injured and will continue to injure Plaintiffs and those similarly situated by subjecting them to unlawful discrimination on the basis of their race, ethnicity and/or national origin. This includes dignitary harms that attach to unlawful discrimination.

157.    Plaintiffs will be imminently subjected to the harms and indignities inherent in immigration detention and removal.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

1. Declaring that Defendant Trump's actions to terminate DED for Liberians in the United States violate the Fifth Amendment of the U.S. Constitution and are, therefore, void and without legal force or effect.

2. Enjoining and restraining all Defendants, their agents, servants, employees, attorneys, and all persons in active concert with them from implementing or enforcing the termination of the DED program for Liberians, and from taking any further action to terminate DED for Liberians in violation of the U.S. Constitution or other applicable laws.

3. Awarding Plaintiffs reasonable attorneys' fees and the cost of maintaining this action such as court costs, expert fees, and other expenses.

4. All other necessary and appropriate relief that justice may require.


Dated: March 8, 2019                                    Respectfully submitted,

                                              _____/s/ Oren Nimni_____
                                              Oren Nimni (BBO #691821)
                                              Oren Sellstrom (BBO# 569045)
                                              Iván Espinoza-Madrigal (pro hac vice forthcoming)
                                              LAWYERS FOR CIVIL RIGHTS
                                              61 Batterymarch Street, 5th Floor
                                              Boston, Massachusetts 02110
                                              (617) 988-0624

                                              _____/s/Jon Greenbaum_____
                                              Jon Greenbaum (pro hac vice forthcoming)
                                              Dorian L. Spence (pro hac vice forthcoming)
                                              Maryum Jordan (pro hac vice forthcoming)
                                              LAWYERS COMMITTEE FOR CIVIL RIGHTS
                                              UNDER LAW
                                              1500 K St. NW, Suite 900
                                              Washington, DC 20005
                                              (202) 662-8600