# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| AFRICAN COMMUNITIES TOGETHER, a membership organization; UNDOCUBLACK NETWORK, a membership organization; DAVID KROMA; MOMOLU BONGAY; OTHELLO A.S.C. DENNIS; YATTA KIAZOLU; CHRISTINA WILSON; JERRYDEAN SIMPSON; C.B., AL. K., D.D., D.K., AI. K., AD. K. by and through their father and next friend DAVID KROMA; O.D., and A.D., by and through their father and next friend OTHELLO A.S.C. DENNIS; O.S. by and through his mother and next friend JERRYDEAN SIMPSON | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| DONALD J. TRUMP, President of the United States in his official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN NIELSEN, Secretary of the U.S. Department of Homeland Security in her official capacity; | ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) |

Civil Action No. 19-cv-10432

**MEMORANDUM OF LAW SUPPORTING MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

FACTUAL BACKGROUND...............................................................................................2

    I.      Humanitarian Relief For Liberians, TPS and DED.............................................2

    II.     Defendant Trump's Termination of DED for Liberians.......................................5

       A. Defendant Trump's Decision in 2018 to Terminate DED Designation for
           Liberia Was Unjustified and Departed From A Long Established Practice of
           Extending DED Protections for Liberian Nationals...............................................5

       C. Defendant Trump Harbors Deep Racial Animus
           Toward Immigrants of Color...................................................................................6

       D. The Termination of DED for Liberians Will Uproot Lives and Tear Apart
           Families....................................................................................................................7

ARGUMENT.......................................................................................................................8

    I.      Plaintiffs Are Likely To Succeed On The Merits Of Their Constitutional
          Claims.....................................................................................................................9

       A. Racially Discriminatory Animus Against Non-White, Non-European
           Immigrants Was a Motivating Factor in Defendants' Termination of DED.........9

       B. Defendants' Termination of DED Violates the Due Process Rights of U.S.
           Citizen Children Plaintiffs...................................................................................13

    II.     Liberian DED Holders And Their U.S. Citizen Children Are Currently
          Suffering Profound And Irreparable Harm and Absent Relief,
          Will Suffer Further Irreparable Harm..................................................................16

    III.    The Balance of Equities And Public Interest Weigh In Favor Of Injunctive
          Relief ....................................................................................................................19

CONCLUSION.................................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Amoco Prod. Co.*, 480 U.S. 531 (1987) .................................................................................... 19

*Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977) ................................ 9, 10

*Ave. 6E Invs., LLC v. City of Yuma, Ariz.,* 818 F.3d 493 (9th Cir. 2016) ................................ 11

*Bourgeois v. Peters*, 387 F.3d 1303 (11th Cir. 2004) ............................................................... 15

*Boyd v. United States*, 116 U.S. 616 (1886) ............................................................................. 14

*Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520 (S.D.N.Y. 2006) ........................................ 12

*Dunkin' Donuts Franchised Rest. LLC v. Wometco Donas Inc.*, 53 F. Supp. 3d 221 (D. Mass. 2014) ...... 19

*Garrity v. New Jersey.*, 385 U.S. 493 (1967) ............................................................................ 15

*Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151 (1st Cir. 1998) .............................................. 10

*Lee Sing Far v. United States*, 94 F. 834 (9th Cir. 1899) ......................................................... 13

*Lefkowitz v. Cunningham*, 431 U.S. 801 (1977) ....................................................................... 15

*Loving v. Virginia*, 388 U.S. 1 (1967) ...................................................................................... 14

*Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68 (1st Cir. 2004) ................................... 16

*Moore v. City of East Cleveland*, 431 U.S. 494 (1977) ............................................................ 14

*N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Circ. 2015) .................................. 12

*Nguyen v. I.N.S.*, 533 U.S. 53 (2001) ........................................................................................ 13

*Pierce v. Soc'y of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510 (1925) ............ 14

*Pittsley v. Warish,* 927 F.2d 3 (1st Cir. 1991) .......................................................................... 14

*Quilloin v. Walcott*, 434 U.S. 246 (1978) ................................................................................. 13

*Reno v. Flores*, 507 U.S. 292 (1993) ........................................................................................ 13

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.* 102 F.3d 12 (1st Cir. 1996) ............................. 9

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996) .......................... 16

*Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 864 F. Supp. 246 (D. Mass. 1994) ........... 19

*Simmons v. United States*, 390 U.S. 377 (1968) ....................................................................... 14

*Stout by Stout v. Jefferson Cty. Bd. of Educ.*, 882 F.3d 988 (11th Cir. 2018) ........................... 11

*United States v. Jackson*, 390 U.S. 570 (1968) ........................................................................ 15

*United States v. Wong Kim Ark*, 169 U.S. 649 (1898) .............................................................. 13

*Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294 (1967) ..................................................... 15

*Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982) ................................................... 10

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ................................................................................. 14

## Statutes

Immigration Act of 1990, 8 U.S.C. § 1254 .................................................................................. 5

# INTRODUCTION

Plaintiffs bring this action to challenge the Trump Administration's imminent termination of Deferred Enforced Departure (DED) for thousands of Liberians lawfully residing, working, and raising U.S. citizen children in the United States, many for nearly three decades. DED is a life-saving humanitarian program providing immigration relief and protection to foreign nationals whose countries of origin have experienced armed conflict, civil unrest, natural disasters, or public health crises.

Liberian nationals were first granted DED in 1999. Through a Presidential Memorandum, issued on March 27, 2018, Defendant Trump announced the abrupt and unjustified end of DED protections for Liberian immigrants. Ex. 1 (Presidential Memorandum for the Secretary of State and the Secretary of Homeland Security).[1] After twenty years of providing life-saving relief to this vulnerable community, the DED program will terminated on March 31, 2019, subjecting each Liberian with DED protection to immediate immigration detention and removal. *Id.*

Though the Presidential Memorandum claims that conditions in Liberia have improved sufficiently enough to warrant the termination of DED, this claim is unsubstantiated and contrary to the facts. *Id*. In truth, Defendant Trump's rationale is a pretext for a discriminatory immigration agenda. The decision to terminate DED for Liberians was rooted in racial animus.

Plaintiffs are Liberian immigrants who will be irreparably harmed with the termination of DED, their U.S. citizen children, and membership-based non-profit organizations serving Liberian families across the country. Plaintiffs respectfully request a preliminary injunction preventing the Trump Administration from arbitrarily separating Liberian parents from their U.S. citizen children, and improperly removing families who have lawfully lived, worked, and raised

---

[1] All numbered exhibits are described in more detail in the Declaration of Oren Nimni, attached as Exhibit A.

children in the United States for nearly three decades.  Lives are at risk. Absent emergency relief

from this Court, Plaintiffs will face imminent detention and deportation, and loss of their homes,

jobs, communities, and families.

## FACTUAL BACKGROUND

### I.      Humanitarian Relief For Liberians – TPS and DED

Since the 1980's, Liberia has experienced a cascading wave of armed conflicts that has

claimed the lives of over 250,000 civilians and destroyed the Liberian economy. Ex. 2 (BBC,

Liberia Country Profile, January 22, 2018) at 2. Recognizing the harsh reality on the ground in

Liberia, four previous Administrations have extended humanitarian relief programs to Liberian

nationals lawfully residing in the United States. For nearly three decades, Liberian immigrants

have lived, worked and built families in this country under the protection of humanitarian relief

programs, including Temporary Protected Status (TPS) and DED.

The guidelines for TPS are found in the Immigration Act of 1990, 8 U.S.C. §

1254a(b)(1), which authorizes the Attorney General (now the Secretary of the Department of

Homeland Security) to extend TPS to foreign nationals who cannot return to their country of

origin because of war, civil unrest or a natural disaster. *Id.*

DED is similarly a humanitarian relief program that prohibits the removal of foreign

nationals because of armed conflict, civil unrest, natural disaster, or other turmoil. However,

DED differs in that the President authorizes the extension of the program. Ex. 3 (Congressional

Research Service, Temporary Protected Status: Overview and Current Issues, Oct. 10, 2018) at 2,

9. Liberia is currently the only country whose citizens are subject to a DED order.

Liberians were first granted TPS in 1991 by Attorney General Dick Thornburgh, because

of "ongoing armed conflict within Liberia" and "extraordinary and temporary conditions in

Liberia that prevent… nationals of Liberia from returning to Liberia in safety." Ex. 4 (56 FR

12745, Mar. 27, 1991) 12746, 12747. Subsequent Attorneys General extended Liberia's TPS

until 1999 when the armed conflict ended and Attorney General Reno terminated the

designation. Ex. 5 (64 FR 41,463, July 30, 1999).

Soon after TPS ended, Liberians nationals were granted DED for the first time by

President Clinton.  Ex. 6 (Statement on Deferring Deportation for Liberian Refugees, Sept. 28,

2000).  Even though internal conflict had seemingly ceased, the fragile political and economic

climate in Liberia provided compelling reasons to assign Liberians DED. *Id.*  President Clinton's

successor, President George W. Bush also found compelling reasons to extend DED to Liberians

through September 2002, citing the "fragile political and economic climate" in the country. Ex. 7

(Presidential Memorandum on Measures Regarding Certain Liberians in the United States, Sept.

25, 2001).

Armed conflict and widespread violence re-erupted in Liberia in 2002, forcing an

additional 75,000 Liberians to flee and displacing at least 120,000 more. Ex. 8 (67 FR 61664, at

61665 Oct. 1, 2002). Attorney General Ashcroft again designated Liberia as a TPS country,

concluding that the armed conflict, its destabilizing effects on the economy, standards of living,

and other humanitarian repercussions prevented the safe return of Liberian nationals. *Id.*

In 2004, Liberia was granted TPS again (this time through DHS) because of

"extraordinary and temporary conditions." [2] Ex. 9 (69 FR 52297, Aug. 25, 2004). Immediately

following the expiration of the 2004 designation, DHS extended TPS to Liberia again in 2005.

Ex. 10 (70 FR 48176, Aug. 16, 2005).

---

[2] When TPS was enacted in 1990, most immigration-related functions, including designating countries for TPS, fell
under the authority of the Attorney General. With the creation of the Department of Homeland Security in 2002
(P.L. 107-296), most of the Attorney General's immigration-related authority transferred to the Secretary of DHS as
of March 1, 2003. Ex. 3. at 2 n.8.

In 2006, DHS Secretary Michael Chertoff determined that TPS should be terminated, and that the termination would take effect on October 1, 2007. Ex. 11 (71 FR 55000, Sept. 20, 2006). However, before the TPS program expired, President Bush granted DED to Liberians because "the political and economic situation in Liberia continue[s] to be fragile." Ex. 12 (Memorandum for Secretary of Homeland Security, Sept. 12, 2007). President Bush also found that "Liberia is struggling to implement reconstruction and economic stabilization programs for the population, including the thousands of former Liberian refugees who have returned from the West African region and elsewhere." *Id*. DED for Liberia was extended for an additional 18 months from October 1, 2007. *Id*.

President Obama followed the precedent set by Presidents Clinton and Bush, extending DED for Liberians immediately after the expiration of the previous order in 2009. Ex. 13 (Presidential Memorandum Regarding Deferred Enforced Departure For Liberians, Mar. 23, 2009). Although armed conflict in Liberia officially ended in 2007, the practical reality in Liberia continued to be one of vast political turmoil and a weak, destabilized economy. As a result, in the following years, President Obama consistently and continuously granted DED to Liberians because of the conditions in the country. Exs. 14 - 17 (Filing Procedures and Automatic Extension of Employment Authorization Notices).

Once again, in 2014, President Obama, granted a 24-month extension to DED holders in the United States. Ex. 18 (79 FR 59286, Oct. 1, 2014).

Liberia broke into disarray again in 2014 with the largest and longest Ebola epidemic in history. Ex. 19 (Ebola: Mapping Outbreak, BBC, Jan. 14, 2016). The deadly and rapidly spreading virus hit Liberia harder than any other country, infecting over ten thousand Liberians in the span of two years. *Id*.

In 2014, in response to the Ebola epidemic, DHS Secretary Jeh Johnson granted TPS for Liberia due to the dire public health crisis, which overwhelmed Liberia's health care system and food supplies. Ex. 20 (79 FR 69502, Nov. 21, 2014). This latest TPS designation continued through the end of the Ebola outbreak in 2016. Ex. 21 (81 FR 66059, Sept. 26, 2016).

Following the containment of the Ebola outbreak, Secretary Johnson terminated TPS. But recognizing the conditions that persisted in the country, President Obama once again extended humanitarian relief protections for Liberians via DED.  Ex. 22 (Memorandum on Deferred Enforced Departure for Liberians, Sept. 28, 2016).  President Obama's 2016 DED order extended through the end of his term of office, and expired on March 31, 2018. *Id.*

## II.      Defendant Trump's Termination of DED

### A.   Defendant Trump's Decision in 2018 to Terminate DED Designation for Liberia Was Unjustified and  Departed From A Long Established Practice of Extending DED Protections for Liberian Nationals

On March 27, 2018, days before the expiration of President Obama's DED extension, Defendant Trump announced the termination of DED for Liberians effective March 31, 2019. Ex. 1.  Defendant Trump claimed that the DED program is no longer necessary because the country "is no longer experiencing armed conflict and has made significant progress in restoring stability and democratic governance." *Id.*

Contrary to Defendant Trump's claims, the effects of prolonged armed conflicts and the Ebola epidemic continue to keep Liberia unstable and unsafe.  A GDP analysis confirms that Liberia is the poorest country in the world. Ex. 23 (USA Today, Nov. 29, 2018) at 7. The forced return of thousands of Liberian DED holders is tantamount to a death sentence given the bleak reality of the country's decimated infrastructure. Ex. 24 (Africa Today, Apr. 5, 2017).

Members of Congress have taken note of the instability in Liberia issuing a bipartisan letter in March 2018 urging the extension of DED for at least another three years. Ex. 25 (Bipartisan Congressional Letter, Mar. 26, 2018).

Defendant Trump's own agencies have come to a similar conclusion as to the issues in Liberia. The Department of State noted the dangers of travelling to Liberia in a recent human rights report that detailed, "extrajudicial killings by the police… criminalization of same-sex sexual conduct and trafficking in persons." Ex. 26 (Liberia Human Rights Report 2017). This report was released on April 20, 2018, just three weeks after Defendant Trump's termination of the DED program. Ex. 26A (Remarks on the Release of the 2017 Country Reports on Human Rights Practices). Liberian DED holders and their U.S. citizen children would immediately face these dangers if forced to return to Liberia.

### B. Defendant Trump Harbors Deep Racial Animus Toward Immigrants of Color

Defendant Trump has an extensive record of making racially-charged comments about African countries and framing his Administration's immigration policy in terms that are both covertly and overtly racist.

During the first year of his presidency as he often targeted non-white, non-European immigrants. Defendant Trump disparaged immigrants from countries in Africa claiming that once seeing the United States, African immigrants would never "go back to their huts." Ex. 28 (The New York Times, Dec. 23, 2017).

On January 11, 2018, Defendant Trump asked "'Why are we having all these people from shithole countries come here?'" in reference to TPS designations for immigrants from … African countries. Ex. 29 (New York Times, Jan. 11, 2018). He then suggested that the United

6

States should instead bring more people in from countries "such as Norway," which has a predominantly white population. *Id.*

Defendant Trump's bigotry was again on full display as recently as February 27, 2019, when the Defendant's former attorney, Michael Cohen, testified before Congress that the Defendant asked him if he "could name a country run by a black person that wasn't a 'shithole.'" Ex. 30. (New York Times, Feb. 27, 2019).

### C. The Termination of DED for Liberians Will Uproot Lives and Separate Families.

The consequences of Defendant Trump's decision to terminate DED protections are far-reaching and have had an immediate effect on Plaintiffs, some of whom have lived in the United States under the protection of humanitarian relief programs for the last two decades. During this time, Plaintiffs have enriched communities, established careers, started families, and developed friendships.

For example, Plaintiff Othello Dennis, lives in Worcester, Massachusetts where he "works with kids in after school programs" as a volunteer. Ex. 31 (Decl. of Othello Dennis) ("Dennis Decl.") ¶ 8. Plaintiff Yatta Kiazolu arrived in the United States 20 years ago when she was six years old. Ex. 32 (Decl. of Yatta Kiazolu) ("Kiazolu Decl.") ¶ 3. Having spent the vast majority of her life in this country, she credits DED for giving her the ability to pursue a PhD. at UCLA. *Id.* at ¶16. Plaintiff Christina Wilson is a staple in her community, she "tutors students", "cares for the elderly" and provides her neighbors with supplies like "food, toiletries and clothes." Ex. 33 (Decl. of Christina Wilson) ("Wilson Decl.") ¶ 13.

The termination of DED threatens Plaintiffs with immediate forcible removal and compels them to return to a country halfway around the world to a land they have not seen in a generation. Plaintiff David Kroma has not lived in Liberia in 20 years. Ex. 34 (Decl. of David

Kroma) ("Kroma Decl.") ¶ 10 A return to Liberia would be "devastating" for him and his family because he stands to lose his "job, home, and community." *Id*. at ¶¶ 10, 12. Plaintiff Kiazolu's only direct connection to Liberia was a visit when she was four years old and she "doesn't remember *anything* there." Kiazolu Decl. ¶ 4. Plaintiff Bongay has spent the last 20 years building a new life in this country and has not been back to Liberia since coming to the United States. Ex. 35 (Decl. of Momolu Bongay) ("Bongay Decl.") ¶ 11.

For Plaintiffs Wilson and Dennis, forced deportation to Liberia, could be the difference between life and death given the country's failing healthcare system. Plaintiff Dennis has "serious medical conditions that require treatment" and is deeply concerned about the lack of medical care in Liberia. Dennis Decl. ¶ 16. Plaintiff Wilson is just as concerned about access to a quality healthcare facility that can treat her diabetic condition. Wilson Decl. ¶ 23.

Plaintiffs C.B., AL. K., D.D., D.K., AI. K., AD. K., O.D., A.D., and O.S, who are U.S. citizen children of DED holders, will experience equally devastating harms if the DED termination is allowed to go into effect. These Plaintiffs will be forced to make an impossible choice – to decide whether to move with their parents to Liberia, a country they have never seen and renounce their U.S. citizenship[3] or to be torn away from their parents and remain in the United States. Kroma Decl. ¶ 15; Dennis Decl. ¶ 13 – 14; Ex. 36 (Declaration of Jerrydean Simpson) ("Simpson Decl.") ¶¶ 20, 23.

## ARGUMENT

With this motion for preliminary injunctive relief, Plaintiffs seek only to preserve the *status quo* for the pendency of this case.  The court considers a four-part framework to determine whether to grant preliminary injunctive relief. Under the framework, courts consider (1) the

---

[3] Liberia grants important rights only to citizens and does not recognize dual citizenship. Ex. 37 (Al Jazeera, Jan. 29, 2019)

likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. *See Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996). Because Plaintiffs clearly satisfy each of these elements, this Court should grant injunctive relief.

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS.

### A. Racially Discriminatory Animus Against Non-White, Non-European Immigrants Was a Motivating Factor in Defendants' Termination of DED.

Plaintiffs are likely to succeed on the merits of their Fifth Amendment Equal Protection and Due Process claims. This requires showing that a factor motivating Defendant Trump's decision to terminate DED for Liberians was race. To prevail, Plaintiffs need only show that discriminatory purpose was a "motivating factor" for the challenged action. *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 265–66 (1977). Plaintiffs are likely to succeed on this claim.

Precedent directs this Court to conduct "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," starting with the (non-exhaustive) factors identified in *Arlington Heights*, which include:

(1) "[t]he impact of the official action—whether it bears more heavily on one race than another . . . may provide an important starting point";

(2) "[t]he legislative or administrative history may be highly relevant, especially when there are contemporaneous statements" of decision-makers;

(3) "[t]he historical background of the decision";

(4) "[t]he specific sequence of events leading up to the challenged decision"; and

(5) "[d]epartures from the normal procedural sequence."

*Id*. at 266-68. *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168–69 (1st Cir. 1998). Each of these factors in isolation suggests discriminatory animus; cumulatively, the evidence is overwhelming.

*First*, Plaintiffs can unquestionably demonstrate discriminatory impact. The termination of DED *exclusively* harms Black immigrants.

*Second*, statements made by Defendant Trump are highly relevant because he wields the authority to extend or terminate DED. Defendant Trump's bigoted statements against non-white immigrants are catalogued in detail above and in the complaint. His references to immigrants as "people from shithole countries" and stated preferences for more immigrants from predominantly white countries such as Norway are telling – especially because Defendant Trump's termination of DED followed soon after. Ex. 29; Ex. 1.

In *Ramos v. Nielsen, 336* F.Supp.3d 1075 (N.D. Cal. 2018), the Court was asked to determine whether the Trump administration's termination of TPS for Haiti, Sudan, Nicaragua, and El Salvador was motivated by discrimination. In granting the Plaintiffs' motion for preliminary injunction in that case, the Court catalogued these *exact* statements, finding them to be direct "evidence that Defendant Trump harbors racial animus against non-white, non-European aliens." *Id.* at 1100.

Here, these statements should similarly be held to be strong evidence of discriminatory motive. Courts regularly rely on less overt statements as evidence of animus. *E.g.*, *Wash. v. Seattle Sch. Dist*. *No. 1*, 458 U.S. 457, 471 (1982) ("racial nature" of anti-busing initiative apparent where proponents also sought to halt desegregation); *Stout by Stout v. Jefferson Cty. Bd.*

*of Educ.*, 882 F.3d 988 (11th Cir. 2018) (affirming discriminatory intent finding, citing coded language that children from predominantly African American schools look "totally different"); *Ave. 6E Invs., LLC v. City of Yuma, Ariz.,* 818 F.3d 493, 506 (9th Cir. 2016) (reference to Latinos as having large households).

Moreover, Defendant Trump is individually responsible for the decision to terminate or extend DED. Thus, the evidence here is arguably even stronger than the evidence that led to the preliminary injunction in *Ramos* because there is no distance between the President's discriminatory sentiments and the decision to rescind DED for Liberian immigrants.

***Third and fourth***, the historical background and specific sequence of events at issue confirm that discriminatory intent substantially motivated the termination of DED. As discussed in detail above, in the months leading up to the March 27, 2018 termination of DED, Defendant Trump consistently made racist statements when discussing immigrants of color and humanitarian aid programs. Ex. 27 - 30. Notably, within weeks of Defendant Trump's statement that 'conditions have improved' in Liberia, his own State Department issued a report that set forth, in excruciating detail, just how dire conditions in Liberia remain. Ex. 26. The report was released on April 20, 2018, and directly contradicts Defendant Trump's claim that the conditions in Liberia had improved. Even a cursory read of the report – detailing "extrajudicial killings by police; police abuse, harassment, and intimidation of detainees and others; …lack of accountability in cases of violence against women and children, including rape, domestic violence, and female genital mutilation/cutting (FGM/C); criminalization of same-sex sexual conduct; and trafficking in persons." — makes clear that Defendant Trump cannot put forth a justified rationale for the termination of this critical program as the litany of human rights abuses listed in the report persist to this day. *Id.*

11

*Fifth*, the Trump Administration's recent DED termination clearly departed from the long established practice of extending DED to Liberia. When presented with similar circumstances, every Presidential Administration since 1991 has extended some form of humanitarian relief to Liberian nationals. Exs. 4 – 18, 20 – 22.  However now, without cause or explanation, and in a sharp departure from the repeated, continued extensions of DED for Liberia, Defendant Trump seeks to strip approximately 4,000 individuals of their lawful residency and send them to a country that cannot support them - not because conditions have so significantly improved in their homeland, but because of their race and national origin.

Courts have found equal protection violations under *Arlington Heights* based on comparable facts. *See Ramos,* 336 F.Supp.3d 1075 (granting a preliminary injunction on same evidence). In *Ramos*, the Court decided that the Plaintiffs showed a "likelihood of success on the merits" because DHS failed to take the current conditions of a country into account. *Id.* at 1097 - 1098. The Court found this to be a "clear" and "substantial change in practice." *Id.*;  *see also N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204, 227 (4th Cir. 2015) (procedural irregularities, including rushed decision making, truncated debate, and timing of enactment were evidence of discriminatory intent); *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 548 (S.D.N.Y. 2006) (procedural irregularities in police deployment, adoption of municipal resolution, and traffic regulation were evidence of racial animus).

Because of the abundance of evidence, Plaintiffs are likely to establish that discriminatory intent at least partially motivated Defendant Trump's decision to terminate DED. *Arlington Heights*, 429 U.S. at 265–66.

**B.  Defendants' Termination of DED Violates the Due Process Rights of U.S. Citizen Children Plaintiffs**

C.B., AL. K., D.D., D.K., AI. K., AD. K., O.D., A.D., and O.S are the U.S. citizen children of DED recipients. Their parents are their sole providers and caregivers. Simpson Decl. ¶ 21; Dennis ¶ 13. These Plaintiffs are likely to succeed on their Fifth Amendment Due Process Claims. The constitutional right to due process forbids the government from infring[ing] on 'fundamental liberty interests' unless the infringement is narrowly tailored to serve a compelling state interest. *Reno v. Flores*, 507 U.S. 292, 301-302 (1993). Defendant Trump's decision to strip away the parents of minor Plaintiffs was not narrowly tailored and stands to infringe on their substantive due process rights.

It is beyond question that children born in the United States, including Plaintiffs here, have "the absolute right" to reside in this country. *Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001). *see also United States v. Wong Kim Ark*, 169 U.S. 649, 705 (1898) (children born in the U.S. are U.S. citizens, even if their parents are not, and cannot be excluded or denied right of entry). Any action that compels a citizen to live abroad for years severely burdens that right. *Lee Sing Far v. United States*, 94 F. 834, 836 (9th Cir. 1899) (children born in the U.S. are citizens "entitled to all the rights, privileges, and immunities, as such, including [the] right to land and remain in the United States").

Equally powerful is the constitutional right of these U.S. citizen children to live with their parents, free from unwarranted governmental intrusion. As the U.S. Supreme Court has opined: "[w]e have little doubt that the Due Process Clause would be offended [i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and children, without some showing of unfitness." *Quilloin v. Walcott*, 434 U.S. 246, 255 (1978)(internal

quotations omitted). It is well-established that the government may not "intrud[e] on choices concerning family living arrangements" without significant scrutiny. *Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977); s*ee also Pittsley v. Warish*, 927 F.2d 3, 8 (1st Cir. 1991) (recognizing a liberty interest in "preventing government interference with the rearing of young children"). The right to live with a parent is well-established and the Due Process Clause guards against infringements far less severe than the state mandated separation of parent and child at issue here. *See Moore* 431 U.S. at 505-06; *see also Loving v. Virginia*, 388 U.S. 1, 3-6 & n.5, 12 (1967) (implying due process violation not cured by option of moving to adjacent state); *Wisconsin v. Yoder*, 406 U.S. 205, 232-33 (1972) (Amish parents could not be compelled to send their children to public high school, even though doing so did not terminate the parent-child relationship); *Pierce v. Soc'y of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534-35 (1925) (compulsory public school "unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control"). Minor Plaintiffs here have an even more well-guarded right to not be torn from their parents – as their parents would be deported thousands of miles away.

Plaintiffs' Due Process claim is bolstered by the robust constitutional prohibition against forced choice. Courts have held it "intolerable that one constitutional right should have to be surrendered in order to assert another." *Simmons v. United States*, 390 U.S. 377, 394 (1968). Accordingly, the Due Process Clause bars the Government from compelling citizen children to choose between two constitutionally protected due process liberty interests, absent a showing of an important government interest.

The forced choice doctrine is well-established in various contexts. The Supreme Court has long applied it in criminal law, holding that the Government could not force a choice

14

between certain Fourth and Fifth Amendment rights. *Boyd v. United States*, 116 U.S. 616, 621-22 (1886), *overruled on other grounds*; *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294 (1967); *see also Garrity v. New Jersey.*, 385 U.S. 493 (1967). The Court later expanded the doctrine to other sets of rights. *See United States v. Jackson*, 390 U.S. 570 (1968) (right to jury trial and right to life); *Lefkowitz v. Cunningham*, 431 U.S. 801, 807-08 (1977) (right against self-incrimination and freedom of association). The constitutional prohibition against forcing citizens to choose among their constitutional rights absent important governmental interests also applies in civil contexts. *Aptheker v. Sec'y of State* invalidated a statute barring Communist party members from obtaining passports because individuals could not be compelled under those circumstances to give up freedom of association to travel internationally. 378 U.S. 500, 507 (1964) ("restrictions imposed upon the right to travel cannot be dismissed by asserting that [it] could be fully exercised if" a person were to forgo associational membership). *See also Bourgeois v. Peters*, 387 F.3d 1303, 1324-25 (11th Cir. 2004) (government may not set up checkpoints requiring protesters to choose between exercising First Amendment rights and preserving Fourth Amendment freedom from unreasonable searches).

Here, multiple vital liberty interests are at stake, and the Government cannot demonstrate the requisite significant interest where it seeks to force thousands of school-aged U.S. citizen children to make the untenable choice between the exercise of two precious constitutional rights - their parents or their home and their citizenship. As such success on the merits of these claims is highly likely.

## II.   LIBERIAN DED HOLDERS AND THEIR U.S. CITIZEN CHILDREN ARE CURRENTLY SUFFERING PROFOUND AND IRREPARABLE HARM AND, ABSENT RELIEF, WILL SUFFER FURTHER IRREPARABLE HARM.

Plaintiffs will unquestionably suffer serious, irreparable harm unless the Court grants a preliminary injunction. They risk deportation, loss of their homes, their families and their lives if relief is not granted. The risk of suffering irreparable harm before a case is adjudicated on the merits is a "necessary threshold" for obtaining preliminary injunctive relief. *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73–74 (1st Cir. 2004). Plaintiff bears the burden of demonstrating that harm; it must a "realistic prospect" instead of mere speculation. *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18 (1st Cir. 1996); *Matos*, 367 F.3d at 73.  The Court may find that an actual risk of irreparable harm exists when damages cannot adequately remedy the threatened injury. *Ross-Simons*, 102 F.3d at 18–19.

Plaintiffs overwhelmingly meet their burden of demonstrating the risk of irreparable harm they face if the Court does not grant preliminary relief enjoining Defendants from terminating DED. The upcoming deadline for the DED program—just weeks from now—shows Plaintiffs' threatened injuries will imminently become a reality.  Plaintiffs cannot wait for the full adjudication of their case.

Terminating DED will cause Plaintiffs severe harm that cannot be remedied through anything other than injunctive relief. Plaintiffs Kroma, Wilson, Kiazolu, Bongay, Dennis, and Simpson have all lived in the United States for many years as DED beneficiaries. Kroma Decl. ¶ 3; Wilson Decl. ¶ 3; Kiazolu Decl. ¶ 3; Bongay Decl. ¶ 3; Dennis Decl. 7 ¶ 3; Simpson Decl. ¶ 3. Plaintiffs have prospered after fleeing violence in Liberia and represent the epitome of the American dream; they are gainfully employed, advancing their education with the expectation of future gainful employment. Kroma Decl. ¶¶ 6–10; Wilson Decl.  ¶¶ 11 - 13, 17; Kiazolu Decl.  ¶

¶ 11 - 16; Bongay Decl. ¶ 7; Dennis Decl.  ¶¶ 8 - 19; Simpson Decl. ¶¶ 7 - 12. Through their hard

work they have gained assets and built concrete ties to their communities in the United States.

Kroma Decl. ¶¶ 15 - 16; Wilson Decl. ¶¶ 21, 23; Kiazolu Decl. ¶ 26; Bongay Decl. ¶ 11 - 13;

Dennis Decl. ¶¶ 21 - 23; Simpson Decl. ¶¶ 13 -15.

If DED is terminated, Plaintiffs will be exiled from their homes and will lose everything

they have struggled to achieve.  Plaintiffs will lose their ability to provide for their family,

including for their U.S. citizen children who are dependent on them for sustenance, healthcare,

and emotional support. Kroma Decl. ¶ 11; Simpson Decl. ¶¶ 15–18, 20–24, 27. Plaintiffs will be

forced to relocate to a country with a weak, unstable economy and limited infrastructure that they

have not returned to in many years, if ever. Exs. 23 – 26; Kroma Decl. ¶ 12; Bongay Decl. ¶ 11;

Simpson Decl. ¶ 23;  Kiazolu Decl. ¶ 26; Dennis Decl. ¶ 13. Plaintiffs' prospect of surviving in

Liberia, let alone thriving there, is bleak. Kroma Decl.  ¶¶ 11–14; Kiazolu Decl.  ¶¶ 21, 25, 26,

27; Bongay Decl. ¶¶ 12, 14; Wilson Decl. ¶¶ 19 - 22.; Dennis Decl. ¶¶ 14 – 16; Simpson Decl. ¶¶

20 – 21;  Exs. 23 – 26

Minor U.S. citizen Plaintiffs will also suffer. For example Plaintiff O.S. is twelve years

old and attends middle school in Maryland. Plaintiff C.B. is 15 years old and attends high school

in Massachusetts. *They are U.S. citizens who have never visited Liberia*. Yet Plaintiffs O.S., C.B.

and all minor Plaintiffs are at risk of being separated from their parents, on whom they depend

for financial and emotional support.

Plaintiffs faced with deportation due to the termination of DED therefore face a painful

choice.  They can return to Liberia alone and tear their families apart.  Or they can uproot their

families to a country where conditions are so dire that four U.S. Presidents have been compelled

to provide its people humanitarian relief (in the form of TPS and DED) for nearly thirty years. Exs.

4 - 18, 20 - 22.  Plaintiffs O.S. and C.B. must choose between being separated from their parents who will have to leave the U.S. after they lose DED, or move to Liberia, a country completely unknown to them. Simpson Decl. ¶¶ 21, 23, 25; Kroma Decl. ¶15. If Plaintiffs O.S. and C.B. move to Liberia, Liberia's restrictive citizenship laws will inflict further harm on them. Since Liberia does not permit dual citizenship, they will be unable to become Liberian citizens without renouncing their U.S. citizenship. If they maintain their U.S. citizenship, they will be prevented from fully integrating into the Liberian population or accessing rights that Liberia affords only to Liberian citizens. Ex. 37.

The cruelty of their imminent family separation and loss of the lives they built in the U.S. has emotionally and mentally terrorized Plaintiffs. Wilson Decl.  ¶¶ 19-28; Kiazolu Decl. ¶ 22; Simpson Decl.  ¶¶ 20-21, 23. They fear for their safety, their children in the U.S., and their ability to survive in Liberia. Wilson Decl.  ¶¶ 19-30; Kiazolu Decl.  ¶¶ 22-29; Simpson Decl. ¶¶ 20-28.[4]

Courts have recognized the harms Plaintiffs face as the type of threatened injuries that justify a preliminary injunction. In *Ramos*, the Northern District of California granted a preliminary injunction to plaintiffs because of the imminent harm that stemmed from the Trump Administration's cancellation of Temporary Protected Status for immigrants from El Salvador, Haiti, Sudan, and Nicaragua. *Ramos*, 336 F. Supp. 1084-1086. Like Plaintiffs here, the *Ramos* plaintiffs have lived in the U.S. for many years and have U.S. citizen children. *Id*. And as here, the Trump Administration's anti-immigrant policies forced the minor plaintiffs in *Ramos* to

---

[4] Plaintiffs ACT and UBN have witnessed the suffering of their DED holder members, who face the same threatened injuries as Plaintiffs. Ex. 38 Declaration of Jonathan Jayes-Green ("Jayes Decl.") ¶ 6.; Ex. 39 Declaration of Amaha Kassa ("Kassa Decl.") ¶ 8. ACT and UBN will also lose many of its members if the end of DED goes into effect. Jayes Decl. ¶ 2; Kassa Decl. ¶ 7. These plaintiffs have diverted many of their limited resources to mitigate the harms the cancellation of DED will cause. Jayes Decl. ¶ 6.; Kassa Decl. ¶ 8

choose between being separated from their families or forced to abandon the lives they created here.  As in *Ramos*, this Court should recognize that Plaintiffs are entitled to a preliminary injunction because they will suffer severe, irreparable harm if the Trump Administration terminates DED.

## III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH OVERWHELMINGLY IN FAVOR OF INJUNCTIVE RELIEF.

The balance of equities tips strongly in favor of Plaintiffs. Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co.*, 480 U.S. 531, 542 (1987). If there are no "legitimate countervailing concerns" for a defendant, then the balance of equities weighs in favor of granting an injunction on behalf of the plaintiff. *Saenger Org., Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 864 F. Supp. 246, 249–50 (D. Mass. 1994).

Plaintiffs have already demonstrated the grave harm they will suffer if the Court denies a preliminary injunction. The minimal harm an injunction may cause to Defendants, if any, pales in comparison.  A preliminary injunction will only preserve the status quo by permitting Liberian DED holders who have lived in the U.S. for decades to continue doing so.

Plaintiffs' Declarations offer a small window into the devastation Defendants' actions have wrought and will wreak on this community. The balance of hardships definitively tip towards preserving the *status quo* pending final resolution on the merits.

The public interest also favors granting a preliminary injunction on behalf of Plaintiffs. The preliminary-injunction inquiry considers the effect an injunction may have on the public interest, or if the public interest supports the issuance of an injunction. *Dunkin' Donuts Franchised*

*Restaurants LLC v. Wometco Donas Inc.*, 53 F. Supp. 3d 221, 231-32 (D. Mass. 2014). Here, granting a preliminary injunction would further the public interest. Liberian DED holders and their families are integral members of their communities, and play critical roles in their local economies. *See, e.g.*, Ex. 40 (Minn. DED Letter, March 27, 2018) (detailing role of Liberian DED holders in Minnesota's healthcare industry).  It is not in the public interest to tear families apart, and uproot hardworking, law-abiding residents from their communities. The fact that an injunction would permit Plaintiffs to continue serving the public interest justifies granting them injunctive relief.

## CONCLUSION

For the reasons explained above, the Court should grant Plaintiffs' Motion for a Preliminary Injunction.

Dated: March 12, 2019                                    Respectfully submitted,


                                    _____ /s/ Oren Nimni
                                    Oren Nimni (BBO #691821)
                                    Oren Sellstrom (BBO# 569045)
                                    Iván Espinoza-Madrigal (Admitted *pro hac vice*)
                                    LAWYERS FOR CIVIL RIGHTS
                                    61 Batterymarch Street, 5th Floor
                                    Boston, Massachusetts 02110
                                    (617) 988-0624

                                    _____ /s/ Jon Greenbaum
                                    Jon Greenbaum (pro hac vice forthcoming)
                                    Dorian Spence (Admitted *pro hac vice*)
                                    Maryum Jordan (Admitted *pro hac vice*)
                                    LAWYERS' COMMITTEE FOR CIVIL RIGHTS
                                    UNDER LAW
                                    1500 K Street NW, Suite 900
                                    Washington, D.C., 20005
                                    (202) 662-6300