# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

AFRICAN COMMUNITIES
TOGETHER, a membership
organization; UNDOCUBLACK
NETWORK, a membership
organization; DAVID KROMA;
MOMOLU BONGAY; OTHELLO
A.S.C. DENNIS; YATTA KIAZOLU;
CHRISTINA WILSON; JERRYDEAN
SIMPSON; C.B., AL. K., D.D., D.K.,
AI. K., AD. K. by and through their
father and next friend DAVID KROMA;
O.D., and A.D., by and through their
father and next friend OTHELLO
A.S.C. DENNIS; O.S. by and through
his mother and next friend
JERRYDEAN SIMPSON,

        Plaintiffs,

    v.

DONALD J. TRUMP, President
of the United States in his
official capacity;
U.S. DEPARTMENT OF
HOMELAND SECURITY;
KIRSTJEN NIELSEN,
Secretary of the
U.S. Department of
Homeland Security in her
official capacity,

        Defendants.

Civil Action No. 19-cv-10432

**[PROPOSED] *AMICI CURIAE* BRIEF OF THE STATE OF MINNESOTA, THE COMMONWEALTH OF MASSACHUSETTS, THE STATES OF CALIFORNIA, ILLINOIS, MARYLAND, NEW JERSEY, NEW YORK, AND RHODE ISLAND, THE COMMONWEALTH OF VIRGINIA, AND THE DISTRICT OF COLUMBIA SUPPORTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF *AMICI* STATES .............................................................1

ARGUMENT ........................................................................................................................2

I.      A NATIONWIDE INJUNCTION IS IN THE PUBLIC INTEREST BECAUSE OF
THE SERIOUS AND IRREPARABLE HARM THE TERMINATION OF DED
FOR LIBERIANS WILL INFLICT ON THE WORKFORCE, COMMUNITIES,
FAMILIES, AND CHILDREN IN THE *AMICI* STATES.................................................2

      A.      IF THE PRESIDENT'S TERMINATION OF DED IS IMPLEMENTED,
THE *AMICI* STATES WILL LOSE THE CONTRIBUTIONS
LIBERIANS PROVIDE TO THEIR ECONOMIES AND
COMMUNITIES. .................................................................................................2

            1.      MINNESOTA. ........................................................................................3

            2.      MASSACHUSETTS.................................................................................7

            3.      CALIFORNIA. .......................................................................................9

            4.      NEW YORK. ........................................................................................11

      B.      CHILDREN IN THE *AMICI* STATES ARE SUFFERING SERIOUS
AND IRREPARABLE HARM, AND WILL SUFFER MORE HARM IF
THE PRESIDENT'S TERMINATION OF DED IS IMPLEMENTED. ..............12

      C.      THE PUBLIC INTEREST OUTWEIGHS ANY MINIMAL HARM TO
THE GOVERNMENT. .........................................................................................16

CONCLUSION.....................................................................................................................17

# TABLE OF AUTHORITIES

CASES

*In re Welfare of Children of N.F.*,
    749 N.W.2d 802 (Minn. 2008) ........................................................................... 12

*Louhghalam v. Trump*,
    230 F. Supp. 3d 26 (D. Mass. 2017) ................................................................... 2

*M.M.M. on Behalf of J.M.A. v. Sessions*,
    347 F. Supp. 3d 526 (S.D. Cal. 2018) ................................................................ 16

*NAACP v. Trump*,
    321 F. Supp. 3d 143 (D.D.C. 2018) ................................................................... 16

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................................ 3

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
    699 F.3d 1 (1st Cir. 2012) ................................................................................... 2

*Winter v. Natural Res. Def. Council*,
    555 U.S. 7 (2008) ................................................................................................ 2

RULES AND REGULATIONS

Cal. Fam. Code § 3020(a) ........................................................................................ 12

Cal. Welf. & Inst. Code § 16000 .............................................................................. 15

Mass. Gen. Laws ch. 119 .................................................................................... 12, 15

Minnesota Juvenile Protection Act, Minn. Stat. § 260C.001, *et seq.* ................... 12, 15

OTHER AUTHORITIES

Andrea Castillo, *Trump's Move to End Humanitarian Program Exposes Liberian UCLA Student to Deportation*, L.A. Times (Mar. 16, 2019) ............................................. 10

Anu-Katriina Pesonen et al., *Intellectual Ability in Young Men Separated Temporarily from Their Parents in Childhood,* 39 Intelligence 335 (2011) ............................... 14

Anu-Katriina Pesonen et al., *Reproductive Traits Following a Parent-Child Separation Trauma During Childhood: A Natural Experiment During World War II*, 20 Am. J. Hum. Biology 345 (2007) .................................................................................................. 14

Bill Catlin, *Minn. Worker Shortage Squeezing Employers Gets Tighter*, MPR News (Sept. 21, 2018) .......................................................................................................... 4

Cal. Dep't of Soc. Servs., *Child Welfare Services/Case Management System (CWS/CMS)* ............................................................................................................. 15

Cal. Employ. Dev. Dep't, *2016-2026 Statewide Employment Projections Highlights* ............... 10

Camila DeChalus, *Ph.D. Student Faces Deportation to Liberia, Where She Has Never Lived,* Roll Call (Mar. 28, 2019) ........................................................................... 10

*Final Report on Strengthening Minnesota's Health Care Workforce*, Minnesota Legislative Health Care Workforce Commission (Dec. 2016) ................................................. 4

Heather Koball et al., *Health and Social Service Needs of US-Citizen Children with Detained or Deported Immigrant Parents*, Migration Pol'y Inst. (Sept. 2015) .................... 14

Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children* (2011) ................................................................................................ 13

Jared Goyette, *'I Was Raised an American': Liberians Await Possible Deportation from US*, The Guardian (Mar. 19, 2019) ........................................................................ 7

Jared Goyette, *She Fled Liberia's Civil War 24 Years Ago. Now Trump Wants Her to Go Back*, The Guardian (Apr. 1, 2018) ................................................................... 13

Jim Walsh, *Linda Clark Tells Her Story as Local Liberians Plan Friday Rally for 'DED Awareness' at the State Capitol*, Minnpost.com (Feb. 21, 2019) ........................................... 6

Josefina de la Fuente, *Liberian Immigrants are Running Out of Time*, N.Y. City Lens (Feb. 16, 2019) .................................................................................................... 11, 12

Karti Räikönnen et al., *Risk of Severe Mental Disorders in Adults Separated Temporarily from Their Parents in Childhood: The Helsinki Birth Cohort Study*, 45 J. Psychiatric Res. 332 (2011) .................................................................................. 14

Kristen Lee Gray, *Effects of Parent-Child Attachment on Social Adjustment and Friendship in Young Adulthood*, Cal. Poly. St. U., San Luis Obispo (June 2011) ............... 14

Letter from Governor Dayton to President Trump (Mar. 27, 2018) ................................ 4

Letter from Speaker of the Minnesota House Melissa Hortman to President Trump
(Mar. 19, 2019) ................................................................................................... 5

Mass. Exec. Off. of Labor & Workforce Dev., *Labor Market Information: Most Job
Openings for Massachusetts* ................................................................................ 10

Maya Rao, *Twin Cities Senior Care Facilities Brace for Loss of Liberian Immigrant
Workers*, Minneapolis Star Tribune (Mar. 21, 2019) ............................................. 5

Michael D. Goodman et al., *The Foreign-born Population of Worcester, Massachusetts:
Assessing the Challenges and Contributions of a Diverse Community,* Public Pol'y
Ctr, Univ. of Mass., Dartmouth (July 2015) .......................................................... 7

Moises Velasquez-Manoff, *Finland Saved These Children From War, Did It Hurt Them
in the Process?*, N.Y. Times (Sept. 19, 2018) ....................................................... 14

New American Economy, *Power of the Purse: How Sub-Saharan Africans Contribute
to the U.S. Economy* (Jan. 2018) ................................................................ 9, 10, 11

Nicholas Zill, *Better Prospects, Lower Cost: The Case for Increasing Foster Care
Adoption*, Nat'l Council for Adoption (May 1, 2011) ........................................... 15

Nina Agrawal, *In New York's 'Little Liberia,' Some Immigrants Get Ready to Leave —
or Go Underground*, Los Angeles Times (Apr. 6, 2018) ....................................... 12

Orion Donovan-Smith, *End of Immigration Program Gives Liberians in U.S. a Choice:
Leave Their American Children or Become Undocumented*, Wash. Post.
(Feb. 21, 2019) ....................................................................................................... 6

Presidential Memorandum for the Secretary of State and the Secretary of Homeland
Security, White House (Mar. 27, 2018) ................................................................ 16

Seth Freed Wessler, *Shattered Families: The Perilous Intersection of Immigration
Enforcement and the Child Welfare System*, Applied Research Ctr. (Nov. 2011) ............... 15

Sydney Kashiwagi, *Island Pols Push to Extend Immigration Status for Borough's
Liberian Population Ahead of Looming Deadline*, SILive.com (Mar. 4, 2019) ................... 11

Tess Allen, *Meet Some of Your Liberian Neighbors Now Facing Deportation*, Mpls. St.
Paul Magazine (July 25, 2018) .............................................................................. 7

*The Economic Status of Minnesotans 2018*, Minnesota State Demographic Center, Minnesota Department of Administration (2018) .................................................... 3

U.S. Bureau of Labor Statistics, *Industries at a Glance* ................................ 9

U.S. Census Bureau, 2011-2015 American Community Survey: Place of Birth by Nativity and Citizenship Status ................................................................ 8, 9, 11

U.S. Census Bureau, 2011-2015 American Community Survey: Selected Economic Characteristics ......................................................................................... passim

U.S. Census Bureau, 2013-2017 American Community Survey 5-Year Estimates: Place of Birth for the Foreign-Born Population in the United States .................................... 7, 9, 11

Wendy Cervantes et al., *Our Children's Fear: Immigration Policy's Effects on Young Children*, Ctr. Law & Soc. Pol'y (Mar. 2018) ...................................................... 13

## INTRODUCTION AND INTEREST OF *AMICI* STATES

The *Amici* States, Minnesota, Massachusetts, California, Illinois, Maryland, New Jersey, New York, Rhode Island, Virginia, and the District of Columbia,[1] are home to a large number of people from Liberia who are protected by Deferred Enforced Departure (DED), which is an immigration program authorized by the President to protect foreign nationals whose countries have experienced armed conflict, civil unrest, natural disasters, or public health crises. Liberians protected by DED are hardworking colleagues and valued contributors to our communities in the *Amici* States.

The President's decision to terminate DED for Liberian nationals could result in their removal to Liberia, despite the unsafe conditions there. This would deprive the *Amici* States' economies and communities of positive contributions from coworkers and neighbors who have lived here for decades. Our health care industries in particular would suffer, as many Liberians work in that field.

The *Amici* States also have an interest in protecting the welfare of the children raised in our states who were born to Liberian parents, or who are cared for by Liberian guardians. These children, who are U.S. citizens, have already suffered because of the fear that their parents may be removed from the country as a result of the President's decision to end DED protections. They will suffer further if the President's decision is enforced. The *Amici* States have an interest in ensuring these children continue to live in stable and loving homes with their parents in our communities, at least until their constitutional rights, and those of their parents, are adjudicated.

Because of these interests and considerations, a nationwide injunction is in the public interest and outweighs any minimal harm to the government.

---

[1] The District of Columbia is included as an "*Amici* State" for the purposes of this brief.

**ARGUMENT**

I.  **A NATIONWIDE INJUNCTION IS IN THE PUBLIC INTEREST BECAUSE OF THE SERIOUS AND IRREPARABLE HARM THE TERMINATION OF DED FOR LIBERIANS WILL INFLICT ON THE WORKFORCE, COMMUNITIES, FAMILIES, AND CHILDREN IN THE *AMICI* STATES.**

A preliminary injunction analysis includes consideration of "the balance of equities" and whether the "injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). The public interest is particularly important in cases where the injunction would halt enforcement of a government law or policy that has an impact beyond the parties. *See, e.g.*, *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 15–16 (1st Cir. 2012). In cases like this one, where an injunction would affect non-parties, including the *Amici* States, courts consider the hardship to those third parties as part of the public interest analysis. *See id.*

Here, the public interest weighs heavily in favor of granting the injunction and outweighs any minimal harm the government may suffer from an injunction.

**A.  If the President's Termination of DED Is Implemented, the *Amici* States Will Lose the Contributions Liberians Provide to Their Economies and Communities.**

In weighing the public interest factor as part of a preliminary injunction analysis, this Court has recognized "the value that immigrants add to our society," and the fact that the "rich immigrant history of the United States has long been a source of strength and pride in this country." *Loughghalam v. Trump*, 230 F. Supp. 3d 26, 38 (D. Mass. 2017). In this case, the Liberian communities in the *Amici* States have made and continue to make valuable contributions to the *Amici* States. They are civic leaders, hardworking coworkers, and reliable neighbors. The President's abrupt termination of DED threatens our Liberian families and communities and the value they bring to the *Amici* States.

There is a "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009). Here, the public interest is broader than just preventing wrongful removal of individual immigrants. Because of the contributions that Liberians make to the communities and workforces in the *Amici* States, there is a public interest in allowing them to continue to live and work in our communities, at least until their constitutional rights have been adjudicated. The following examples from four of our States highlight some of the many ways that Liberian DED holders contribute to our communities, as well as the ways in which the public interest will suffer harm if the President's termination of DED takes effect.

## 1. Minnesota

Minnesota is home to one of the largest Liberian communities in the United States, with an estimated population of 15,900 people who were born in Liberia or report Liberian ancestry.[2] A majority of employed Liberians work in the health care and social assistance or educational services industries, according to U.S. Census data.[3] The President's actions thus pose particular harms to the state's economy because Minnesota, like many other states, faces serious shortages

---

[2] *See The Economic Status of Minnesotans 2018*, Minnesota State Demographic Center, Minnesota Department of Administration 8 (2018), https://mn.gov/admin/assets/MNSDC_EconStatus_2018Report_FNL_Access.pdf_tcm36-362054.pdf.

[3] U.S. Census Bureau, 2011-2015 American Community Survey: Selected Economic Characteristics, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_SPT/DP03/0400000US27/popgroup~308.

and a growing need for workers in health and social services.[4]  A significant percentage of

Liberians in Minnesota also work in manufacturing, retail trade, and finance and real estate.[5]

Last year, then-Governor Mark Dayton wrote to President Trump to urge him to reverse

the decision to terminate DED protections.[6]  This letter summarized how Liberians have become

enmeshed in Minnesota communities and how their removal would harm Minnesota, particularly

its health care industry:

> Many Liberian DED holders have been in the United States for over 30 years and
> have built families and careers in our country.  They are part of the social fabric
> of Minnesota; they are our neighbors, colleagues, and friends.
>
> In 1989, a devastating civil war began in Liberia which ravaged that country for
> seven years, and displaced millions.  Liberia is still recovering from that conflict,
> and so are its people.  Many fled to find new lives for themselves and their
> families—including thousands who settled here in the United States.
> Minnesotans welcomed Liberian refugees with open arms, and today our state is
> home to the largest community of Liberian Americans of any state in the nation.
>
> We are proud of our Liberian neighbors, and grateful for their many contributions
> to our communities, our culture, and our economy.  A large number of Liberian
> Americans work in Minnesota's health care industry—providing quality, skilled
> care to many sick, elderly, and other vulnerable people.  Our health care industry
> has come to depend upon their hard work and skilled labor.  If these workers are
> forced to leave our country, their absence would cause a workforce crisis in
> Minnesota's health care industry.

*Id.*

---

[4] *See, e.g.*, Bill Catlin, *Minn. Worker Shortage Squeezing Employers Gets Tighter*, MPR News
(Sept. 21, 2018), https://www.mprnews.org/story/2018/09/21/minn-worker-shortage-squeezing-
employers-gets-tighter; *Final Report on Strengthening Minnesota's Health Care Workforce*,
Minnesota Legislative Health Care Workforce Commission 5-13 (Dec. 2016),
https://www.leg.state.mn.us/docs/2016/mandated/161368.pdf.

[5] U.S. Census Bureau, *supra* note 3.

[6] *See* Letter from Governor Dayton to President Trump (Mar. 27, 2018),
https://www.uscis.gov/sites/default/files/files/nativedocuments/TPS_-
_Haiti_El_Salvador_Nicaragua_DED_-_Liberians_DACA_Governor_Dayton.pdf.

The Minnesota Speaker of the House of Representatives recently sent a similar letter to President Trump, which recognized that "[o]ur Liberian neighbors contribute to our economy, our culture and our communities," and asked the President to extend DED for Liberians.[7]

In addition to Minnesota's political leaders, its business leaders are also sounding the alarm. St. Therese will be especially hard hit by the expiration of DED protections. A recent news article described how the Catholic nonprofit, which has senior care facilities in five Minnesota suburbs, will lose about 100 workers or more, a significant percentage of its workforce. St. Therese's chief human resources officer was quoted as saying: "To lose that skilled care is an enormous negative impact."[8]

Indeed, there are many examples of Liberians, protected by DED, who work and contribute to civic life in Minnesota. If they were deported, Minnesota's workforce would lose valuable employees and Minnesota's communities would lose civically-involved neighbors.

Plaintiff Christina Wilson is one such example. Ms. Wilson has lived in the U.S. for 17 years and is a Minnesota resident. Complaint (Doc. #1) at ¶ 58. While in the U.S., she attended a nursing assistant school. *Id.* at ¶ 59. For the past 16 years, she has worked as a nursing assistant at the St. Therese Nursing Home in Minnesota, mentioned above, where she cares for elderly patients. *Id.* She is also active in her community and church. *Id.* at ¶ 60.

Magdalene Menyongar is another example. She is a certified nursing assistant in Minnesota. She works more than 60 hours each week at two nursing homes and uses her

---

[7] *See* Letter from Speaker of the Minnesota House Melissa Hortman to President Trump (Mar. 19, 2019), https://www.dfl3cd.org/speaker-hortman-and-house-dflers-letter-to-president-trump-and-congressional-delegation/.

[8] *See* Maya Rao, *Twin Cities Senior Care Facilities Brace for Loss of Liberian Immigrant Workers*, Minneapolis Star Tribune (Mar. 21, 2019), http://www.startribune.com/twin-cities-senior-care-facilities-brace-for-loss-of-liberian-immigrant-workers/507489282/.

paycheck to support her 97-year-old mother. She is also the president of the women's ministry at her Liberian church. Her husband, also a Liberian immigrant, died in 2011. If Ms. Menyongar is deported, she will be separated from her daughter, a high school student who is preparing for college.[9]

Linda Clark fled war-torn Liberia to Minneapolis, where she lives with her mother and two brothers. She has worked at Wells Fargo for 14 years, currently as an account resolution specialist. She is a civic leader who has raised awareness about Liberians losing DED protections and was U.S. Representative Ilhan Omar's guest to President Trump's February 5, 2019 State of the Union Address. Representative Omar said of Ms. Clark: "Linda is exactly the type of American success story we should celebrate—someone who came to this country seeking a better life, played by the rules, and built a life for herself."[10]

Isabela Wreh-Fofana has lived in St. Paul, Minnesota for 17 years and works as a nursing assistant. Her son, Nyensuahtee Fofana, 23, played running back for his high school football team and dreams of pursuing a college marketing degree. However, he has been diagnosed with a heart condition that has required three open-heart surgeries. He will probably need another

---

[9] *See* Orion Donovan-Smith, *End of Immigration Program Gives Liberians in U.S. a Choice: Leave Their American Children or Become Undocumented*, Wash. Post. (Feb. 21, 2019), https://www.washingtonpost.com/national/end-of-immigration-program-gives-liberians-in-us-a-choice-leave-their-american-children-or-become-undocumented/2019/02/20/03b3cae6-30db-11e9-813a-0ab2f17e305b_story.html?utm_term=.ffb68c22aa59.

[10] *See* Jim Walsh, *Linda Clark Tells her Story as Local Liberians Plan Friday Rally for 'DED Awareness' at the State Capitol*, Minnpost.com, (Feb. 21, 2019), https://www.minnpost.com/new-americans/2019/02/linda-clark-tells-her-story-as-local-liberians-plan-friday-rally-for-ded-awareness-at-the-state-capitol/.

surgery by the time he is 30. They fear being removed to Liberia, because they do not know how he will receive the health care he needs there.[11]

Moses Punni is a group production leader at Medtronic in Minnesota, an associate pastor, and a worship ministry founder. He mentors many Liberian youth in his community of Coon Rapids, Minnesota. He also has a 16-year-old daughter, who is a U.S. citizen. He fears having to leave his daughter behind, as well as the community-rich life he has built over 17 years in Minnesota.[12]

If Ms. Wilson, Ms. Clark, Ms. Wreh-Fofana, Mr. Fofana, Mr. Punni, and many others like them are removed, Minnesota's workforce will lose hardworking employees and Minnesota's communities will lose civically-involved neighbors and friends.

### 2. Massachusetts

Massachusetts is also home to a vibrant Liberian community that contributes to the economy and civic life, especially in Worcester, where Liberian immigrants predominantly reside.[13] An estimated 2,750 people who were born in Liberia currently live in Massachusetts,[14]

---

[11] *See* Jared Goyette, *'I Was Raised an American': Liberians Await Possible Deportation from US*, The Guardian (Mar. 19, 2019), https://www.theguardian.com/us-news/2019/mar/19/liberians-deportation-trump-administration.

[12] *See* Tess Allen, *Meet Some of Your Liberian Neighbors Now Facing Deportation*, Mpls. St. Paul Magazine (July 25, 2018), http://mspmag.com/arts-and-culture/meet-some-of-your-liberian-neighbors-now-facing-deportation/.

[13] See Michael D. Goodman et al., *The Foreign-born Population of Worcester, Massachusetts: Assessing the Challenges and Contributions of a Diverse Community,* Public Pol'y Ctr, Univ. of Mass., Dartmouth 7 (July 2015), http://www.sevenhills.org/uploads/ForeignBornStudy.pdf.

[14] U.S. Census Bureau, 2013-2017 American Community Survey 5-Year Estimates: Place of Birth for the Foreign-Born Population in the United States, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/17_5YR/B05006/0400000US25.

and approximately 600 people who report they are of Liberian ancestry are not U.S. citizens.[15] The majority of people of Liberian ancestry in Massachusetts work in educational services, health care, and social assistance (53%).[16] Significant percentages also work in the financial services and real estate (13%) and retail (10%) industries.[17] The labor force participation rate for people of Liberian ancestry in Massachusetts is 74%,[18] substantially higher than the average of 67.5% for the Commonwealth as a whole.[19]

The plaintiffs in this case demonstrate the deep ties and significant contributions of Liberian DED holders in our communities. Plaintiff David Kroma is a Liberian DED holder in Worcester, where he owns his home. Complaint at ¶ 31. He is employed as a mental health care worker, providing care to patients of a Commonwealth mental health facility in Worcester. Declaration of David Kroma, Exhibit 34 (Doc. #13-36) at ¶ 7. Plaintiff Momolu Bongay, a Liberian DED holder, works as a direct care professional, caring for patients in Worcester. Declaration of Momolu Bongay, Exhibit 35 (Doc. #13-37) at ¶ 7. Plaintiff Othello A.S.C. Dennis is a Liberian DED holder and a social worker, also in Worcester. Complaint at ¶ 46. Mr. Dennis also supports his community outside of work, volunteering with community

---

[15] U.S. Census Bureau, 2011-2015 American Community Survey: Place of Birth by Nativity and Citizenship Status, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_SPT/B05002/0400000US25/popgroup~308.

[16] U.S. Census Bureau, 2011-2015 American Community Survey: Selected Economic Characteristics, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_SPT/DP03/0400000US25/popgroup~308.

[17] *Id.*

[18] *Id.*

[19] U.S. Census Bureau, 2011-2015 American Community Survey: Selected Economic Characteristics https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_SPT/DP03/0400000US25.

8

organizations to support youth in Worcester-area schools. Declaration of Othello Dennis, Exhibit 31 (Doc. #13-33) at ¶ 8. These Plaintiffs support their families in Massachusetts, including their U.S. citizen children. Complaint at ¶¶ 31–53. The termination of DED will not only harm these Plaintiffs and their families, but will also deprive the Worcester community and economy of valued neighbors and hardworking employees.

### 3. California

California's African population in general, and Liberian population in particular, is an important part of California's large and diverse immigrant community (the largest in the United States). The state has the fourth-largest population of African immigrants in the country, with over 130,000 African immigrants calling California home,[20] including over 2,300 Liberians.[21] Over 350 Liberians living in California report they are non-citizens.[22] The largest percentage of Liberians by far—more than 40 percent—work as home health aides, nurses, and teachers.[23] Given the increasing projected need for workers in the direct care field with a growing elderly

---

[20] New American Economy, *Power of the Purse: How Sub-Saharan Africans Contribute to the U.S. Economy* 13 (Jan. 2018), http://research.newamericaneconomy.org/wp-content/uploads/sites/2/2018/01/NAE_African_V6.pdf.

[21] U.S. Census Bureau, 2013-2017 American Community Survey 5-Year Estimates: Place of Birth for the Foreign-Born Population in the United States, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/17_5YR/B05006/0400000US06.

[22] U.S. Census Bureau, 2011-2015 American Community Survey: Place of Birth by Nativity and Citizenship Status, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_SPT/B05002/0400000US06/popgroup~308.

[23] U.S. Census Bureau, 2011-2015 American Community Survey: Selected Economic Characteristics, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_SPT/DP03/0400000US06/popgroup~308; U.S. Bureau of Labor Statistics, *Industries at a Glance*, https://www.bls.gov/iag/tgs/iag62.htm.

population,[24] Liberian immigrants' "outsized role in the healthcare industry . . . makes them a small, but important, component of our workforce."[25]

Plaintiff Yatta Kiazolu exemplifies the strong contributions that Liberian DED holders have made and continue to make to California, the dilemma they face if DED is terminated, and the senselessness of the Administration's decision to do so. Ms. Kiazolu is a 28-year-old PhD candidate at UCLA in history who has taught at colleges in California and Delaware. Complaint at ¶¶ 54-56. She was born in Botswana to Liberian parents, and has lived in the U.S. since she was six years old, growing up in Delaware. *Id.* Ms. Kiazolu has not been to Liberia since she was four; thus, she is facing the prospect of removal to a country where she has never lived. Complaint at ¶ 55. She dreams of completing her studies and continuing her career as an educator, but her future is profoundly clouded by the uncertainty surrounding DED: "Administrators haven't been able to tell her what could happen to her research funding or whether she'll even be able to remain a student. Without permission to work, she doesn't know how she'd pay back her student loans."[26] This uncertainty has led to missed opportunities for Ms. Kiazolu, despite her repeated efforts to become a U.S. citizen.[27] California will be

---

[24] In California and Massachusetts, the position of home health aide is the fastest growing job, predicted to grow by 41% and 38%, respectively, in the next few years. Cal. Employ. Dev. Dep't, *2016-2026 Statewide Employment Projections Highlights*, https://tinyurl.com/CALabMar ("CA Long-Term" tab); Mass. Exec. Off. of Labor & Workforce Dev., *Labor Market Information: Most Job Openings for Massachusetts*, https://tinyurl.com/MASSLabMar.

[25] *How Sub-Saharan Africans Contribute to the U.S. Economy*, *supra* note 20.

[26] Andrea Castillo, *Trump's Move to End Humanitarian Program Exposes Liberian UCLA Student to Deportation*, L.A. Times (Mar. 16, 2019), https://www.latimes.com/local/lanow/la-me-liberian-program-20190316-story.html.

[27] Camila DeChalus, *Ph.D. Student Faces Deportation to Liberia, Where She Has Never Lived,* Roll Call (Mar. 28, 2019), https://www.rollcall.com/news/facing-deportation-to-liberia-where-she-has-never-lived.

diminished if industrious, dedicated students and educators like Ms. Kiazolu are removed from this country due to their loss of DED.

        4.      **New York**

New York is also home to a large population of immigrants from Africa in general and Liberia in particular. It has the country's second-largest population of immigrants from sub-Saharan Africa,[28] and its estimated population of African immigrants overall exceeds 192,000, including an estimated 5,200 people born in Liberia.[29] Many New York residents of Liberian ancestry live in Staten Island's "Little Liberia" neighborhood[30]—one of the largest Liberian populations outside of Africa.[31] Approximately 1,350 of those in New York who report having Liberian ancestry are not U.S. citizens.[32]

Terminating DED will cause significant hardship to New York and its Liberian residents. As in other States, New York's Liberian population plays an important role in crucial industries such as educational services, health care, and social assistance, which employ nearly half (45%)

---

[28] *How Sub-Saharan Africans Contribute to the U.S. Economy*, supra note 20.

[29] U.S. Census Bureau, 2013-2017 American Community Survey 5-Year Estimates: Place of Birth for the Foreign-Born Population in the United States, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/17_5YR/B05006/0400000US36.

[30] Josefina de la Fuente, *Liberian Immigrants are Running Out of Time*, N.Y. City Lens (Feb. 16, 2019), http://nycitylens.com/2019/02/liberian-immigrants-running-time/.

[31] Sydney Kashiwagi, *Island Pols Push to Extend Immigration Status for Borough's Liberian Population Ahead of Looming Deadline*, SILive.com (Mar. 4, 2019), https://www.silive.com/news/2019/03/island-pols-push-to-extend-immigration-status-for-boroughs-liberian-population-ahead-of-looming-deadline.html.

[32] U.S. Census Bureau, 2011-2015 American Community Survey: Place of Birth by Nativity and Citizenship Status, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_SPT/B05002/0400000US36/popgroup~308.

of the State's residents with Liberian ancestry.[33] Terminating DED would harm these industries and devastate communities like Little Liberia, where many Liberian immigrants are parents of U.S. citizens and DED holders wonder how they would make ends meet if forced to return to Liberia after decades in the United States.[34]

**B.      Children in the *Amici* States Are Suffering Serious and Irreparable Harm, and They Will Suffer More Harm if the President's Termination of DED is Implemented.**

The *Amici* States have a strong interest in protecting the welfare of children in their states. *See, e.g.*, Minnesota Juvenile Protection Act, Minn. Stat. § 260C.001, *et seq.*; *In re Welfare of Children of N.F.*, 749 N.W.2d 802, 808–09 (Minn. 2008) (describing Minnesota law's emphasis on the "best interests of the child" and public policy of protecting children); Mass. Gen. Laws ch. 119, § 1 ("The health and safety of the child shall be of paramount concern and shall include the long-term well-being of the child."); Cal. Fam. Code § 3020(a) (declaring state's public policy "to ensure that the health, safety, and welfare of children" are of "primary concern in determining the best interests of children"). The children of Liberian nationals in the *Amici* States are already suffering as a result of the President's decision to terminate DED, and they will suffer further serious and irreparable harm if their parents have to leave the country. It is clearly in the public interest to allow these children to remain with their parents, in loving and stable homes in our communities, until the lawfulness of the President's decision is adjudicated.

---

[33] U.S. Census Bureau, 2011-2015 American Community Survey: Selected Economic Characteristics, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_SPT/DP03/0400000US36/popgroup~308.

[34] *Liberian Immigrants Are Running Out of Time*, supra note 30; *see also* Nina Agrawal, *In New York's 'Little Liberia,' Some Immigrants Get Ready to Leave — or Go Underground*, Los Angeles Times (Apr. 6, 2018), https://www.latimes.com/nation/la-na-liberians-protected-status-2018-htmlstory.html.

Because DED holders from Liberia have lived in the *Amici* States for many years, they have had the opportunity to raise families. *See, e.g.,* Complaint at ¶¶ 31–53. Children born in the U.S. to Liberian nationals are U.S. citizens. *See id.* at ¶¶ 1, 2, 7, 14–16, 18.

The President's decision to terminate DED for Liberians is likely already causing deep harm to these children. Studies show that fears about family members' deportations can cause children to experience serious mental health problems, including depression, anxiety, self-harm, and regression.[35] Children's concerns about their parents' deportation can also impair their socioemotional and cognitive development.[36] The children of Liberian nationals likely face these same fears, and corresponding mental and emotional harms, as a result of President Trump's decision to terminate DED protections for their parents.

A recent newspaper profile of Liberians in Minnesota discussed these types of concerns. The article focused on a high school student, a cheerleader and an honors student, who is preparing for college in a couple of years. While the student is a U.S. citizen, her Liberian mother has remained in the country through DED. The student explained: "I would be so hurt if my mom were to leave. . . . I need her here, I need her with me."[37]

If the President's DED termination goes into effect, injuries to children will grow even more substantial. Forced separation from a parent is a traumatic event that can have serious and lifelong physical and psychological consequences. In one study, children with parents who had

---

[35] Wendy Cervantes et al., *Our Children's Fear: Immigration Policy's Effects on Young Children*, Ctr. Law & Soc. Pol'y (Mar. 2018), https://tinyurl.com/ChildFears.

[36] Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children* 120–136 (2011).

[37] *See* Jared Goyette, *She Fled Liberia's Civil War 24 Years Ago. Now Trump Wants Her to Go Back*, The Guardian (Apr. 1, 2018), https://www.theguardian.com/us-news/2018/apr/01/liberians-us-deportation-temporary-protected-status-tps-ded.

been detained or deported by immigration authorities refused food, pulled out their hair, had persistent stomach-aches and headaches, used drugs and alcohol, lost interest in daily activities, and had trouble maintaining positive relationships with other parents or new guardians.[38] In the long term, these traumatic childhood experiences can cause severe impairments of a child's self-worth and ability to form close relationships, increased anxiety, and depression.[39] Studies of adults who were separated from their families as children have shown negative outcomes for mental health and substance abuse,[40] marital success,[41] and intellectual ability,[42] as well as higher rates of chronic illnesses such as diabetes and heart disease.[43] Moreover, these children will lose their economic stability and wellbeing, as parents will no longer be able to legally work. As a result, many families will be forced to seek increased public benefits and social services, stretching limited state resources.

The children of DED holders will not only lose their economic security and even the comfort and stability of living in homes with their parents, but also may become subject to child

---

[38] Heather Koball et al., *Health and Social Service Needs of US-Citizen Children with Detained or Deported Immigrant Parents*, Migration Pol'y Inst. 5 (Sept. 2015), https://tinyurl.com/MIRFinal.

[39] Kristen Lee Gray, *Effects of Parent-Child Attachment on Social Adjustment and Friendship in Young Adulthood*, Cal. Poly. St. U., San Luis Obispo (June 2011), https://tinyurl.com/j3lgrno.

[40] Karti Räikönnen et al., *Risk of Severe Mental Disorders in Adults Separated Temporarily from Their Parents in Childhood: The Helsinki Birth Cohort Study*, 45 J. Psychiatric Res. 332 (2011); Moises Velasquez-Manoff, *Finland Saved These Children From War, Did It Hurt Them in the Process?*, N.Y. Times (Sept. 19, 2018), https://tinyurl.com/NYT-Fam-Sep.

[41] Anu-Katriina Pesonen et al., *Reproductive Traits Following a Parent-Child Separation Trauma During Childhood: A Natural Experiment During World War II*, 20 Am. J. Hum. Biology 345 (2007) (finding higher rates of divorce).

[42] Anu-Katriina Pesonen et al., *Intellectual Ability in Young Men Separated Temporarily from Their Parents in Childhood,* 39 Intelligence 335 (2011) (showing severe decline in verbal ability and moderate impairments in general intelligence and mathematics).

[43] Velasquez-Manoff, *supra* note 40.

protective services and ultimately placed in foster homes.[44] In Minnesota, county social services agencies are responsible for the welfare and protection of children in need of services. Minn. Stat. §§ 260C.001, 260C.007, subd. 27a. In Massachusetts, the state-level Department of Children and Families takes on this responsibility. *See* Mass. Gen. Laws ch. 119, § 1. California's counties organize and operate their own programs of child protection based on local needs under the California Department of Social Services' oversight.[45] When it is not possible for children to live with their parents, the social service agencies may seek placement in a foster home. Minn. Stat. § 260N.01; Cal. Welf. & Inst. Code § 16000; Mass. Gen. Laws ch. 119, § 23(c). In this case, the termination of DED protections could result in the removal of Liberian parents and family members, leaving children with no parents or adult kin capable of caring for them in this country. As a result, some children could end up in foster care. These children would suffer the trauma of losing a stable home with loving parents, and could instead find themselves shuttling between temporary placements in a foster care system. Not only will this be traumatic and harmful to the children, but it will needlessly cost states valuable resources for children who have been abused or neglected.[46]

It is unquestionably in the public interest to ensure that the children of Liberian nationals remain with their parents in stable and loving homes in our communities, at least while awaiting

---

[44] Studies have estimated that, nationally, there are thousands of children in foster care due to their parents' detention or deportation. *See* Seth Freed Wessler, *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System*, Applied Research Ctr. (Nov. 2011), https://tinyurl.com/ARCFam.

[45] Cal. Dep't of Soc. Servs., *Child Welfare Services/Case Management System (CWS/CMS)*, https://www.cdss.ca.gov/inforesources/Child-Welfare-Services-Case-Management-System.

[46] Long-term foster care is estimated to cost federal and state governments about $25,000 annually per child. Nicholas Zill, *Better Prospects, Lower Cost: The Case for Increasing Foster Care Adoption*, Nat'l Council for Adoption (May 1, 2011), https://tinyurl.com/ZillFoster.

a final determination of the constitutionality of President Trump's decision to end DED protections. *See M.M.M. on Behalf of J.M.A. v. Sessions*, 347 F. Supp. 3d 526, 537 (S.D. Cal. 2018) (concluding that "[m]aintaining family unity" is in the public interest and enjoining the government from removing parents from the U.S., pending determination of whether the children had asylum rights).

## C. The Public Interest Outweighs Any Minimal Harm to the Government.

The federal government would suffer no significant or cognizable harm from entry of an injunction. The President did not contend that there was an emergency justifying his decision to end DED protections for Liberians. To the contrary, the President's DED directive recognized that there was no rush to implement the policy change. The directive states "that the foreign policy interests of the United States warrant affording an orderly transition ('wind-down') period to Liberian DED beneficiaries."[47] During this one-year wind-down period, Liberians have "continued authorization for employment." *Id.*

While the directive provides that the one-year wind-down period expires on March 31, 2019, there is no reason why the government cannot wait longer to ensure that a policy change that would uproot the lives of thousands of law-abiding Liberians and Liberian Americans does not run afoul of the Constitution. In short, there is no harm to the government that outweighs the public interest in favor of an injunction. *Cf. NAACP v. Trump*, 321 F. Supp. 3d 143, 148 (D.D.C. 2018) (finding a lack of injury to the federal government from an order that "simply corrects the improper exercise of [government] authority").

---

[47] Presidential Memorandum for the Secretary of State and the Secretary of Homeland Security, White House (Mar. 27, 2018), https://www.whitehouse.gov/presidential-actions/presidential-memorandum-secretary-state-secretary-homeland-security.

## CONCLUSION

For these reasons, the public interest weighs heavily in favor of a nationwide preliminary injunction, and far outweighs any minimal harm the government may suffer from an injunction.

Respectfully submitted,

KEITH ELLISON
Attorney General
State of Minnesota
Liz Kramer
Solicitor General
Jason Marisam
Assistant Attorney General
445 Minnesota Street, Suite 1100
St. Paul, Minnesota, 55101-2128
Telephone: (651) 757-1010
Email: liz.kramer@ag.state.mn.us
Attorneys for State of Minnesota


MAURA HEALEY
Attorney General
Commonwealth of Massachusetts

*/s/ Jonathan B. Miller*
Jonathan B. Miller (BBO #663012)
Abigail B. Taylor
Joshua Olszewski-Jubelirer
Assistant Attorneys General
Public Protection and Advocacy Bureau
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
Tel: (617) 727-2200
Jonathan.Miller@mass.gov
*Attorneys for Commonwealth of Massachusetts*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Senior Assistant Attorney General
CHRISTINE CHUANG
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II
Deputy Attorney General
*Attorneys for the State of California*


KWAME RAOUL
Attorney General
State of Illinois
100 W. Randolph St., 12th Fl.
Chicago, IL 60601


BRIAN E. FROSH
Attorney General of Maryland
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6300


GURBIR S. GREWAL
Attorney General
State of New Jersey
Glenn Moramarco
Assistant Attorney General
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625
(609) 984-3900
Glenn.Moramarco@law.njoag.gov
Attorneys for State of New Jersey


LETITIA JAMES
Attorney General of New York
28 Liberty Street
New York, NY 10005


PETER F. NERONHA
Attorney General of Rhode Island
150 South Main Street
Providence, Rhode Island 02903

MARK R. HERRING
Attorney General of Virginia
202 North 9th Street
Richmond, Virginia 23219


KARL A. RACINE
Attorney General
District of Columbia
441 4th Street, N.W.
Washington, D.C. 20001