**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

---

AFRICAN COMMUNITIES TOGETHER, a
membership organization; UNDOCUBLACK
NETWORK, a membership organization;
DAVID KROMA; MOMOLU BONGAY;
OTHELLO A.S.C. DENNIS; YATTA
KIAZOLU; CHRISTINA WILSON;
JERRYDEAN SIMPSON; C.B., AL. K., D.D.,
D.K., AI. K., AD. K. by and through their
father and next friend DAVID KROMA; O.D.,
and A.D., by and through their father and next
friend OTHELLO A.S.C. DENNIS; J.S. by
and through his mother and next friend
JERRYDEAN SIMPSON,

        Plaintiffs,

    v.

DONALD J. TRUMP, President of the United
States in his official capacity; UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY; KEVIN MCALEENAN, Acting
Secretary of the Department of Homeland
Security in his official capacity,

        Defendants.

Civil Action No. 19-cv-10432-TSH

**AMENDED COMPLAINT**

---

## INTRODUCTION

1.    For decades, Liberia has been ravaged by war and disease. From 1989 to 2003, it

endured two consecutive civil wars that claimed a quarter of a million lives and displaced a

million more.[1] These bloody conflicts were marked by vicious atrocities against civilian

---

[1]   Liberia Country Profile, BBC (22 Jan. 2018), https://www.bbc.com/news/world-africa-13729504; Liberia –
UNOMIL, United Nations Observer Mission in Liberia,
https://www.un.org/Depts/DPKO/Missions/unomil_b.htm (last visited May 13, 2019).

populations and involved widespread reliance on child soldiers. Those who survived witnessed brutality and suffering beyond comprehension.

2.      On the heels of these brutal conflicts, Libera suffered the worst outbreak of Ebola virus ever recorded. With its infrastructure decimated by years of violent conflict, Liberia was woefully inequipped to handle any public health challenge, let alone a pandemic of such a deadly and terrifying pathogen. Reportedly, at the time the outbreak began, Liberia was home to only 50 doctors.[2]

3.      This confluence of events killed, displaced, and harmed untold numbers of Liberians and left deep scars that will take many years to heal. In the face of such monumental obstacles, economic development has been no more than a dream.  By some measures, Liberia is today the poorest country in the world.[3]

4.      The United States bears a special responsibility for Liberia's present condition. In the years preceding the Civil War, the American Colonization Society, a Congressionally-funded organization, sent thousands of freed slaves to Africa to "rid" the United States of "a useless and pernicious, if not dangerous portion of its population."[4] Many of those forced to Africa established settlements in what would become Liberia.

5.      Recognizing this troubled history, for nearly thirty years the United States has offered a critical lifeline to thousands of Liberians who would otherwise face repatriation to dire

---

[2]    Marc Bastian, *Ebola-hit Liberia on the brink of societal collapse – experts*, Rappler (Sept. 30, 2014), https://www.rappler.com/world/regions/africa/70583-ebola-hit-liberia-societal-breakdown.

[3]    John Harrington, From the Solomon Islands to Liberia: These are the 25 poorest countries in the world, *USA Today*, Nov. 29, 2018, https://www.usatoday.com/story/money/2018/11/29/poorest-countries-world-2018/38429473/.

[4]    James Ciment, *American in Africa*, Slate (Sept. 23, 2014), https://slate.com/news-and-politics/2014/09/ebola-in-liberia-america-owes-the-west-african-nation-founded-by-free-blacks-a-special-debt.html.

conditions that threaten their health, safety, and human rights. Today, this lifeline takes the form of a humanitarian designation known as Deferred Enforced Departure ("DED").

6.      DED is a status conferred by the President that ensures its beneficiaries are not subject to immigration detention and removal.  It permits beneficiaries to reside and work in the United States legally instead of being forced to return to unsafe conditions in their countries of origin.  It provides critical relief to foreign nationals whose countries of origin have experienced armed conflict, civil unrest, natural disasters, or public health crises.  It is no exaggeration to say that DED has saved the lives of many of its beneficiaries.

7.      Over 60,000 Liberians reside in the United States.[5][6]  DED protects approximately 4,000 of them, including Plaintiffs in this action.[7] These DED beneficiaries now call the United States home. Thanks to DED, they have thrived here instead of being expelled to meet uncertain fates in a nation decimated by armed conflict and the Ebola epidemic. They have built lives, families, and careers in this country.  They are economically productive, they pay taxes, and they give back to their communities.  They have established themselves as important figures in their local economies, where in many places they form the bedrock of industries such as healthcare and social services.  They have purchased homes and enrolled their children in local schools. Many have not returned to Liberia since escaping years ago, and many are raising U.S. citizen children who have never set foot on Liberian soil.[8]

---

[5]     U.S. Census Bureau, 2011-2015 American Community Survey 5-Year Estimates, https://factfinder.census.gov/bkmk/table/1.0/en/ACS/15_SPT/B01003//popgroup~308.

[6]     U.S. Census Bureau, 2011-2015 American Community Survey 5-Year Estimates, https://factfinder.census.gov/faces/tableservices/jsf/pages/productview.xhtml?pid=ACS_15_SPT_B05001&pro dTyp e=table.

[7]     Marie Solis, *Trump Leaves 4,000 Liberians at Risk of Deportation with End to Immigration Program*, Newsweek (Mar. 27, 2018), https://www.newsweek.com/more-4000-liberian-immigrants-risk-deportation-soon-unless-trump-renews-ded-861744.

[8]     *Id.*

8.      As recognized by successive presidential administrations, the extension of

protection to Liberian nationals has been warranted due to Liberia's uniquely tragic history.

Thus, since 1991, Liberian nationals have enjoyed some form of protected status allowing them

to live and work in the US legally. Liberian nationals were first granted DED in 1999, and

administrations representing both major political parties have since uniformly extended its

application. They have done so based on the overwhelming evidence that conditions in Liberia

do not permit the forcible repatriation of thousands of DED beneficiaries, and because they

recognize that for many, returning to Liberia is a death sentence.

9.      Defendant Trump brushed aside the overwhelming evidence that prior

administrations found so persuasive as to justify extensions of DED. After campaigning on a

platform based largely on bigotry against persons of color, Defendant Trump broke with long-

standing practice in March 2018, when he announced the termination of the DED program.[9]

Although the termination was originally to become effective on March 31, 2019, by an eleventh-

hour order issued on March 28, 2019 (immediately after the Parties had exchanged briefing on

Plaintiffs' Motion for Preliminary Injunction), Defendant Trump postponed the termination for

one year, until March 30, 2020.[10]

10.     Defendant Trump's decision to terminate DED was not based on an objective or

reasoned assessment of current conditions in Liberia.  Rather, it was part of an overarching

immigration agenda by the Trump Administration to forcibly remove non-white, non-European

immigrant families from the United States.

---

[9]     Presidential Memorandum for the Secretary of State and the Secretary of Homeland Security, White House
(Mar. 27, 2018), https://www.whitehouse.gov/presidential-actions/presidential-memorandum-secretary-state-
secretary-homeland-security/.

[10]    Memorandum on Extension of Deferred Enforced Departure for Liberians, White House (Mar. 28, 2019),
https://www.whitehouse.gov/presidential-actions/memorandum-extension-deferred-enforced-departure-
liberians/.

11.     The Trump Administration's purported justification for terminating DED was that "conditions in Liberia have improved."[11] This statement is both cynical and self-serving, if not altogether false. To the contrary, conditions in Liberia remain dire.  The anemic Liberian economy is still recovering from armed conflicts as well as the devastation of resources caused by the outbreak of the Ebola epidemic.[12]  As such, it is unable to manage the safe return of thousands of its nationals.

12.     The Trump Administration's purported justification for terminating DED is a mere pretext for racial and national origin discrimination, in furtherance of the administration's discriminatory immigration agenda.  During both his campaign and tenure in office, Defendant Trump has made overt statements and taken concrete actions demonstrating animus against immigrants of color.  His administration has adopted deleterious immigration policies directly targeting immigrants of color.  For example, Trump's push to cancel Deferred Action for Childhood Arrivals ("DACA") and Temporary Protected Status ("TPS"); his endorsement of forcibly separating migrant children from their parents at the border; and the unlawful detention of migrant children have all specifically and systemically targeted immigrants of color.  These cruel and injurious policy measures are a direct result of Defendant Trump's blatant discrimination against immigrants of color.

13.     Defendant Trump has displayed particular malice and ignorance toward Blacks and those of African origin. He has called countries on the African continent "shithole

---

[11]   Presidential Memorandum for the Secretary of State and the Secretary of Homeland Security, White House (Mar. 27, 2018), https://www.whitehouse.gov/presidential-actions/presidential-memorandum-secretary-state-secretary-homeland-security/.

[12]   Center for Disease Control and Prevention, *Ebola Epidemic — Liberia, March–October 2014*, Morbidity and Mortality Weekly Report (Nov. 14, 2014), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm63e1114a4.htm (noting that the Ebola epidemic started in March 2014).

countries,"[13] and questioned why the United States has immigrants from those countries instead of immigrants from predominantly white countries such as Norway.[14]

14.     He has ridiculed and mocked African people for purportedly living in "huts."[15]

15.     He has stoked racial hostility and unreasonable fear about Black people in Africa by spreading false claims of "attacks on white farmers in South Africa."[16]

16.     And in a stunning display of ignorance, while referring to Africa, Defendant Trump spoke repeatedly of "Nambia"—a country that does not exist.[17]

17.     To permit Defendant Trump's unjustified termination of DED to proceed would be to uproot thousands of hard-working members of society from their lives, families and communities, and to subject them to a forced march to a foreign land where they would almost certainly face persecution and rampant violations of their human rights. It would leave gaping holes in the communities that depend on the services these individuals provide.

18.     The U.S. citizen children of DED beneficiaries would also face an untenable decision: stay in the United States and be separated from their Liberian parents, or accompany them sight-unseen to a foreign and dangerous country.  This Hobson's choice is made even

---

[13]   Jose Dawsey, *Trump Derides Protections for Immigrants From 'Shithole' Countries*, Washington Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.5b7a6bea2459 ("Why are we having all these people from shithole countries come here?" Trump said...").

[14]   *Id.* ("Trump then suggested that the United States should instead bring more people from countries such as Norway...").

[15]   Michael Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, New York Times (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html?module=inline.

[16]   Kimon de Greef & Palko Karasz, *Trump Cites False Claims of Widespread Attacks on White Farmers in South Africa*, New York Times (Aug. 23, 2018), https://www.nytimes.com/2018/08/23/world/africa/trump-south-africa-white-farmers.html.

[17]   *Where is 'Nambia'? President Trump 'Invents' African Country*, BBC (Sept. 21, 2017), https://www.bbc.com/news/world-africa-41345577.

harsher because Liberian law forbids dual citizenship.  U.S. citizen children of DED beneficiaries, if forced to relocate to Liberia, will need to renounce their U.S. citizenship to legally work and to enjoy the rights conferred on Liberian citizens.  For these U.S. citizen children, the Trump Administration has set up an impossible and unconstitutional choice: lose your parents or lose your citizenship.  Under the U.S. Constitution, they are entitled to have both.

19.     Accordingly, Plaintiffs bring this action to challenge the Trump Administration's termination of DED for the thousands of Liberians lawfully residing, working, and raising U.S. citizen children in the United States, many for nearly three decades.

20.     Defendant Trump's termination of DED violates the rights of these Liberian DED beneficiaries and their U.S. citizen children under the U.S. Constitution.  It recalls a shameful period of American-Liberian history when the U.S. federal government sought to rid the United States of people it found undesirable and threatening based on their race and identity.  Now, more than a century later, Plaintiffs find themselves in an identical position: targeted for immigration detention and removal on the basis of their race, ethnicity, and national origin.

21.     Therefore, Plaintiffs respectfully ask this Court to preserve the status quo; to rule that Defendant Trump's discriminatory DED cancellation order violates the Due Process and Equal Protection guarantees of the U.S. Constitution; and to enjoin the termination of this life-saving humanitarian program.

## PARTIES

### A.     *Plaintiffs*

22.     Plaintiffs in this action are fifteen individuals: six DED beneficiaries and nine of their US-citizen children. They are joined by two organizations whose membership includes DED beneficiaries and which offer services to DED beneficiaries.

23.     Plaintiff African Communities Together ("ACT") is a New York membership-based non-profit organization created and operated by African immigrants.  The organization provides services to African immigrants throughout the United States, including in Massachusetts.  Created in 2012, ACT has approximately 3,000 members, a national network, and organizational chapters.  ACT's membership includes Liberian DED beneficiaries, their families, and their U.S. citizen children.

24.     Each year, ACT assists hundreds of African immigrants through free immigration, legal, and employment services.  ACT organizes monthly leadership trainings for African immigrants empowering them to become leaders on civil rights issues.  ACT also mobilizes immigrant communities to engage on issues affecting African immigrants.  ACT's members have opportunities to interface with civic and political leaders.

25.     Defendant Trump's DED cancellation order has directly harmed ACT and its membership.  Liberian DED beneficiaries affiliated with ACT will be uprooted from their communities and forced to abandon their homes as soon as DED is terminated.  They will be imminently subjected to the harms and indignities inherent in immigration detention and removal.  This prospect has generated tremendous uncertainty and fear among ACT's members and staff.  This is deeply traumatizing for Liberian DED beneficiaries and their families, including their U.S. citizen children.

26.     ACT has diverted and continues to divert staff and resources:

(i) to address the deleterious effect of the DED cancellation order;

(ii) to respond to inquiries concerning DED termination from affected Liberians and from community groups, associations, churches, and service providers in Liberian communities;

(iii) for public education and outreach concerning the significance of DED cancellation, including coordination of nationwide conference calls to connect with and provide updates to the affected Liberian community;

(iv) for policy analysis and advocacy to raise awareness of the hardships imposed on Liberians by the abrupt DED cancellation order; and

(v) for local advocacy and engagement on DED issues, including policy advocacy with the New York City Mayor's Office of Immigrant Affairs, the Immigration Committee of the New York City Council, the Philadelphia Immigrant Affairs Unit, the Washington D.C. Mayor's Office on Agrican Affairs, the African Affairs Advisory Group for Montgomery County, and members of Congress concerning the adverse impact of the DED cancellation order.

ACT estimates that, as of March 2019, it had spent $52,000.00 in staff time and direct expenditures to respond to the termination of DED for Liberians, and the amount continues to grow as this case progresses.

27.     Plaintiff UndocuBlack Network ("UndocuBlack") is a Washington D.C. membership-based non-profit organization dedicated to serving Black immigrants.  Created in 2016, UndocuBlack serves thousands of immigrants through organizational chapters and a national network across approximately thirty states, including Massachusetts.  UndocuBlack's membership includes Liberian DED beneficiaries, their families, and their U.S. citizen children.

28.     UndocuBlack advocates on behalf of currently and formerly undocumented Black immigrants; facilitates a community for its members; and provides its members access to resources, including information and materials concerning legal issues, mental wellness, health services, housing, and education opportunities.

29.     Defendant Trump's DED cancellation order has directly harmed UndocuBlack and its membership.  The organization's Liberian members have been living in fear and uncertainty.  They are scared about the cancellation of DED.

30.     UndocuBlack's DED-beneficiary members fear for the well-being and care of their children if they are detained and deported to Liberia.  DED beneficiaries have also expressed concerns to UndocuBlack staff about their mortgages, bank accounts, and pensions.  UndocuBlack has diverted and continues to divert resources and staff time to address these concerns conducting trainings and disseminating resources to DED beneficiaries.

31.     With the imminent termination of DED, UndocuBlack's members are increasingly wary of engaging with the organization and accessing services.  If the termination of DED goes into effect, UndocuBlack will lose the participation of members who have been developed and trained – using significant organizational resources – for advocacy projects and community engagements.

32.     UndocuBlack has diverted and continues to divert resources and staff time to accompanying DED beneficiaries to immigration appointments and to providing mental health support to those traumatized by the prospect of being torn apart from their families and forcibly returned to unsafe conditions in Liberia; and for policy advocacy related to DED cancellation, including Congressional briefings, programmatic activities in Washington, D.C., and training Liberian DED beneficiaries for lobby visits.

33.     Plaintiff David Kroma is a Liberian immigrant who has lawfully resided in the United States for the last twenty (20) years.  He fled Liberia because he had witnessed violence and saw close friends die as a result of that violence. He has not tried to return to Liberia since arriving in the U.S.

34.     Mr. Kroma is a healthcare worker residing in Worcester, Massachusetts, where he owns his home.  He started saving for his home as soon as he got his first job in the U.S., and is proud to be a homeowner and have a place for his children to live.  He is currently living in the United States as a DED beneficiary.

35.     Mr. Kroma has been working at the Worcester Recovery Center and Hospital since 2001.  Over the years, he has been promoted, having started as a Care Worker I and being promoted to his current position, as a Care Worker IV.  He works with patients who have mental and physical disabilities.  Mr. Kroma also volunteers in the community and is an active volunteer with his church.

36.     During his two decades in the United States, Mr. Kroma has started a family.  His six U.S. citizen children range in age from four to fifteen.

37.     All of Mr. Kroma's children were born in Massachusetts.

38.     All of Mr. Kroma's school age children attend public schools in Worcester, Massachusetts.

39.     None of Mr. Kroma's children have ever been to Liberia.

40.     Mr. Kroma is terrified about returning to Liberia.  After twenty years in the U.S., he only has vague memories of his life there.  He has many restless nights in which he lies awake wracked with anxiety and fear about being forced to leave the U.S. and his six U.S. citizen children.  He is worried that he will not be able to find work in Liberia.  He is also worried that the violence has not subsided in Liberia.

41.     Plaintiff C. B., a minor son of Mr. Kroma, is 15 years-old.  He plays basketball at school.  He depends on his father for financial and emotional support.  The imminent termination of the DED program has caused him anxiety and fear.

42.     Plaintiff AL. K., a minor daughter of Mr. Kroma, is 11 years-old.  She is a shy student, but she loves school and enjoys singing with her friends.  She depends on her father for financial and emotional support.  The imminent termination of the DED program has caused her anxiety and fear.

43.     Plaintiff D. D., a minor son of Mr. Kroma, is 10 years-old.  He plays basketball, and he loves to ride his bike around his neighborhood.  He depends on his father for financial and emotional support.  The imminent termination of the DED program has caused him anxiety and fear.

44.     Plaintiff D. K., a minor daughter of Mr. Kroma, is 7 years-old.  She loves singing and dancing, and wants to grow up to be a professional dancer.  She depends on her father for financial and emotional support.  The imminent termination of the DED program has caused her anxiety and fear.

45.     Plaintiffs AI. K. and AD. K. are four-year-old minor sons of Mr. Kroma and twin brothers. The twins will start kindergarten next year.  They love soccer and enjoy playing with monster trucks.  They both depend on their father for financial and emotional support.  The imminent termination of the DED program has caused them anxiety and fear—every day, they ask if he is going to leave them.  Mr. Kroma struggles to answer his children, and can only tell them that he truly doesn't know.

46.     Plaintiff Momolo Bongay is a Liberian immigrant who has resided in the United States for eighteen (18) years.  Through his work as an orderly and home care aid, Mr. Bongay assists patients providing much needed healthcare.  He resides in Worcester, Massachusetts, and he is a DED beneficiary.

47.     Mr. Bongay is a new husband, having recently married.

12

48.     Mr. Bongay fled to the United States seeking safety after his sister was killed during an armed conflict in Liberia.  Over the past three years, Mr. Bongay has lost relatives to the Ebola epidemic in Liberia.

49.     If DED is terminated, Mr. Bongay will be forced to forfeit his job, leave his home, and be separated from his new wife.

50.     Plaintiff Othello A.S.C Dennis is a Liberian immigrant who has resided in the United States for the last twenty (20) years.  Mr. Dennis does not have any family left in Liberia. He left the country because of pervasive violence, and he recalls people being forced out of their homes and friends of his suddenly disappearing prior to him leaving.

51.     Mr. Dennis is a social worker living in Worcester.  He is currently in the United States as a DED beneficiary.

52.     During his two decades in the United States, Mr. Dennis has started a family.  He has two 9 year-old sons born in Massachusetts.

53.     Both of Mr. Dennis's sons attend public schools in Worcester, Massachusetts. Neither of them has ever been to Liberia.

54.     After beginning his career in manufacturing, Mr. Dennis transitioned to social work in 2005.  He most recently worked as a social worker through Catholic Charities in Worcester, Massachusetts.  As a social worker, Mr. Dennis helps people in the community, including those struggling with homelessness or addiction.  His chosen vocation and volunteer work are driven by his deep care for others, and he wants to help give others a better life and greater opportunities. He is particularly passionate about helping African community members better acclimate to life in the U.S., and using his own experiences to guide others.

55.     Mr. Dennis actively volunteers with Angel's Net Foundation, where he helps young students achieve success in school.

56.     Mr. Dennis has a number of medical conditions for which he receives specialized medical care and treatment in Worcester, Massachusetts.  He reasonably fears that if forced to return to Liberia, he would be unable to access the life-saving treatment he requires.

57.     Plaintiff A. D., a son of Mr. Dennis, is nine years old.  He has never been to Liberia.  He depends on his father for financial and emotional support.  The imminent termination of the DED program has caused him anxiety and fear.

58.     Plaintiff O. D., a son of Mr. Dennis, is nine years old.  He has never been to Liberia.  He depends on his father for financial and emotional support.  The imminent termination of the DED program has caused him anxiety and fear.

59.     Plaintiff Yatta Kiazolu is a Liberian immigrant who has lawfully resided in the United States since she was six (6) years old.  She has been in the United States for twenty-two (22) years.  She is a Ph.D. student in history at the University of California, Los Angeles ("UCLA"), and resides in Los Angeles, California.  Ms. Kiazolu is a DED beneficiary.

60.     Ms. Kiazolu was born to Liberian parents in Botswana.  Her parents moved back to Liberia during the height of the civil war, but they sent Ms. Kiazolu to the United States for her safety.  She grew up in Delaware, where she attended public schools and excelled as a student.  The last time she was in Liberia, she was four years old.

61.     While in college, Ms. Kiazolu discovered her passion for history. She also worked with at risk youth and college-bound adolescent girls.  In 2013, she began pursuing her PhD in the Department of History at UCLA.  Her dissertation will focus on the African diaspora during the 20th century in the United States.  Ms. Kiazolu tutored at the Social Justice Learning

Institute, and has taught history courses as an adjunct professor at California State University,

Long Beach and Delaware State University.

62.     Ms. Kiazolu has experienced great stress and anxiety because of the cancellation

of the DED program.  If forced to leave the United States, she would be uprooting her life from

the only country she knows. As a full-time student and scholar, she would be especially ill-

equipped to handle the transition.

63.     Plaintiff Christina Wilson is a Liberian national who has lawfully resided in the

United States for seventeen (17) years.  Ms. Wilson resides in Minnesota.  She is a DED

beneficiary.

64.     Ms. Wilson attended a nursing assistant school.  She has been employed as a

nursing assistant for sixteen years at the St. Therese Nursing Home in Minnesota, where she

takes care of elderly patients.  Ms. Wilson is passionate about taking care of America's aging

population.

65.     Ms. Wilson is active in her community.  She participates in community meetings

and activities.  She also reads the holy scripture at her church.

66.     The cancellation of the DED program would irreparably harm and devastate Ms.

Wilson, a survivor of war terror.  The prospect of returning to Liberia strikes terror deep in her

heart.  Ms. Wilson fled Liberia during the civil war.  Members of her immediate family were not

so lucky. One of her brothers was jailed for his human rights activities which were critical of

former Liberian warlord and president Charles Taylor.  In Liberia, another one of her brothers

was disappeared and one of her nieces was shot.  Ms. Wilson witnessed her mother being

attacked.  She lost all of her possessions when her home was burned to the ground by arsonists.

Her personal and family experiences demonstrate that conditions in Liberia are unstable and

unsafe.  She has also heard accounts of people in Liberia being targeted, attacked, and killed because they used to live in the United States.

67.     Ms. Wilson suffers from diabetes. Thanks to the medical attention she receives at home in Minnesota, her condition is well under control, and she is able to live a normal life. By contrast, Liberia's primitive healthcare apparatus does not have the capacity to treat Ms. Wilson's condition. If she is forced to return there, she will face serious complications and a risk of early death—all of which are otherwise preventable.

68.     Understandably, Ms. Wilson is haunted by the atrocities she survived while living in Liberia. In light of those traumatic experiences and the readily foreseeable health consequences she would face if repatriated, she dreads the prospect of being forced to return.

69.     Plaintiff Jerrydean Simpson is a Liberian immigrant who has resided in the United States for twenty (20) years.  She is a senior member service sales representative at Navy Federal Credit Union in Maryland.  While working full time, she is also studying Business Administration at University of Maryland, University College.  She resides in Clarksburg, Maryland, where she owns her home.  Ms. Simpson is a DED beneficiary.

70.     Ms. Simpson was born in Monrovia, Liberia.  During the violent civil war, her family was at risk because her father served in the military under the administration overthrown by Liberian warlord and president Charles Taylor.  In 1998, she was visiting relatives in the United States when there was an armed uprising in Liberia that prevented her from safely returning to her home.  She remained in the United States.

71.     Ms. Simpson is experiencing stress and anxiety because of the cancellation of the DED program.  She is concerned about unsafe conditions in Liberia.

16

72.     Plaintiff J.S., a son of Ms. Simpson, is twelve years old and a U.S. citizen.  He has a nineteen year old sister, also a child of Ms. Simpson and also a U.S. citizen.  Neither of Ms. Simpson's children have ever been to Liberia.  Ms. Simpson is their only source of emotional and financial support. Ms. Simpson is also responsible for her daughter's college tuition loans.

73.     Ms. Simpson's son and daughter are experiencing emotional distress.  They have panic attacks.  Plaintiff J.S. is having trouble focusing in school.  He is concerned about being separated from his mother.  They do not want to move to Liberia because the United States is their home.

**B.     *Defendants***

74.     Defendant Donald J. Trump is currently President of the United States.  He assumed his presidency on January 20, 2017.  As chief executive, Defendant Trump oversees all executive agencies and cabinet members, including Defendant U.S. Department of Homeland Security ("DHS") and Defendant Kevin McAleenan.  He is sued in his official capacity.

75.     Defendant DHS is a department of the Executive Branch of the United States government.  DHS and its component agencies, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, and U.S. Citizenship and Immigration Services, have the authority to administer and enforce U.S. immigration laws and policies, including the termination of DED protection for Liberians.

76.     Defendant Kevin McAleenan is the Acting Secretary of Homeland Security. He has occupied that position since the resignation of former DHS Secretary Kirstjen Nielsen came into effect on April 10, 2019. Defendant McAleenan is currently DHS's senior official.  As such, he is responsible for DHS oversight and for implementing and enforcing immigration laws and policies, including the termination of DED for Liberia.  He is sued in his official capacity.

## JURISDICTION AND VENUE

77.     The Court has jurisdiction over this matter under 28 U.S.C. § 1331. Plaintiffs

assert Due Process and Equal Protection claims under the Fifth Amendment.  Each of these

constitutional claims presents a federal question. 28 U.S.C. § 1331 grants the federal district

courts original jurisdiction over such claims "arising under the Constitution." *Davis v. Passman*,

442 U.S. 228, 243-44 (1979) ("Like the plaintiffs in *Bolling v. Sharpe, supra,* petitioner rests her

claim directly on the Due Process Clause of the Fifth Amendment. . . . [S]he is an appropriate

party to invoke the general federal-question jurisdiction of the District Court to seek relief.")

(citations omitted); 13D Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Juris. §

3563 (3d ed.) ("Repeatedly, the Supreme Court has held that cases depending directly on the

construction of the Constitution fall within the grant of federal-question jurisdiction.").

78.     Venue is proper in this Court pursuant to two separate provisions of 28 U.S.C. §

1391. First, under 28 U.S.C. § 1391(e)(1), for actions against an officer or employee of the

United States acting in his or her official capacity, venue lies in "any judicial district in

which . . . the plaintiff resides if no real property is involved in the action."  Here, eleven of the

fifteen individual plaintiffs reside in Worcester, Massachusetts.[18] Likewise, plaintiffs ACT and

UndocuBlack operate in Massachusetts and count Massachusetts residents among their members.

Defendants Trump and McAleenan are officers or employees of the United States acting in their

official capacity.

79.     Second, under 28 U.S.C. § 1391(b)(2), venue lies in "a judicial district in which a

substantial part of the events or omissions giving rise to the claim occurred."  Here, the harm

---

[18]     Plaintiffs Momolo Bongay; Othello A.S.C. Dennis and his two children, A.D. and O.D.; and David Kroma and
his six children, C. B., AL. K., D. D., D. K., AI. K., and AD. K, all reside in Worcester, Massachusetts.

precipitated by the termination of DED befell Plaintiffs in Massachusetts. Thus, "a substantial part of the events or omissions giving rise to the claim" occurred in this judicial district. *Van Eperen v. Massachusetts Mut. Life Ins., Co.*, No. 3:14-CV-13008-MAP, 2017 WL 9249439, at *12-13 (D. Mass. Feb. 28, 2017), *adopted by* 2017 WL 2362004 (D. Mass. May 31, 2017).

## FACTS

80.     DED is a life-saving humanitarian program providing immigration relief and protection to foreign nationals whose countries of origin have experienced war, civil unrest, natural disasters, or public health crises.  The President is empowered to order DHS and immigration enforcement officials to refrain from removing DED recipients from the United States.[19]  Past DED designations have ranged from one year to five years, but presidents may renew or extend the length of a DED designation.  Liberian DED has been renewed by Republican and Democratic administrations.  DED beneficiaries may also be granted employment authorization.[20]

81.     DED involves an intensive vetting process.  Individuals are ineligible for the program if they have been convicted of any felony or more than one misdemeanor.

82.     Since 1990, most DED directives have followed an expired Temporary Protected Status ("TPS") designation.[21]  Like DED, TPS is a form of humanitarian relief that prevents the removal of foreign nationals because of armed conflict, civil unrest, or natural disasters.[22] Unlike

---

[19]  U.S. Customs and Immigration Services, Deferred Enforced Departure, https://www.uscis.gov/humanitarian/temporary-protected-status/deferred-enforced-departure (last updated Mar. 30, 2018).

[20]  Congressional Research Service (CRS), Temporary Protected Status: Overview and Current Issues, RS20844, at 3-4 (Oct. 10, 2018).

[21]  *Id.* at 4-5. Unlike the basis of authority for granting a DED order, the authority for granting TPS arises from the Immigration and Nationality Act of 1990, 8 U.S.C. § 1254a. The Secretary of DHS maintains the authority to make a TPS designation after consultation with certain agencies in the U.S. government.

[22]  16 *Id.* at 2.

DED, TPS is authorized by statute and may be granted only if specific statutory requirements are fulfilled.[23]

83.     During previous administrations, DED was granted to immigrants from China, countries in the Persian Gulf, El Salvador, and Haiti.  For each group of DED recipients, in anticipation of the termination or after the termination of these DED programs, Congress passed various acts creating a path for those who had resided and worked in the U.S. as DED beneficiaries to become legal permanent residents. Liberian DED beneficiaries have not been so fortunate.

*DED Status for Liberian Nationals*

84.     Currently, Liberia is the only country whose citizens are subject to a DED order. The Liberian DED program stems from the decision to grant Liberians TPS at different periods beginning in 1991.  On March 21, 1991, Attorney General Dick Thornburgh designated Liberia as a TPS country because of "ongoing armed conflict within Liberia," and "extraordinary and temporary conditions in Liberia that prevent... nationals of Liberia from returning to Liberia in safety."[24]  This TPS designation ran until March 27, 1992.[25]

85.     After Attorney General Thornburgh's initial TPS designation, other Attorneys General extended the TPS determination for Liberians until 1999.[26]  In 1999, Attorney General Janet Reno announced the termination of TPS for Liberia, citing the U.S. Department of State's

---

[23]   16 *Id.* at 2.

[24]   Notice of Designation of Liberia Under Temporary Protected Status Program, 56 Fed. Reg. 12746 (Mar. 27, 1991). https://www.justice.gov/sites/default/files/eoir/legacy/2014/12/01/fr27mar91_post.pdf.

[25]   *Id.*

[26]   U.S. Dep't of Justice, Temporary Protected Status, https://www.justice.gov/eoir/temporary-protected-status#Lib (last updated Mar. 1, 2019).

recommendation that Liberia no longer met the statutory conditions for designation of TPS under section 244(b)(1) of the the Immigration and Nationality Act. [27]

86.     That same year, violent hostilities erupted into a second civil war when a rebel group, Liberians United for Reconciliation and Democracy, supported by forces from neighboring Guinea, sought to overthrow the government of Charles Taylor. "The conflict was defined by the use of child soldiers on all sides and extensive civilian casualties. Although armed combatants were mostly male, women and girls across the country were subjected to widespread sexual violence, abductions, forced labor, and forced marriage."[28]

87.     On September 27, 1999, on the eve of the expiration of Liberia's TPS designation, President Bill Clinton directed Attorney General Reno to defer enforced departure of Liberians until September 29, 2000.[29]  President Clinton concluded that the fragile conditions in Liberia provided compelling reasons to assign Liberians DED status.[30]

88.     On September 28, 2000, President Clinton extended DED status for another year noting:

> I am concerned that a decision by our Government to deport Liberians who have enjoyed the protection of our country for many years could cause the involuntary repatriation of many thousands of Liberian refugees from other nations in West Africa.  This would severely burden Liberia and cause instability in Liberia and in the region.[31]

---

[27]   Termination of Designation of Liberia Under Temporary Protected Status Program, 64 Fed. Reg. 41463 (July 30, 1999), https://www.justice.gov/sites/default/files/eoir/legacy/2002/09/09/fr30jy99N.pdf.

[28]   Women's Participation in Peace Processes: Liberia, Council on Foreign Relations, https://www.cfr.org/interactive/womens-participation-in-peace-processes/liberia (last visited May 13, 2019).

[29]   Presidential Memorandum on Measures Regarding Certain Liberians in the United States, Sept. 28, 2000, https://www.justice.gov/sites/default/files/eoir/legacy/2004/04/22/pd02oc00.pdf.

[30]   *Id.*

[31]   *Id.*

89.     Since then, Republican and Democratic administrations alike have endorsed DED

for Liberians.  On September 25, 2001, President George W. Bush extended DED status for

Liberians until September 29, 2002.[32]  In a memorandum directing the Attorney General to defer

enforced departure, President Bush acknowledged that there continues to be compelling reasons

". . . not to deport these Liberians at this time.  In particular, there is a significant risk that such a

decision would cause the involuntary repatriation of many thousands of Liberian refugees in

West Africa, causing instability in Liberia and the region."[33]

90.     By 2002, Liberia's second civil war had reached a fever pitch. The hostilities had

displaced at least 120,000 Liberians and forced approximately 75,000 to flee the country.[34]

Thus, on September 26, 2002, Attorney General John Ashcroft re-designated Liberia as a TPS

country. In making his assessment, Attorney General Ashcroft relied on analysis prepared by the

U.S. Department of State and the Resource Information Center of the Immigration and

Naturalization Service ("INS").[35]  A memorandum from the Department of State concluded that

involuntarily repatriating Liberian nationals would pose a serious risk to their personal safety

because the government and rebel forces were committing serious human rights abuses, and the

country's vital services such as food, sanitation, shelter, and health were on the verge of

collapse.[36]  INS similarly noted the grave human rights violations, widespread displacement, and

---

[32]   Presidential Memorandum on Measures Regarding Certain Liberians in the United States, Sept. 25, 2001,
https://www.justice.gov/sites/default/files/eoir/legacy/2002/09/09/pd01oc01.pdf.

[33]   Presidential Statement on House of Representatives Action on the Defense Authorization Bill, Sept. 25, 2001,
https://www.justice.gov/sites/default/files/eoir/legacy/2002/09/09/pd01oc01.pdf.

[34]   Designation of Liberia Under the Temporary Protected Status Program, 67 Fed. Reg. 61,665 (Oct. 1, 2002),
https://www.gpo.gov/fdsys/pkg/FR-2002-10-01/pdf/02-24992.pdf.

[35]   *Id.*

[36]   *Id.*

the humanitarian crisis in Liberia.[37]  This TPS program ran from October 1, 2002 until October

1, 2003.[38]

91.     DHS Secretary Tom Ridge extended the TPS program related to the civil conflict

in Liberia until October 1, 2004.  On July 28, 2004, Secretary Ridge concluded that the

conditions that prompted the TPS designation originally assigned by Attorney General Ashcroft

no longer existed.[39]  But Secretary Ridge re-designated TPS based on "extraordinary and

temporary conditions in Liberia that prevent the safe return of certain nationals of Liberia," for a

one-year period until October 1, 2005.[40]  DHS again extended TPS until October 1, 2006.[41]

92.     On September 6, 2006, DHS Secretary Michael Chertoff determined that TPS

designation should be terminated, and that the termination would take effect on October 1, 2007.

Secretary Chertoff noted that the statutory conditions required for extending TPS were no longer

applicable.[42]

93.     However, on September 12, 2007, President Bush granted DED status to

Liberians for 18 months until March 21, 2009.[43]  In a memorandum to DHS, President Bush

---

[37]  *Id.*

[38]  *Id.*

[39]  Termination and Re-Designation of Liberia for Temporary Protected Status, 69 Fed. Reg. 52,297 (Aug. 25, 2004), https://www.federalregister.gov/documents/2004/08/25/04-19448/termination-and-re-designation-of-liberia-for-temporary-protected-status.

[40]  *Id.*

[41]  Extension of the Designation of Liberia for Temporary Protected Status, 70 Fed. Reg. 48176 (Aug. 16, 2005), https://www.justice.gov/sites/default/files/eoir/legacy/2005/08/17/fr16aug05.pdf.

[42]  Termination of the Designation of Liberia for Temporary Protected Status; Automatic Extension of Employment Authorization Documentation for Liberia TPS Beneficiaries, 71 Fed. Reg. 55,000 (Sept. 20, 2006), https://www.federalregister.gov/documents/2006/09/20/06-7785/termination-of-the-designation-of-liberia-for-temporary-protected-status-automatic-extension-of.

[43]  Dep't Homeland Security, Fact Sheet: Liberians Provided Deferred Enforced Departure (DED) (Sept. 12, 2007), https://www.uscis.gov/sites/default/files/files/pressrelease/LiberiaFS_07Sep12.pdf; *see also* Automatic Extension of Employment Authorization and Related Documentation for Liberians Provided Deferred Enforced Departure, 72 Fed. Reg. 53,596 (Sept. 19, 2007), https://www.federalregister.gov/documents/2007/09/19/07-4645/automatic-extension-of-employment-authorization-and-related-documentation-for-liberians-provided.

ordered DED because "the political and economic situation in Liberia continues to be fragile."[44]

President Bush concluded that "Liberia is struggling to implement reconstruction and economic

stabilization programs for the population, including the thousands of former Liberian refugees

who have returned from the West African region and elsewhere."[45]

     94.    On March 20, 2009, President Barack Obama extended DED for Liberians for

another year until March 31, 2010.[46]  In the following years, President Obama again extended

DED for periods of 18-24 months.[47]  In September 2014, President Obama issued another DED

order for a 24-month DED designation lasting from October 1, 2014 to September 30, 2016.[48]

---

[44]   Presidential Memorandum for the Secretary of Homeland Security (Sept. 12, 2007), https://georgewbush-whitehouse.archives.gov/news/releases/2007/09/20070912-10.html.

[45]   *Id.*

[46]   Presidential Memorandum Regarding Deferred Enforced Departure for Liberians (Mar. 23, 2009), https://obamawhitehouse.archives.gov/the-press-office/presidential-memorandum-regarding-deferred-enforced-departure-liberians.

[47]   Filing Procedures and Automatic Extension of Employment Authorization and Related Documentation for Liberians Provided Deferred Enforced Departure, 75 Fed. Reg. 15,715 (Mar. 30, 2010), https://www.federalregister.gov/documents/2010/03/30/2010-7115/filing-procedures-and-automatic-extension-of-employment-authorization-and-related-documentation-for; Presidential Memorandum–- Deferred Enforced Departure for Liberians (Mar. 19, 2010) http://www.tlcafrica.com/DED2010.pdf.; Filing Procedures for Employment Authorization and Automatic Extension of Existing Employment Authorization Documents for Liberians Provided Deferred Enforced Departure, 76 Fed. Reg. 53,145 (Aug. 25, 2011), https://www.federalregister.gov/documents/2011/08/25/2011-21842/filing-procedures-for-employment-authorization-and-automatic-extension-of-existing-employment; Filing Procedures for Employment Authorization and Automatic Extension of Existing Employment Authorization Documents for Liberians Eligible for Deferred Enforced Departure, 76 Fed. Reg. 53,145 (Mar. 21, 2013), https://www.federalregister.gov/documents/2013/03/21/2013-06519/filing-procedures-for-employment-authorization-and-automatic-extension-of-existing-employment; Filing Procedures for Employment Authorization and Automatic Extension of Existing Employment Authorization Documents for Liberians Eligible for Deferred Enforced Departure, 79 Fed. Reg. 59,286 (Oct. 1, 2014), https://www.federalregister.gov/documents/2014/10/01/2014-23507/filing-procedures-for-employment-authorization-and-automatic-extension-of-existing-employment.

[48]   Filing Procedures for Employment Authorization and Automatic Extension of Existing Employment Authorization Documents for Liberians Eligible for Deferred Enforced Departure, 79 Fed. Reg. 59,286 (Oct. 1, 2014), https://www.federalregister.gov/documents/2014/10/01/2014-23507/filing-procedures-for-employment-authorization-and-automatic-extension-of-existing-employment.

95.     During this DED period, in March 2014, the first Ebola virus infection was detected in Liberia. This infection rapidly spread to become the largest and longest Ebola epidemic in history.[49]

96.     Ebola is "one of the deadliest viral diseases" known to man.[50] The World Health Organization has described it as "a traumatic illness both in terms of symptom severity and mortality rates.  Those affected are likely to experience psychological effects due to the traumatic course of the infection, fear of death and experience of witnessing others dying."[51]

97.     Liberia's healthcare system, devastated by years of conflict, was no match for Ebola. The epidemic wrought havoc on Liberia's population, killing thousands. Ebola also caused a ripple effect, as the country's desperate attempts to curb the virus's transmission disrupted the economy and threatened food shortages.[52] Thus, on November 21, 2014, DHS Secretary Jeh Johnson granted Liberia a new TPS designation for a period of 18 months until May 21, 2016.[53]  Secretary Johnson noted that the virus had overwhelmed Liberia's already weak healthcare system and that due to the epidemic, conditions in Liberia were dire.[54]

---

[49]   Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report (MMWR) (Nov. 14, 2014), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm63e1114a4.htm.

[50]   *History of Ebola Virus Disease*, Centers for Disease Control and Prevention, https://www.cdc.gov/vhf/ebola/history/summaries.html (last visited May 13, 2019).

[51]   World Health Organization, Psychosocial effects of an Ebola outbreak at individual, community and international levels, https://www.who.int/bulletin/volumes/94/3/15-158543/en/.

[52]   Designation of Liberia for Temporary Protected Status, 79 Fed. Reg. 69502 (Nov. 21, 2014), https://www.federalregister.gov/documents/2014/11/21/2014-27772/designation-of-liberia-for-temporary-protected-status.

[53]   *Id.*

[54]   *Id.*

98.     Secretary Johnson then extended TPS for six months from May 22, 2016 until November 21, 2016.[55]  He concluded that although Liberia was free of Ebola transmission, the country was facing recovery challenges such as rebuilding its fragile healthcare system and securing an adequate food supply.[56]

99.     On September 26, 2016, Secretary Johnson published his decision to terminate TPS on May 21, 2017, because the country conditions no longer supported TPS determination.[57] That same day, President Obama extended DED to Liberians from October 1, 2016 until March 31, 2018.[58]  This was the last DED order before Defendant Trump assumed the presidency.

*Defendant Trump's History of Racial Animus*

100.     Defendant Trump harbors a deep racial animus against immigrants of color. He makes little attempt to hide these feelings; he frequently wears his bigotry as a badge of honor. His long history of bigoted remarks and actions reveals that he has no qualms about using racist remarks to foment anti-immigrant sentiment among his supporters for short-term political gain. *See, e.g.*, *Ramos v. Nielsen, Order Granting Plaintiffs' Motion For Preliminary Injunction*, 18-CV-1554 (N.D. Cal. 2018) at 27-37 (cataloguing "evidence that President Trump harbors an animus against non-white, non-European aliens").

---

[55]   Extension of the Designation of Liberia for Temporary Protected Status, 81 Fed. Reg. 15328 (Mar. 22, 2016). https://www.federalregister.gov/documents/2016/03/22/2016-06328/extension-of-the-designation-of-liberia-for-temporary-protected-status.

[56]   *Id.*

[57]   Six Month Extension of Temporary Protected Status Benefits for Orderly Transition Before Termination, 81 Fed. Reg. 66059 (Sept. 26, 2016). https://www.federalregister.gov/documents/2016/09/26/2016-23250/six-month-extension-of-temporary-protected-status-benefits-for-orderly-transition-before-termination.

[58]   Memorandum to the Sec'y of Homeland Security, from the President, Sept. 28, 2016, https://obamawhitehouse.archives.gov/the-press-office/2016/09/28/presidential-memorandum-deferred-enforced-departure-liberians; Filing Procedures for Employment Authorization and Automatic Extension of Existing Employment Authorization Documents for Liberians Eligible for Deferred Enforced Departure, 81 Fed. Reg. 67,366 (Sept. 30, 2016), https://www.federalregister.gov/documents/2016/09/30/2016-23798/filing-procedures-for-employment-authorization-and-automatic-extension-of-existing-employment.

101.    Discriminatory sentiment has permeated Defendant Trump's agenda since the dawn of his presidential candidacy.  In 2015, Defendant Trump announced his campaign for the presidency by describing Mexican nationals in blatantly racist terms:

> When Mexico sends its people, they're not sending their best. They're not sending you.  They're not sending you.  They're sending people that have lots of problems, and they're bringing those problems with us.  They're bringing drugs.  They're bringing crime. They're rapists.[59]

102.    In another statement, Trump also declared: "What can be simpler or more accurately stated? The Mexican Government is forcing their most unwanted people into the United States.  They are, in many cases, criminals, drug dealers, rapists, etc."[60]

103.    Trump continued to insult and belittle immigrants of color after he began his presidency, further demonstrating his animus towards them.  In June 2017, he participated in a policy meeting regarding immigration matters.[61]  According to officials interviewed by the New York Times, during the meeting, Trump read aloud from a document listing the number of immigrants that had received visas in 2017.[62]  He complained that more than 2,500 were from Afghanistan, which he called a "terrorist haven."[63]  He "grumbled" that the 15,000 people from Haiti "all have AIDS."[64]  Trump also read that 40,000 immigrants came from Nigeria.[65]  Two

---

[59]    Washington Post Staff, *Full Text: Donald Trump Announces a Presidential Bid*, Washington Post, Jun. 16, 2015, https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.450b6efca4b3.

[60]    Eugene Scott, *Trump's History of Making Offensive Comments about Nonwhite Immigrants*, Washington Post, Jan. 11, 2018, https://www.washingtonpost.com/news/the-fix/wp/2018/01/11/trumps-history-of-controversial-remarks-about-nonwhite-immigrants/?utm_term=.3e95d1658762.

[61]    Michael D. Shear and Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, NY Times, Dec. 23 2017, https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html?_r=0.

[62]    *Id.*

[63]    *Id.*

[64]    *Id.*

[65]    *Id.*

officials who participated in the meeting recalled that Defendant Trump stated that once the

Nigerian immigrants had seen the United States, they would never "go back to their huts" in

Africa.[66]

104.    During a speech in December 2017, Defendant Trump ridiculed the Diversity

Visa Program as a "joke".[67]  According to the Washington Post, the State Department awards

50,000 visas through this program each year, and most of the recipients are from African

nations.[68] Defendant Trump derided the program, complaining: "They give us their worst people,

put them in a bin... they're picking the worst of the worst, congratulations you're going to the

U.S."[69]

105.    Even more telling were statements made by Defendant Trump in the months

leading to his memorandum announcing the termination of DED for Liberia.  The Washington

Post reported that in January 2018, Defendant Trump attended a meeting discussing immigrants

from Haiti, El Salvador, and African countries as part of a bipartisan immigration deal.[70]

According to participants in the meeting, Trump, while referencing Haiti, El Salvador, and

African countries said, "Why are we having all these people from shithole countries come

here?"[71]  He also said, "why do we need more Haitians," and wanted Haitians removed from an

---

[66]   *Id.*

[67]   *Id.*

[68]   Eugene Scott, *Trump's History of Making Offensive Comments about Nonwhite Immigrants*, Washington Post,
Jan. 11, 2018, https://www.washingtonpost.com/news/the-fix/wp/2018/01/11/trumps-history-of-controversial-
remarks-about-nonwhite-immigrants/?utm_term=.3e95d1658762.

[69]   *Id.*

[70]   Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, Washington Post, Jan. 12,
2018, https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-
countries-in-oval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-
31ac729add94_story.html?utm_term=.197963a10340.

[71]   *Id.*

immigration deal; specifically, when discussing Haitians, Defendant Trump said "Take them out."[72]

106.    Donald Trump's prejudicial view of predominantly Black countries as "shithole countries" predates his presidency.  On February 27, 2019, Defendant Trump's former attorney, Michael Cohen, testified before Congress that Trump asked him if he "could name a country run by a black person that wasn't a 'shithole.'"[73]  Although the exact date of this statement is unknown, Cohen testified that this occurred "when Barack Obama was President of the United States."[74]

107.    In direct contrast to the statements he made about African and Latin American countries, Defendant Trump suggested that the United States bring in more immigrants from predominantly white countries such as Norway instead of the aforementioned "shithole countries."[75]  Lawmakers present in the meeting were shocked by Defendant Trump's statements.[76]

108.    Seven days after these statements, the Department of Homeland Security cancelled TPS for immigrants from Haiti, El Salvador, Nicaragua, and Sudan.  A federal court has currently enjoined the TPS terminations, finding sufficient "evidence that Defendant Trump harbors an animus against non-white, non-European aliens" to grant a preliminary injunction. *See Ramos v. Nielsen*, No. 18-cv-01554-EMC, Dkt. 128 at 30 (N.D. Cal. Oct. 3, 2018).

---

[72]    *Id.*

[73]    *Michael Cohen's prepared statement to the House Committee on Oversight and Reform*, Washington Post, Feb. 27, 2019, at 10-11, https://www.washingtonpost.com/michael-cohen-s-prepared-statement-to-the-house-committee-on-oversight-and-reform/d2cdc193-2f0c-44bb-b2f8-e7dadddf545e_note.html?questionId=a194ac05-9c53-4be2-868d-777713d7c30e&utm_term=.4a1162e75aaf.

[74]    *Id.*

[75]    Julia Hirschfeld Davis et al, *Trump Alarms Lawmakers with Disparaging Words for Haiti and Africa*, NY Times (Jan. 11, 2018), https://www.nytimes.com/2018/01/11/us/politics/trump-shithole-countries.html.

[76]    *Id.*

*Trump Administration Terminates DED Program for Liberians*

109.   Shortly thereafter, on March 27, 2018, Defendant Trump terminated the DED program for Liberians.[77]

110.   Although thousands of Liberians have resided in the United States for over twenty years protected under TPS and DED designations made during multiple administrations, on March 27, 2018, Defendant Trump issued a presidential memorandum directing DHS to terminate DED effective March 31, 2019.[78]   The president stated that he made this decision "through consultation with appropriate executive departments and agencies and [his] advisors."[79] On information and belief, these agencies and advisors included Defendant DHS and Former DHS Secretary Nielsen.

111.   Although Defendant Trump acknowledged that Liberia suffered economic damage because of the Ebola epidemic, he claimed that the conditions in the country had improved because Liberia "is no longer experiencing armed conflict and has made significant progress in restoring stability and democratic governance."[80]

112.   The President's unsubstantiated claims are mere pretext.   There is extensively corroborated evidence that the situation in Liberia remains dire.   According to Defendant Trump's own State Department, significant human rights abuses are prevalent throughout Liberia.   This includes "extrajudicial killings by police; police abuse, harassment, and intimidation of detainees and others; arbitrary arrest and detention; press harassment; official

---

[77]   Presidential Memorandum for the Secretary of State and the Secretary of Homeland Security (Mar. 27, 2018), https://www.whitehouse.gov/presidential-actions/presidential-memorandum-secretary-state-secretary-homeland-security/.

[78]   *Id.*

[79]   *Id.*

[80]   *Id.*

corruption; lack of accountability in cases of violence against women and children, including

rape, domestic violence, and female genital mutilation/cutting ("FGM/C"); criminalization of

same-sex sexual conduct; and trafficking in persons."[81]  "Impunity remained a serious problem

for individuals who committed atrocities during the civil wars, as well as for those responsible

for current and continuing crimes, despite intermittent and limited government attempts to

investigate and prosecute officials accused of current abuses, whether in the security forces or

elsewhere in the government.  Corruption at all levels of government continued to undermine

public trust in state institutions."[82]

113.    Taken together, these factors demonstrate that conditions in Liberia undoubtedly

justify an extension of DED. Moreover, they confirm that Defendant Trump's stated justification

for terminating DED is mere pretext.  Defendant Trump's long history of disparaging comments

against Africans reveal that a far more ominous reason catalyzed his decision to terminate DED:

his discriminatory and prejudicial attitudes towards immigrants of color.

114.    On March 28, 2019, the very next day after Plaintiffs filed their Reply in Further

Support of Motion for Preliminary Injunction in this action, Defendant Trump issued a

memorandum instructing DHS to delay termination of DED until March 30, 2020.[83] Therein,

Defendant Trump recognized the "unique" relationship between the U.S. and Liberia. Further, he

acknowledged that "[t]he overall situation in West Africa remains concerning, and Liberia is an

important regional partner for the United States. The reintegration of DED beneficiaries into

---

[81]    U.S. Dep't of State, Liberia 2017 Human Rights Report, https://www.state.gov/documents/organization/ 277259.pdf.

[82]    *Id.*

[83]    Memorandum on Extension of Deferred Enforced Departure for Liberians, White House (Mar. 28, 2019), https://www.whitehouse.gov/presidential-actions/memorandum-extension-deferred-enforced-departure-liberians/.

Liberian civil and political life will be a complex task, and an unsuccessful transition could strain United States-Liberian relations and undermine Liberia's post-civil war strides toward democracy and political stability."[84] Despite this delay in implementing the termination of DED, there is no indication of a fundamental change in conditions in Liberia that would justify the program's termination in March 2020.

115.    Notably, the Trump Administration has asserted no national security interest for terminating the Liberian DED program, and indeed, none could exist.  The beneficiaries of the program have lived in the United States for decades and are all known to and extensively vetted by the government. Indeed, there is no evidence that the four thousand hardworking Liberian DED beneficiaries, who have lived and raised U.S. citizen children for decades, are having any sort of adverse impact on our country. To the contrary, they contribute immensely to their respective communities and to the United States.

116.    Regrettably, however, Defendant Trump's racial animus has influenced not only his own policy positions but also the agencies, advisors, and policymakers that work under his control.  Upon information and belief, Defendant Trump's discriminatory attitudes influenced consultations with agencies and advisors under his charge.

117.    The Trump Administration's claim that conditions in Liberia have improved to the point of justifying the termination of DED is also a departure from the regular process used to terminate of DED programs for other foreign nationals.  In every past administration that evaluated Liberian DED, a decision was made to extend the program.  This includes extensions granted, at times, when there was no active armed conflict.  The Trump Administration's cancellation is, therefore, a sharp departure from longstanding practice.

---

[84]    *Id.*

118.    The Trump Administration also departs from past practice by announcing the termination of DED without consulting Liberian government officials.  Previously, under the Clinton Administration, the INS permitted the expiration of DED for Salvadoran nationals after consulting with both U.S. agencies and government officials from El Salvador.[85]  In contrast, nothing in Defendant Trump's memorandum terminating DED referenced any consultation with Liberian government officials.

119.    Additionally, multiple thoroughly investigated articles and reports make clear that Liberia cannot handle the immediate return of thousands of Liberian nationals due to its weak economy and limited infrastructure.  These conditions largely mirror those considered by previous administrations when Liberians were granted TPS or DED.  According to USA Today's GDP analysis, Liberia is the poorest country in the world.[86]  The return of Liberian nationals would also harm the Liberian economy given the country's dependence on money sent by those living outside of the country.  Most of the remittances are sent from Liberians living in the United States.[87]  In 2015, Liberians in the United States sent roughly $328 million in remittances.[88]  In 2016, remittances accounted for roughly 31% of Liberia's GDP.[89]

120.    Even more telling is information provided by Congress and U.S. agencies that confirm Liberia's struggling economy and limited infrastructure.  Shortly before Defendant Trump announced the termination of DED in March 2018, members of Congress issued a

---

[85]    News Release, American Immigration Lawyers Association (Dec. 2, 1994) https://www.aila.org/infonet/ins-ded-for-salvadorans-expires.

[86]    John Harrington, From the Solomon Islands to Liberia: These are the 25 poorest countries in the world, *USA Today*, Nov. 29, 2018, https://www.usatoday.com/story/money/2018/11/29/poorest-countries-world-2018/38429473/.

[87]    GAO, Remittances to Fragile Countries, Mar. 2018, at 14-15, https://www.gao.gov/assets/700/690546.pdf.

[88]    *Id.*

[89]    Rishi Iyengar, *Migrant workers will send home $450 billion this year*, *CNN Business*, Jun. 15, 2017, https://money.cnn.com/2017/06/15/news/economy/migrant-workers-global-remittances/index.html.

bipartisan letter urging that DED be extended for at least another three years.[90]  The letter

recognized that:

> [T]here are still serious concerns about the nation's ability to maintain peace and deliver essential services to its population.  A flood of Liberians from the United States could overburden the country's limited infrastructure and reverse the advances the nation of Liberia has made.  It would also stem the crucial socio-economic investment and assistance that Liberians in our country provide through remittances to their relatives in Liberia.[91]

121.    On March 1, 2019, fifty members of Congress sent Defendant Trump a letter

urging him to reinstate DED immediately to "prevent anxiety and legal uncertainty within our

Liberian-American communities."[92]  The letter expressed concerns that

> While few in number, an influx of Liberians from the United States could overburden the country's limited infrastructure and reverse the nascent advances that the Liberian people and government have made.  Deporting this population would also prevent its members from contributing to the crucial private sector investment and socio-economic assistance that they have long provided in the form of remittances to their relatives in Liberia.[93]

122.    On March 27, 2019, the Attorneys General of Minnesota, Massachusetts,

California, Illinois, Maryland, New Jersey, New York, Rhode Island, Virginia, and the District of

Columbia submitted an amicus brief in support of Plaintiffs' motion for preliminary injunctive

relief.[94]  The Amici States noted that the termination of DED for Liberian nationals "would

---

[90]    Press Release, *50+ Bipartisan Members of Congress Urge Trump to Extend Deferred Enforced Departure (DED) for Liberians*, America's Voice, Mar. 26, 2018, https://americasvoice.org/press_releases/50-bipartisan-members-congress-urge-trump-extend/.

[91]    *Id.*

[92]    Press Release, *50 Members of Congress Call for Extension of Protected Status for Liberians Living in the United States*, Congressional Offices of Donald M. Payne (Mar. 1, 2019), https://payne.house.gov/press-release/50-members-congress-call-extension-protected-status-liberians-living-united-states.

[93]    *Id.*

[94]    Amici Curiae Brief of the State of Minnesota, the Commonwealth of Massachusetts, the States of California, Illinois, Maryland, New Jersey, New York, and Rhode Island, the Commonwealth of Virginia, and the District of Columbia Supporting Plaintiffs' Motion for Preliminary Injunction, Dkt. 34, at 7-9 (Mar. 27, 2019).

deprive the Amici States' economies and communities of positive contributions from coworkers and neighbors who have lived here for decades."[95]  For example, Minnesota is facing "particular harms to the state's economy because Minnesota, like many other states, faces serious shortages and a growing need for workers in health and social services" and "[a] majority of employed Liberians work in the health care and social assistance or educational services industries."[96]

123.    Indeed, information provided by the Trump Administration's own agencies directly contradicts Defendant Trump's conclusions about the program.  USAID's profile on the effects of the Ebola epidemic in Guinea, Sierra Leone, and Liberia outlines how the virus "derailed lives and livelihoods in some of the most vulnerable countries in world" and continues "to have direct, negative impacts in all three countries."[97]  These negative impacts include "a retraction in previous development gains; severely disrupted economic and social activity; and a decline in the delivery of essential government services."[98]

124.    The U.S. Department of State has also reported on the adverse economic effects of the Ebola outbreak.  For example, in July 2018, the State Department acknowledged that "the Ebola epidemic and the concurrent global downturn in prices of Liberia's principal exports have also slowed economic growth, drained the government's resources, and delayed development projects."[99]

125.    The State Department has even cautioned U.S. travelers not to rely on the healthcare infrastructure in Liberia:

---

[95]    *Id.* at 1.

[96]    *Id.* at 3-4.

[97]    Ebola: The Recovery, USAID, https://www.usaid.gov/ebola (last updated May 22, 2018).

[98]    *Id.*

[99]    U.S. Dep't of State, Bureau of African Affairs, *U.S. Relations with Libya: Fact Sheet*, Jul. 20, 2018, https://www.state.gov/r/pa/ei/bgn/6618.htm.

> Hospitals and medical facilities in Liberia are poorly equipped and are incapable of providing many services. Emergency services comparable to those in the United States or Europe are non-existent, and the blood supply is unreliable and unsafe for transfusion. For serious medical problems, you should consider traveling to the United States, Europe, or South Africa for treatment. Within Liberia, medicines are scarce, often beyond expiration dates, possibly counterfeit, and generally unavailable in most areas.[100]

126.    The Central Intelligence Agency's ("CIA") Factbook for Liberia notes that the Ebola epidemic forced the Liberian government to divert "scarce resources to combat the spread of the virus, reducing funds available for needed public investment."[101] The CIA also recognizes that Liberia is a low-income country that relies heavily on remittances from its diaspora.[102]

127.    The U.S. government is hardly alone in recognizing the dire conditions prevailing in Liberia. The World Bank reported in October 2018 that more than half of all Liberians live in poverty and that the Liberian economy is still "struggling to recover fully from the effects of multiple shocks in recent years; namely, Ebola Virus Disease ("EVD") outbreak, collapse of commodity prices, UNMIL withdrawal and the perception of risk associated with the political transition."[103]

128.    Additionally, the human rights situation in Liberia renders it impossible for Liberian DED beneficiaries to safely return to the country. As noted above, the State Department's most recent human rights report on Liberia details serious, pervasive human rights abuses, including:

---

[100]  U.S. Dep't of State, Bureau of Consular Affairs, *Liberia International Travel Information*, https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Liberia.html (last updated Jan. 7, 2019).

[101]  Central Intelligence Agency World Factbook, *Economy: Liberia*, https://www.cia.gov/library/publications/the-world-factbook/geos/li.html (last updated Feb. 17, 2019).

[102]  *Id.*

[103]  World Bank Group, Political and Security Update [Liberia], https://www.worldbank.org/en/country/liberia/overview (last updated Oct. 12, 2018).

extrajudicial killings by police; police abuse, harassment, and
intimidation of detainees and others; arbitrary arrest and detention;
press harassment; official corruption; lack of accountability in cases
of violence against women and children, including rape, domestic
violence, and female genital mutilation/cutting (FGM/C);
criminalization of same-sex sexual conduct; and trafficking in
persons.  Impunity remained a serious problem for individuals who
committed atrocities during the civil wars, as well as for those
responsible for current and continuing crimes, despite intermittent
and limited government attempts to investigate and prosecute
officials accused of current abuses, whether in the security forces or
elsewhere in the government.  Corruption at all levels of government
continued to undermine public trust in state institutions.[104]

129.     LGBTI individuals also face risks and curtailment of rights in the country.

Liberian law prohibits sexual activity among same-sex partners.  The State Department reports

that prejudice against LGBTI individuals in Liberia is so strong that they faced "difficulty in

obtaining redress for crimes committed against them, including at police stations, because those

accused of criminal acts used the victim's LGBTI status as a defense."[105]

130.     Additionally, the Trump Administration failed to consider the effect of forced

repatriation on the U.S. citizen children of DED beneficiaries, including Plaintiffs C.B, AL. K,

D.D, D.K, AI. K, AD. K, O.D., A.D., and J.S.  These U.S. citizen children face the

unconstitutional choice of remaining in the United States while being separated from their

Liberian parents or relocating to an unsafe country.

131.     Liberia forbids dual citizenship.[106]  Any U.S. citizen child of a Liberian DED

beneficiary must renounce his or her U.S. citizenship to enjoy the rights conferred on Liberian

---

[104]   U.S. Dep't of State, Bureau of Democracy, Human Rights and Labor, *Liberia 2017 Human Rights Report*, at 1
        https://www.state.gov/documents/organization/277259.pdf.

[105]   *Id.* at 29.

[106]   Robtel Neajai Pailey, *The Struggles for Liberian Citizenship*, Al Jazeera (Jan. 29, 2019),
        https://www.aljazeera.com/indepth/opinion/struggles-liberian-citizenship-190128050949269.html.

citizens such as owning land, inheriting real property, or operating or working for many types of businesses.[107]

*Harmful Effects of Defendants' Discriminatory Actions*

132.   Defendant Trump's pattern of hateful comments towards immigrants from African countries conveys a clear, painful message: immigrants from these countries are undesirable based on their race, ethnicity and national origin.  The president does not want immigrants of color in the United States, but he welcomes immigration from predominantly white countries such as Norway.

133.   Because of these discriminatory attitudes, Defendants Trump and DHS have made immigration decisions that target immigrants of color and would result in their detention and removal from the United States.  This includes the termination of DED for Liberians who were granted humanitarian relief by previous administrations.

134.   The termination of DED has violated the constitutional rights of Liberian DED beneficiaries and their U.S. citizen children.  Additionally, the termination of DED has harmed or will imminently harm the dignity and well-being of Liberian DED beneficiaries and their U.S. citizen children, including Plaintiffs.

135.   Liberian DED beneficiaries will be forced to leave the United States after legally residing in the country for decades.  Many are home owners, economically productive taxpayers, and active in their communities.  They will be forced to abandon the assets they have built here through hard work, including their property and pensions.

136.   Many Liberians living in the United States – including terror survivor Christina Wilson – fled Liberia because they were targeted and persecuted during the civil war.  Notorious

---

[107]   *Id.*

and brutal warlords are now part of the Liberian government.  For example, Prince Johnson, a former rebel leader who was allied with convicted war criminal Charles Taylor and whose threats to arrest foreigners led U.S. marines to evacuate the U.S. Embassy in Monrovia during the civil war,[108] is now a Liberian senator who has influenced the election of the past two Liberian presidents, and has actively blocked efforts to establish a war crimes tribunal in Liberia.[109]  George Boley, an ex-warlord who was deported from the United States in 2012 for extrajudicial killings and recruitment of child soldiers, now serves in Liberia's House of Representatives.[110]  Many Liberian DED beneficiaries, particularly those whose families were active in previous administrations, face violent retaliation if they return to Liberia.

137.   The U.S. citizen children of Liberian DED beneficiaries also face extreme hardship.  They face the searing and unconstitutional decision of either being separated from their parent(s) and remaining in the United States, or moving with their parent(s) to Liberia, a country that is unsafe and foreign to them.  None of the U.S. citizen Plaintiffs have ever been to Liberia.

138.   Furthermore, U.S. citizen children who relocate to Liberia may face legal difficulties that could affect their ability to survive in the new country.  For example, Liberian

---

[108]   Eric Schmitt, Man in the News; A Foe to Be Feared: Prince Yormie Johnson, Sept. 11, 1990, https://www.nytimes.com/1990/09/11/world/man-in-the-news-a-foe-to-be-feared-prince-yormie-johnson.html.

[109]   Alvin Worzi, *Is Prince Johnson still a kingmaker?*, LIBERIAN OBSERVER, Oct. 25, 2017, https://www.liberianobserver.com/news/is-prince-johnson-still-a-kingmaker/.

[110]   News Release, U.S. Immigration and Customs Enforcement, Liberian human rights violator removed from US (Mar. 29, 2012) (https://www.ice.gov/news/releases/liberian-human-rights-violator-removed-us); John H. T. Stewart, *George Boley sues GoL for pension benefits*, LIBERIAN OBSERVER (Sept. 10, 2018), https://www.liberianobserver.com/news/george-boley-sues-gol-for-pension-benefits/.

law forbids dual citizenship, meaning that any U.S. citizen child of a Liberian DED beneficiary must renounce his or her U.S. citizenship to enjoy the rights conferred on Liberian citizens.[111]

139.    The termination of DED will also harm local economies and industries throughout the United States.  For example, a large number of Liberians in the United States reside in Massachusetts and Minnesota.  After Defendant Trump announced the termination of DED, Minnesota Governor Mark Dayton sent a letter to Defendant Trump urging him to reconsider his decision.  Governor Dayton described how a large number of Liberian Americans in Minnesota work in the healthcare industry, and if they are forced to leave the country, there will be a workforce crisis in the state's health care industry.[112]  Similar outcomes are expected in Massachusetts, where many Liberians work in the healthcare industry including Plaintiffs Kroma and Bongay.[113]

140.    Finally, Plaintiffs would lose access to life-saving medical care and effectively be sentenced to die of diseases and medical conditions that would be easily prevented, treated, or even cured in the United States.

---

[111]  George Weah vows to change Liberia's citizenship laws, BBC News, Jan. 30, 2018, https://www.bbc.com/news/world-africa-42871741.

[112]  *Minnesota Governor's Letter to Trump: Reinstate DED for Liberians, Find Pathway for Dreamers*, Fox 9, Mar. 29, 2018, http://www.fox9.com/news/minnesota-governor-liberians-ded-trump-letter; *see also Amici Curiae* Brief of the State of Minnesota, the Commonwealth of Massachusetts, the States of California, Illinois, Maryland, New Jersey, New York, and Rhode Island, the Commonwealth of Virginia, and the District of Columbia Supporting Plaintiffs' Motion for Preliminary Injunction, Dkt. 34, at 3-7 (Mar. 27, 2019).

[113]  *See Amici Curiae* Brief of the State of Minnesota, the Commonwealth of Massachusetts, the States of California, Illinois, Maryland, New Jersey, New York, and Rhode Island, the Commonwealth of Virginia, and the District of Columbia Supporting Plaintiffs' Motion for Preliminary Injunction, Dkt. 34, at 7-9 (Mar. 27, 2019).

## CLAIMS

## COUNT 1

### Violation of Equal Protection – Fifth Amendment

### Against Defendant Trump by All DED-Holding Plaintiffs

141.   Plaintiffs incorporate by reference all allegations stated above.

142.   The Due Process Clause of the Fifth Amendment incorporates a guarantee of equal protection and prohibits unjustified discrimination by federal actors.  *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954).  Equal-protection principles under the Fourteenth Amendment apply to federal actors under the Fifth Amendment.  *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975).

143.   Defendant Trump's decision to terminate DED for Liberian immigrants living in the United States violates the Fifth Amendment because it constitutes intentional discrimination against Liberians on the basis of race, ethnicity, and/or national origin.  Defendant Trump's decision marked an unjustified departure from the longstanding practice of extending DED due to destabilizing conditions in Liberia.  Instead, this decision was motivated by discrimination against immigrants of color, and Black immigrants in particular, including Liberians. Government conduct violates equal protection guarantees if a discriminatory purpose was a motivating factor.  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

144.   Defendant Trump's disparaging statements against immigrants of color as discussed in the paragraphs above compel the conclusion that discrimination on the basis of race, ethnicity, and/or national origin motivated his decision to terminate DED for Liberia.

145.   Numerous other factors also evince a discriminatory purpose behind the termination of DED: Defendant Trump's departure from the practice of previous administrations;

the fact that conditions in Liberia favor extending DED instead of terminating the program; the fact that the decision burdens one race almost exclusively; the sequence of events leading to the decision; contemporaneous statements of decision-makers; other actions targeting immigrants of color; and the historical background of the decision.  Each of these factors is probative of intentional discrimination.  *See id.* at 266-68.

146.    As a direct and proximate result of the termination of DED by Defendant Trump and/or his agents, Plaintiffs have been or will be imminently deprived of their rights under the Fifth Amendment to the U.S. Constitution.

## COUNT 2

**Violation of Due Process (Irrational Government Action) – Fifth Amendment**

**Against Defendant Trump by All DED-Holding Plaintiffs**

147.    Plaintiffs incorporate by reference all allegations as stated above.

148.    The Due Process Clause of the Fifth Amendment prohibits irrational government action. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 532-33 (1973).

149.    By unjustifiably terminating DED for Liberians, Defendant Trump failed to carry out his duties consistent with the Due Process requirements of the Fifth Amendment.

150.    Because of the discriminatory motivation underlying it, Defendant Trump's decision to terminate DED for Liberians deprives Plaintiffs of the appropriate and non-discriminatory process due to them under the law.

## COUNT 3

**Violation of Due Process (Right to Family Integrity) – Fifth Amendment**

**Against All Defendants by U.S. Citizen Children Plaintiffs**

151.    Plaintiffs incorporate by reference all allegations as stated above.

152.     The Due Process Clause of the Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  Const. amend. V.

153.     The guarantee against the deprivation of liberty without due process bars the government from infringing on certain "fundamental" liberty interests, regardless of the procedures involved, unless the action is "narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301–02 (1993).  Four such fundamental rights are implicated here.

154.     First, for at least so long as these U.S. citizen Plaintiffs remain minors, they have a fundamental right protected by both the First and Fifth Amendments to live with and be raised by their parents.  *E.g.*, *Moore v. City of East Cleveland*, 431 U.S. 494, 499 (1977); *Board of Dirs. v. Rotary Club*, 481 U.S. 537, 545 (1987). Were their parent DED beneficiaries to be expelled from the United States, these Plaintiffs would be unable to exercise that fundamental right without resigning themselves to the same fate as their parents.

155.     Second, the Plaintiffs who are school-aged U.S. citizens have a right to live in the United States.  To compel them to live abroad at any time, let alone in their formative years, would deny them a core aspect of their liberty protected by the Fifth Amendment.  *See, e.g.*, *Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001); *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922).

156.     Third, Defendants' foisting of this dilemma upon the U.S. citizen Plaintiffs violates their constitutionally-protected liberty interests.  These U.S. citizen children have a legally cognizable interest in not being compelled to choose between two alternatives when each option will deprive them of a substantial, constitutionally-protected aspect of liberty.  *See United States v. Jackson*, 390 U.S. 570 (1968); *cf. New York v. United States*, 505 U.S. 144, 176 (1992).

157.    Fourth, if forcibly removed to Liberia with their parents, U.S. citizen Plaintiffs will be forced to give up their U.S. citizenship because Liberia does not recognize dual citizenship.[114]  U.S. citizen Plaintiffs were born in the United States and have an absolute and fundamental right to their citizenship under the Fifth and Fourteenth Amendments.

158.    In abridging these fundamental constitutional rights, Defendants have articulated no substantial governmental interest and have failed to tailor their action to promote any legitimate interest they may have.  Nowhere in the memorandum announcing the termination of DED have Defendants identified any risk to the interests of the United States that would follow from allowing the school-aged U.S. citizen children to remain in the United States with their DED beneficiary parents until the children reach the age of majority.

159.    Plaintiffs suffer irreparable injury resulting from the termination of the DED designations.

## COUNT 4

### Declaratory Judgment – 28 U.S.C. § 2201

### Against All Defendants by All Plaintiffs

160.    Plaintiffs incorporate by reference all allegations as stated above.

161.    Defendants' illegal actions have injured and will continue to injure Plaintiffs and those similarly situated by subjecting them to unlawful discrimination on the basis of their race, ethnicity and/or national origin.  This includes dignitary harms that attach to unlawful discrimination.

162.    Plaintiffs will be imminently subjected to the harms and indignities inherent in immigration detention and removal.

---

[114]  Although Plaintiffs could live in Liberia as non-citizens, they would not be able to own or inherit property and would be prohibited from working in most industries.

163.    For the reasons stated above, Defendants violated the U.S. Constitution and other

laws.

164.    Plaintiffs seek a declaration to that effect.

### PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court grant the following relief:

1.    Declaring that Defendant Trump's actions to terminate DED for Liberians in the

United States violate the Fifth Amendment of the U.S. Constitution and are,

therefore, void and without legal force or effect.

2.    Enjoining and restraining all Defendants, their agents, servants, employees,

attorneys, and all persons in active concert with them from implementing or

enforcing the termination of the DED program for Liberians, and from taking any

further action to terminate DED for Liberians in violation of the U.S. Constitution

or other applicable laws.

3.    Awarding Plaintiffs reasonable attorneys' fees and the cost of maintaining this

action such as court costs, expert fees, and other expenses.

4.    All other necessary and appropriate relief that justice may require.

Respectfully submitted,

Dated:  May 28, 2019

/s/ Timothy C. Blank

Oren Nimni (BBO #691821)
Iván Espinoza-Madrigal (*pro hac vice*)
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, 5th Floor
Boston, MA 02110
Tel: (617) 988-0624
Fax: (617) 482-4392
onimni@lawyerscom.org

Timothy C. Blank
DECHERT LLP
One International Place
100 Oliver Street, 40th Floor
Boston, MA 02110
Tel: (617) 728-7100
Fax: (617) 426-6567
timothy.blank@dechert.com

Dorian L. Spence (*pro hac vice*)
Maryum Jordan (*pro hac vice*)
LAWYERS' COMMITTEE FOR CIVIL
   RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Tel: (202) 662-8600
Fax: (202) 783-0857
dspence@lawyerscommittee.org

Dennis H. Hranitzky (*pro hac vice*)
Michael A. Losco (*pro hac vice*)
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 641-5647
Fax: (212) 698-3500
dennis.hranitzky@dechert.com