# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AFRICAN COMMUNITIES TOGETHER, a membership organization; UNDOCUBLACK NETWORK, a membership organization; DAVID KROMA; MOMOLU BONGAY; OTHELLO A.S.C. DENNIS; YATTA KIAZOLU; CHRISTINA WILSON; JERRYDEAN SIMPSON; C.B., AL. K., D.D., D.K., AI. K., AD. K. by and through their father and next friend DAVID KROMA; O.D., and A.D., by and through their father and next friend OTHELLO A.S.C. DENNIS; J.S. by and through his mother and next friend JERRYDEAN SIMPSON,<br><br>               Plaintiffs,<br><br>       v.<br><br>DONALD J. TRUMP, President of the United States in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KEVIN MCALEENAN, Acting Secretary of the Department of Homeland Security in his official capacity,<br><br>               Defendants. | Civil Action No. 19-cv-10432-TSH |

# PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 2

STANDARD OF REVIEW ................................................................................................. 4

ARGUMENT ..................................................................................................................... 5

I.     The Individuals Plaintiffs Have Article III Standing to Challenge Potential Future
       Injuries .................................................................................................................. 5

       A.     The Individual Plaintiffs' Substantial Risk of Imminent Harm Constitutes
              an 'Injury in Fact' ....................................................................................... 6

       B.     The Individual Plaintiffs' Harms Are Redressable ...................................... 8

II.    The Individual Plaintiffs' Claims Are Ripe ........................................................... 10

III.   The Organizational Plaintiffs Have Standing ....................................................... 12

       A.     ACT and UndocuBlack Have Standing to Sue on Their Own Behalf ........... 12

       B.     ACT and UndocuBlack Have Standing to Sue on Behalf of Their
              Members .................................................................................................... 16

IV.    Plaintiffs Have Stated a Claim for Violation of Equal Protection ......................... 18

       1.     Plaintiffs Have a Cause of Action Against Defendant Trump ..................... 18

       2.     *Arlington Heights* Provides the Applicable Standard for Plaintiffs'
              Equal Protection Claim .............................................................................. 18

       3.     Plaintiffs State a Claim Under the *Arlington Heights* Standard ............... 20

       4.     Plaintiffs State a Claim Even Under the Inapt *Trump v. Hawaii*
              Standard .................................................................................................... 25

V.     Plaintiffs Have Stated a Claim for Violation of Due Process ............................... 27

VI.    Plaintiffs Have Stated a Claim for Which Relief Is Available Under the
       Declaratory Judgment Act .................................................................................... 29

CONCLUSION.................................................................................................................. 30

# TABLE OF AUTHORITIES

CASES

*Adams v. Watson*,
    10 F.3d 915 (1st Cir. 1993) ................................................................................... 15

*American–Arab Anti–Discrimination Comm. v. Reno*,
    70 F.3d 1045 (9th Cir. 1995) ................................................................................... 9

*Anderson v. City of Boston*,
    375 F.3d 71 (1st Cir. 2004) .................................................................................... 19

*Animal Welfare Institute v. Martin*,
    623 F.3d 19 (1st Cir. 2010) .................................................................................... 16

*Antilles Cement Corp. v. Fortuño*,
    670 F.3d 310 (1st Cir. 2012) .................................................................................... 8

*Arce v. Douglas*,
    793 F.3d 968 (9th Cir. 2015) .................................................................................. 24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................ 2, 4

*Baker v. Carr*,
    369 U.S. 186 (1962) ................................................................................................ 5

*Batalla Vidal v. Nielsen*,
    291 F. Supp. 3d 260 (E.D.N.Y. 2018) ................................................................... 20

*Berner v. Delahanty*,
    129 F.3d 20 (1st Cir. 1997) ...................................................................................... 7

*CASA de Maryland, Inc. v. Trump*,
    355 F. Supp. 3d 307 (D. Md. 2018) ................................................................. 19, 27

*Centro Presente v. United States Dep't of Homeland Sec.*,
    332 F. Supp. 3d 393 (D. Mass. 2018) ............................................................. *passim*

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) .................................................................................................. 8

*Coll. Hill Props., LLC v. City of Worcester*,
    821 F.3d 193 (1st Cir. 2016) .................................................................................... 4

*College of Dental Surgeons of Puerto Rico v. Connecticut General Life Ins. Co.*,
   585 F.3d 33 (1st Cir. 2009)................................................................................................16, 17

*Dep't of Commerce v. New York*,
   139 S. Ct. 2551 (2019)...................................................................................................26, 27

*Dubois v. U.S. Dep't of Agric.*,
   102 F.3d 1273 (1st Cir. 1996)....................................................................................................6

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992)....................................................................................................................8

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)..............................................................................................................6, 13

*Gustavsen v. Alcon Labs., Inc.*,
   903 F.3d 1 (1st Cir. 2018).........................................................................................13, 14, 15

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982)..................................................................................................................13

*Hayden v. Grayson*,
   134 F.3d 449 (1st Cir. 1998)..................................................................................................19

*Hochendoner v. Genzyme Corp.*,
   823 F.3d 724 (1st Cir. 2016)....................................................................................................5

*Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*,
   844 F.3d 318 (1st Cir. 2016)..................................................................................................11

*Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc.*,
   498 F. Supp. 2d 187 (D.D.C. 2007).......................................................................................13

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)........................................................................................................ passim

*Mass. Gen. Hosp. v. Sargent*,
   397 F. Supp. 1056 (D. Mass. 1975) ......................................................................................30

*Massachusetts v. United States Dept. of Health and Human Servs.*,
   923 F.3d 209 (1st Cir. 2019)............................................................................................13, 16

*McInnis–Misenor v. Me. Med. Ctr.*,
   319 F.3d 63 (1st Cir. 2003)....................................................................................................11

*Miller v. Town of Wenham*,
   833 F.3d 46 (1st Cir. 2016).......................................................................................................4

*Moore v. City of E. Cleveland,*
    431 U.S. 494 (1977)................................................................27

*Mulero-Carrillo v. Román-Hernández,*
    790 F.3d 99 (1st Cir. 2015).....................................................25

*Nat'l Ass'n for the Advancement of Colored People v. United States Dep't of*
    *Homeland Sec.,*
    364 F. Supp. 3d 568 (D. Md. 2019)................................19, 27

*Nat'l Treasury Employees Union v. Nixon,*
    492 F.2d 587 (D.C. Cir. 1974)................................................10

*Nguyen v. I.N.S.,*
    533 U.S. 53 (2001)..................................................................27

*Payne-Barahona v. Gonzales,*
    474 F.3d 1 (1st Cir. 2007).......................................................27

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979)...........................................................20, 21

*Pharmaceutical Care Mgmt. Ass'n v. Rowe,*
    429 F.3d 294 (1st Cir. 2005)...................................................17

*Playboy Enters., Inc. v. Public Serv. Comm'n of Puerto Rico,*
    906 F.2d 25 (1st Cir. 1990).....................................................17

*Ramos v. Nielsen,*
    321 F. Supp. 3d 1083 (N.D. Cal. 2018) .....................19, 27, 28

*Ramos v. Nielsen,*
    336 F. Supp. 3d 1075 (N.D. Cal. 2018) .........................18, 24

*Reddy v. Foster,*
    845 F.3d 493 (1st Cir. 2017)..............................................10, 11

*Regents of Univ. of California v. United States Dep't of Homeland Sec.,*
    298 F. Supp. 3d 1304 (N.D. Cal.) ...........................................21

*Ríos-Colón v. Toledo-Dávila,*
    641 F.3d 1 (1st Cir. 2011).......................................................24

*Roman Catholic Bishop v. City of Springfield,*
    724 F.3d 78 (1st Cir. 2013).....................................................11

*S. Bos. Allied War Veterans Council v. City of Boston,*
    875 F. Supp. 891 (D. Mass. 1995) ..........................................30

*Saget v. Trump*,
    345 F. Supp. 3d 287 (E.D.N.Y. 2018) ........................................................19, 20, 27

*Saget v. Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ........................................................9, 10

*Saldivar v. Racine*,
    818 F.3d 14 (1st Cir. 2016) ........................................................................4

*Shaw v. Reno*,
    509 U.S. 630 (1993) ........................................................................21

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) ........................................................................12

*Simmons v. United States*,
    390 U.S. 377 (1968) ........................................................................27

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014) ........................................................................6, 7, 10

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ........................................................................18, 25

*U.S. Dep't of Agric. v. Moreno*,
    413 U.S. 528 (1973) ........................................................................25

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ........................................................................ *passim*

*Warth v. Seldin*,
    422 U.S. 490 (1975) ........................................................................12

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ........................................................................9

**OTHER AUTHORITIES**

Kari Paul and Joan E. Greve, *Trump Praises 'Incredible' Crowd Who Chanted
    'Send Her Back' at Ilhan Omar* – AS IT HAPPENED, THE GUARDIAN (JUL. 22,
    2019), https://www.theguardian.com/us-news/live/2019/jul/19/trump-ilhan-
    omar-news-today-live-latest-send-her-back-racist-attack-updates-........................................23

Katie Rogers and Nicholas Fandos, *Trump Tells Congresswomen to 'Go Back' to
    the Countries They Came From*, N.Y. TIMES (Jul. 14, 2019),
    https://www.nytimes.com /2019/07/14/us/politics/trump-twitter-squad-
    congress.html ........................................................................22

Lauren Aratani, *How Trump Distorts Facts to Make Ilhan Omar Seem Like an Enemy to the US*, THE GUARDIAN (Jul. 18, 2019), https://www.theguardian.com/us-news/2019/jul/18/trump-ilhan-omar-attacks-factcheck ................................................................................................................22

Maureen Groppe and John Fritze, *'It's breaking my heart': Greenville, NC, Wrestles with Fallout of* DONALD TRUMP'S RALLY, USA TODAY (JUL. 29, 2019), https://www.usatoday.com/story/news/politics/elections/2019/07/29/send-her-back-chants-trump-rally-open-wounds-greenville-nc/1828979001/ ......................................22

# INTRODUCTION

Plaintiffs filed this lawsuit to protect their dignity, their families, and the communities they serve from the rapidly approaching termination of Deferred Enforced Departure ("DED") for Liberians. DED is a crucial lifeline for Liberian immigrants, permitting them to work, attend school, and own property in the United States without immediate fear of deportation to a country that is still recovering from years of armed conflict and political turmoil. Despite the fact that three previous Administrations have issued DED to Liberians for over twenty years, President Trump cancelled this critical humanitarian relief as part of his agenda to terminate immigration programs that offer protections to immigrants of color.

Contrary to Defendants' argument, this case does not involve the mere exercise of Defendant Trump's constitutional authority to conduct foreign affairs; it involves actions taken as part of the Trump Administration's discriminatory immigration agenda and inspired by Defendant Trump's racial animus. Defendant Trump's cancellation of the DED program for Liberians constitutes a constitutionally impermissible action, not a mere exercise of his foreign affairs authority.

Equally without merit are Defendants' arguments that Plaintiffs lack standing to bring their claims, that their claims are unripe, that they cannot assert claims against the President of the United States, and that they have failed to allege adequately violations of the Constitution or other laws. It would be entirely premature to dismiss Plaintiffs' claims at this stage.  As explained in detail by Plaintiffs below, both the individual and organizational Plaintiffs do, in fact, have standing to bring their claims. The individual Plaintiffs are clearly the objects of the action at issue, as the cancellation of DED will directly impact them and their families. Further, the individual Plaintiffs are suffering from an injury in fact that is imminent—as DED will expire in March 2020—and their harms are redressable, because, although exceptional, it is within the power of the

courts to grant of injunctive relief against the President when the circumstances are sufficiently extraordinary. In the instant situation, where the President's racial animus is being used to justify the unconstitutional cancellation of the DED program that will result in the breakup of families and the breakdown of communities, the circumstances are sufficiently extraordinary to warrant an injunction.

The organizational Plaintiffs also have standing to bring claims on their own behalf and on behalf of their members. Like the individual Plaintiffs, the organizational Plaintiffs have suffered an injury in fact through both the actual harm they are currently sustaining financially to address the cancellation of DED and the threatened imminent harm resulting from the impending removal of their Liberian constituents as a result of the cancellation of DED.

Plaintiffs' claims are ripe because there is hardship—due to the great harm Plaintiffs would suffer if this Court withholds adjudication of this controversy—and fitness—because Plaintiffs seek relief related to the unconstitutional termination of DED, which has already been set in motion—in this controversy.

Finally, as explain in further detail below, Plaintiffs have adequately stated their claims for violations of the equal protection and due process clauses of the Constitution. Accordingly, the Court should deny Defendants' Motion to Dismiss the Amended Complaint.

## **FACTUAL BACKGROUND**[1]

DED is a program that provides immigration relief and protection to foreign nationals whose countries of origin have experienced war, civil unrest, natural disasters, or public health

---

[1] The factual information contained in this section is drawn from Plaintiffs' allegations in the Amended Complaint, which on a Motion to Dismiss must be taken as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

crises. Am. Compl. ¶ 80. The DED program for Liberian citizens was initially established by the Clinton Administration in 1999 for a one-year period due to an ongoing armed conflict in Liberia. *Id.* ¶ 84. Several presidential administrations then extended the Liberian DED program, with the final extension occurring on September 26, 2016, when President Barack Obama extended the program until March 31, 2018. *Id.* ¶¶ 85-99.

To date, conditions in Liberia remain dire. Following two devastating civil wars between 1989 and 2003 and, in 2014, the worst outbreak of the Ebola virus ever recorded, the Liberian government is still barely recovering from prolonged years of war and economic crisis. *Id.* ¶¶ 112-113. Both security conditions and health systems remain fragile and severe poverty remains widespread. By some measures, Liberia is today considered the poorest country in the world. *Id.* ¶ 119.

On March 27, 2018, Defendant Trump released a presidential memorandum directing the Department of Homeland Security to terminate DED effective March 31, 2019, citing "improved" conditions in Liberia. *Id.* ¶¶ 109-11. However, Defendant Trump's decision to terminate DED was not based on an objective evaluation of the conditions in Liberia; instead, the cancellation was part of the Trump Administration's immigration agenda that involves the forcible removal of non-white, non-European immigrant families from the United States. *Id.* at ¶¶ 112-13. Defendant Trump's justification for termination of DED—that conditions in Liberia have improved—merely serves as pretext for racial and national origin discrimination in furtherance of his Administration's discriminatory immigration agenda. *Id.*

On March 28, 2019, facing pressure from the instant case,[2] in addition to pressure from politicians and the Liberian community, the Trump administration announced that it would extend the "wind down" period for the expiration of Liberian DED for another year, until March 31, 2020 – approximately eight months from now. *Id.* ¶ 114. Defendant Trump's imminent termination of DED for Liberians violates the rights of Liberian DED holders and their U.S. citizen children under the Constitution.

## **STANDARD OF REVIEW**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Coll. Hill Props., LLC v. City of Worcester*, 821 F.3d 193, 195–96 (1st Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "This standard is 'not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir. 2016) (quoting *Iqbal*, 556 U.S. at 678).

In reviewing a motion to dismiss, the Court "accept[s] as true all well-pled facts alleged in the complaint and draw[s] all reasonable inferences in [the plaintiff's] favor." *Miller v. Town of Wenham*, 833 F.3d 46, 51 (1st Cir. 2016) (quoting *Evergreen Partnering Grp., Inc. v. Pactiv Corp*, 720 F.3d 33, 36 (1st Cir. 2013) (final alteration in original)).

---

[2] The hearing on Plaintiffs' Motion for Preliminary Injunction was scheduled for the following day, March 29, 2019.

## ARGUMENT

**I.    The Individuals Plaintiffs Have Article III
        Standing to Challenge Potential Future Injuries**

There is "ordinarily little question" that a plaintiff challenging the legality of a government action has standing to do so when he or she is the "object of the action . . . at issue." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). Here, the individual Plaintiffs, Liberian DED holders and their U.S. citizen children, bring suit to challenge the constitutionality of a government action that concerns the legal presence of Liberian DED holders.  As this action undoubtedly affects both DED holders and their U.S. citizen family members, the individual Plaintiffs' standing is indisputable.

The DED program for Liberians has been terminated, with a "wind-down period" that will end approximately eight months from now.  Defendants posit that a number of speculative events "may occur" between now and then—such as legislative action or another extension—to argue that the individual Plaintiffs have no standing in this case.  Defs' Mem. in Supp. of Mot. to Dismiss the Am. Compl., Dkt. No. 53, at 9. But this unpersuasive speculation does not deprive the Plaintiffs of standing.  The termination of DED has already been set in motion, the program is in a "wind down" period, and the program *will expire* on March 30, 2020—subjecting Plaintiffs to deportation and separation from their families. The individual Plaintiffs' great personal stake in the outcome of this case vests them with standing to seek the remedial powers of the Court. *See Baker v. Carr*, 369 U.S. 186, 204 (1962).

Moreover, the Amended Complaint is replete with plausible facts establishing the individual Plaintiffs' standing. *See Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016) (holding that the plausibility standard applies to standing determinations at the pleading stage). To demonstrate Article III standing, "a plaintiff must show (1) it has suffered an 'injury in

fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Plaintiffs easily meet these criteria.[3]

### A.   The Individual Plaintiffs' Substantial Risk of Imminent Harm Constitutes an 'Injury in Fact'

Under the first element of the standing doctrine, a court looks to whether a plaintiff has suffered an 'injury in fact' tied to the defendant's injurious conduct. *Id*. An 'injury in fact' is an injury or threat of injury that is "concrete and particularized," and not conjectural, hypothetical, or speculative. *Lujan*, 504 U.S. at 560. The injury or threat of injury affects a plaintiff in a "personal and individual way." *Id*. at 560 n. 1. The 'injury in fact' need not be significant; a "'small' stake in the outcome will suffice, if it is 'direct.'" *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1281 (1st Cir. 1996) (quoting *U.S. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973)).

When a controversy concerns the threat of a future injury, this threat must be "certainly impending" or there must be substantial risk that the harm will occur. *Susan B. Anthony List v. Driehaus* ("*SBA List*"), 134 S. Ct. 2334, 2341 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)).   While a threatened injury must be imminent, imminence is a "somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the

---

[3] Plaintiffs' brief only addresses the first and third elements of the Article III standing requirements, as Defendants do not contest Plaintiffs' ability to satisfy the second element. *See* Defs' Mem. in Supp. of Mot. to Dismiss the Am. Compl., Dkt. No. 53, at 13 ("Here, the individual plaintiffs fail to establish the first and third elements of standing.").

alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Lujan*, 504 U.S. at 560 n.2 (internal quotation marks omitted). Although courts have cautioned that the threatened injury cannot be too speculative, they recognize that imminence is far reaching. *Berner v. Delahanty*, 129 F.3d 20, 24 (1st Cir. 1997) (quoting *Lujan*, 504 U.S. at 564 n.2).

The individual Plaintiffs here suffer an 'injury in fact' that undoubtedly grants them standing. They face a substantial risk of harm that will surely occur once the termination of DED goes into effect. *See SBA List*, 134 S. Ct. at 2341. This threatened injury particularly affects the individual Plaintiffs in a "personal and individual way" due to the fact that they are subject to the DED program. *See Lujan*, 504 U.S. at 560 n.1. The harm they will suffer is imminent because DED will end on March 30, 2020. On that day, Plaintiffs will become subject to forcible removal and "will be forced to abandon their lives after living in the U.S. for over twenty years essentially losing their jobs, homes, and educational opportunities." Dkt. No. 40 at 14. The U.S.-citizen children will also "be forced to choose between staying in the United States without their parents and primary means of economic support, or forced to relocate to a foreign country where they will be compelled to renounce their U.S. citizenship." *Id.*  On a motion to dismiss, these factual assertions must be taken as true—and indeed they are indisputable.

Defendants engage in speculation about what "might occur" to forestall these harms, but unfounded speculation does not undermine the imminent threat that in fact currently exists for Plaintiffs.

This impending, significant harm is far from the "'conjectural' or 'hypothetical' [or speculative]" injury that courts caution against when considering standing. *See Lujan*, 504 U.S. at 560. To the contrary, Defendants themselves rely on wishful thinking and speculate on what "may

occur months or even years from now," Dkt. No. 53 at 16, that could change the harmful circumstances Plaintiffs imminently face. Defendant's position is no more than a shot in the dark. The only sure thing for the Court to consider here is the set expiration of DED. It cannot be reasonably disputed that the harm that will occur from the termination of DED is a devastating "injury in fact."

### B.    The Individual Plaintiffs' Harms Are Redressable

Redressability concerns whether a favorable outcome in litigation will likely mitigate the asserted injury. *Lujan*, 504 U.S. at 561. When considering whether a plaintiff's claims are redressable, the court must first determine whether it has the power to grant an appropriate remedy. *City of Los Angeles v. Lyons*, 461 U.S. 95, 129 n.20 (1983). Second, a court will then contemplate whether judicial relief would be a futile gesture or if it will cure the alleged harm. *Id.*  Notably, a plaintiff "need not definitively demonstrate that a victory would completely remedy the harm." *Antilles Cement Corp. v. Fortuño*, 670 F.3d 310, 318 (1st Cir. 2012).

This Court has the authority to order both injunctive and declaratory relief that would redress the serious threatened injury looming over Plaintiffs by preventing Defendants from implementing the directives set forth by Defendant Trump in the 2018 and 2019 presidential memoranda. These directives, as ordered by President Trump, would lead to the forced deportation Plaintiffs, and the separation of families.

With regard to Plaintiffs' requested injunctive relief, Defendants argue that Plaintiffs' claims are not redressable because the Court cannot enjoin the President. But Defendants are wrong. To be sure, a "grant of injunctive relief against the President himself is extraordinary." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992).  However, it is within the power of the courts when the circumstances are sufficiently extraordinary to warrant it—as is the case here.

Indeed, the Supreme Court has explicitly recognized immigration decisions by the executive branch do not escape judicial review if the decision runs afoul of "important constitutional limitations." *Zadvydas v. Davis*, 533 U.S. 678, 695 (2001). The judicial review of immigration policies also extends to "foreign policy arguments that are offered to justify legislative or executive action when constitutional rights are at stake." *American–Arab Anti–Discrimination Comm. v. Reno*, 70 F.3d 1045, 1056 (9th Cir. 1995).

Here, Plaintiffs seek injunctive relief to prevent Defendants from implementing the termination of DED because Defendant Trump's decision to end the program was unconstitutional. President Trump chose to end this long-standing humanitarian protection because of, in part, his racial animus towards immigrants of color which justifiably raises constitutional concerns. *See Zadvydas*, 533 U.S. at 695. Even though presidents wield the authority to grant or terminate a DED designation for foreign policy reasons, the exercise of the authority must comply with the Constitution.

Recently, in *Saget v. Trump*, the court denied the government's motion to dismiss with respect to the plaintiffs' request for injunctive relief against the President and certain executive officials because of the unlawful cancellation of Temporary Protected Status ("TPS") for Haitian nationals due to Trump's animus towards immigrants of color. *Saget v. Trump*, 375 F. Supp. 3d 280, 334–35 (E.D.N.Y. 2019). There, the court reasoned that the injunctive relief against the President would correct "unlawful conduct" and ensure that the extension or termination of TPS complies with the law. *Id*. Similarly, this Court has the authority to grant Plaintiffs injunctive relief to redress the threatened harm of their deportation and separation of families. The termination of DED is imminent and sufficiently connected to Trump's racial animus towards Black immigrants. Thus it is well within the Court's power to prevent the implementation of the presidential

memorandum through an injunction that would both cure this unconstitutional conduct and ensure that the administration of DED falls within the boundaries of the Constitution. *See id*.

Additionally, Plaintiffs may also obtain declaratory relief. *See* Section VI, *infra*. Courts have the power to grant a declaratory judgment against the President. *Nat'l Treasury Employees Union v. Nixon*, 492 F.2d 587, 609 (D.C. Cir. 1974) ("no immunity established under any case known to this Court bars every suit against the President for injunctive, declaratory or mandamus relief"). Even though this form of relief against the President is extraordinary, a declaration of the law with regard to the President's constitutional duty is appropriate. *See id*. at 616. Thus, this Court may declare that the termination of DED in the context here is unlawful because the Constitution prohibits the President from adopting immigration policies tied to racial animus.

Accordingly, a favorable judgment from this Court granting injunctive and declaratory relief will clearly rectify Plaintiffs' threatened injury and make their constitutional claims redressable. *See Lujan*, 504 U.S. at 561. This, in turn, further satisfies the requirements under Article III standing. It would be inappropriate and premature to end the case at this point, on a motion to dismiss, when courts have clearly said that the relief Plaintiffs are seeking is available.

## II.   **The Individual Plaintiffs' Claims Are Ripe**

Similar to the elements of Article III standing, Plaintiffs satisfy the requirements for ripeness. Article III standing and ripeness "boil down to the same question." *SBA List*, 134 S. Ct. at 2341 n.5. While standing prevents courts from presiding over disputes involving hypothetical injuries, ripeness seeks to prevent the adjudication of disputes that relate to future contingent events that may not occur. *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017). For both doctrines, courts look to the existence of "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of [the judicial relief sought]."

*Labor Relations Div. of Constr. Indus. of Mass., Inc. v. Healey*, 844 F.3d 318, 326 (1st Cir. 2016) (internal quotations omitted).

Under the ripeness doctrine, courts consider both fitness and hardship. *Reddy*, 845 F.3d at 501. The fitness element has "jurisdictional and prudential components." *Roman Catholic Bishop v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013). The jurisdictional component relates to "whether there is a sufficiently live case or controversy, at the time of the proceedings, to create jurisdiction in the federal courts." *Id.* The prudential component concerns whether judicial restraint requires postponing the resolution of a dispute. *Id.* The hardship prong under the ripeness doctrine, considers the harm to the party seeking relief if the court withholds adjudication. *McInnis–Misenor v. Me. Med. Ctr.*, 319 F.3d 63, 73 (1st Cir. 2003).

Plaintiffs' claims are ripe because there is fitness and hardship in this controversy. With regard to fitness, this Court has jurisdiction because Plaintiffs seek relief related to the unconstitutional termination of DED which is already set in motion. *See Roman Catholic Bishop*, 724 F.3d at 89. Under the prudential component of fitness, there is no judicial restraint that would justify postponing the adjudication of this case. Indeed, Plaintiffs cannot afford any delay to this case because they urgently seek relief due to the looming deadline of DED. *See id.* Similarly, Plaintiffs also satisfy the hardship element of ripeness due to the great harm they would suffer if this Court withholds adjudication of this controversy. *See McInnis–Misenor*, 319 F.3d at 73. They will be eligible for deportation and separation from their families starting on March 30, 2020.

Defendants argue this dispute is not ripe because the circumstances underlying Plaintiffs' claims could change between now and March 30, 2020. Defs' Mem. in Supp. of Mot. to Dismiss the Am. Compl., Dkt. No. 53, at 19. But Defendants contradict themselves with this grievance. When Plaintiffs filed a motion for a preliminary injunction during the same month that DED was

11

originally supposed to expire this year, Defendants lamented that "Plaintiffs sat on their rights for nearly a year before seeking relief from this Court at the eleventh hour." *Id.* at 2. Essentially Defendants have created a Goldilocks scenario for the Court where the timing of relief for Plaintiffs is either *too early* or *too late*. Yet, based on Defendants' logic, there appears to be no timing that would be *just right*. In fact, the timing is currently right for Plaintiffs' challenge: termination of the DED program is imminent.  Plaintiffs clearly meet the requirements of ripeness.

## III.    The Organizational Plaintiffs Have Standing

Similar to an individual plaintiff, associations also have standing to seek relief for an injury or violation of their rights. *Warth v. Seldin*, 422 U.S. 490, 511 (1975). Organizational standing "requires more than an injury to a cognizable interest . . . It requires that the party seeking review be himself among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972). This standard has the purpose of "serv[ing] as . . . a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome," and not merely any interested party. *Id.* at 740. Organizational plaintiffs African Communities Together ("ACT") and UndocuBlack Network ("UndocuBlack") unquestionably have such a stake in the fate of DED, because its unconstitutional termination has forced them to divert their resources and will result in the removal of members of the community they serve.

### A.    ACT and UndocuBlack Have Standing to Sue on Their Own Behalf

To establish standing, an organizational plaintiff must establish the same elements of standing applicable to an individual plaintiff. *See* Section I, *supra*. ACT and UndocuBlack easily satisfy this standard. They too have "(1) suffered an 'injury in fact' . . . ; (2) the injury is fairly

traceable to the challenged action of the [D]efendant[s]; and (3) . . . the injury will be redressed by a favorable decision." *See Friends of the Earth*, 528 U.S. 167, 180–81 (2000).[4]

ACT and UndocuBlack have suffered an 'injury in fact' through both the actual harm they are currently sustaining financially and the threatened imminent harm resulting from the impending removal of their Liberian constituents. For standing purposes, an 'injury in fact' must be (a) concrete and particularized and (b) actual or imminent, instead of conjectural or hypothetical. *See id.*

A violation to a plaintiff's financial interest is a sufficient injury to uphold standing. *Gustavsen v. Alcon Labs., Inc.*, 903 F.3d 1, 7 (1st Cir. 2018); see also *Massachusetts v. United States Dept. of Health and Human Servs.* ("*HHS*"), 923 F.3d 209, 222 (1st Cir. 2019) ("[i]t is a bedrock [principle] that 'a relatively small economic loss – even an identifiable trifle – is enough to confer standing.'") (citation omitted). Defendant Trump's decision to terminate DED for unconstitutional reasons is forcing ACT and UndocuBlack to spend their limited resources on an emergency response for their members. *See* Dkt. No. 13-40 at ¶¶ 5-15; Dkt. No. 13-41 at ¶¶ 7-10.

Moreover, an organization plaintiff may suffer an injury due to the diversion of its funds as a result of a defendant's actions. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). As Defendants themselves have noted, "[t]he pivotal inquiry is . . . not whether the organization has diverted resources from one priority to another, but whether its activities have been directly impeded by defendant's activities, thus necessitating the diversion of resources." *Long Term Care Pharmacy Alliance v. UnitedHealth Group, Inc.*, 498 F. Supp. 2d 187, 192 (D.D.C. 2007). Here,

---

[4] Defendants do not contest the organizational Plaintiffs' ability to satisfy the second element of standing, and ACT and UndocuBlack also satisfy the third element because their injuries would be directly redressed by declaratory and injunctive relief (*see* Section I(B), *supra*).

the unconstitutional termination of DED is having a clear impact on ACT and UndocuBlack's day-to-day operations. *See* Ex. 1 (Decl. of Amaha Kassa)("Kassa Decl."); Ex. 2 (Decl. of Jonathan Jayes-Green) ("Jayes Decl.").

In response to the fear and distress that the impending termination has caused to the organizations' constituents, and in anticipation of the devastating changes that the termination of DED will cause, Defendants' actions have forced ACT and UndocuBlack to divert resources (including funds and staff time), increase spending, and engage in emergency advocacy efforts. *See* Kassa Decl.; Jayes Decl.; Dkt. No. 13-40 at ¶¶ 5-15; Dkt. No. 13-41 at ¶¶ 7-10. UndocuBlack estimates that some of their staff are now dedicating up to 60% of their time to advocate on behalf of DED holders. *See* Dkt. No. 13-40 at ¶ 15. In addition, ACT has expended approximately $52,000 in staff time and direct expenditures in response to the termination of DED as of March 12, 2019. Dkt. No. 13-41 at ¶ 9. The diversion of these resources have forced ACT and UndocuBlack to drop other priorities to continue their DED advocacy, which in turn has adversely affected the organizations. Kassa Decl. at ¶¶ 4–9; Jayes Decl. at ¶¶ 4–8. Contrary to the government's claim that these diversion of resources are "consistent with the organizations' ordinary work," ACT's diversion of resources for DED advocacy has exceeded its ability to carry on its ordinary operations, Kassa Decl. at ¶ 10, and UndocuBlack's strategic plan did not contemplate responding to the cancellation of DED. Jayes Decl. at ¶ 9.

ACT and UndocuBlack are unquestionably suffering an 'injury in fact' following the termination of DED and will sustain further injury if their Liberian members are forced to leave the United States.

The injuries to ACT and UndocuBlack are also concrete and particularized because they are affecting the organizations "in a personal and individual way." *Gustavsen,* 903 F.3d at 7 (quoting *Lujan*, 504 U.S. at 560 n.1). An injury is concrete when it constitutes more than a "bare

procedural violation" and constitutes cognizable harm to the plaintiff. *Id.* at 7-8. Defendant Trump's decision to unconstitutionally end the DED program is causing "undisputed harm to the plaintiff[s] specifically," *id.* at 7, because the termination exclusively affects Liberian immigrants, a population that ACT and UndocuBlack exist to serve. *See* Dkt. No. 13-40 at ¶ 4; Dkt. No. 13-41 at ¶ 3. Further, Defendants' actions will profoundly damage the organizations' ability to pursue the core missions for which they were organized. UndocuBlack was created to "advocate for the rights of Black undocumented individuals" while ACT's core mission is "to advocate for civil rights, opportunities, and a better life for African immigrants and their families in the United States[.]"*See* Dkt. No. 13-40 at ¶ 4; Dkt. No. 13-41 at ¶ 5. It is impossible for UndocuBlack and ACT to advocate for the rights of African immigrants protected under the DED program if those immigrants are subject to deportation early next year.

Finally, ACT and UndocuBlack have already suffered harm and face imminent injury. Under this component of the 'injury in fact' inquiry, an injury must have either occurred or a threatened injury must be impending. *Gustavsen*, 903 F.3d at 8; *see also* Section I, *supra*. ACT and UndocuBlack have already suffered harm through their financial injuries. They also face an imminent threat through the upcoming removal of their Liberian constituents. To wait until after the Liberian constituents have been removed from the United States to allow the organizational Plaintiffs to seek relief would be to deny them any relief in this matter at all. *See Adams v. Watson*, 10 F.3d 915, 921 (1st Cir. 1993) ("it could hardly be thought that administrative action likely to cause harm cannot be challenged until it is too late.")

Defendants have argued that "If DED eventually ends . . . [plaintiffs] may be able to show an imminent injury at that time, but at this point their challenge . . . is based purely on speculation of what may occur months or even years from now." Defs' Mem. in Supp. of Mot. to Dismiss the

Am. Compl, Dkt. No. 53, at 9. This argument does not stand. To establish injury, "[e]ither a certainly impending harm or *substantial risk* of harm suffices." *HHS*, 923 F.3d at 222 (emphasis added). It cannot reasonably be argued that the President's memoranda declaring the unconstitutional termination of DED do not constitute a "substantial risk" of harm. *Id*. While it is virtually always possible for clever lawyers to think up a conceivable scenario under which an imminent harm could be forestalled, that is not the correct legal standard to apply. *See* Section I, *supra*. Here, there is no indication that Defendant Trump intends to reverse his decision to terminate DED. *See* Dkt. No. 42-1 at 2. Plaintiffs' ability to seek relief cannot be predicated upon the mere possibility that the injury might not occur, especially in the face of every tangible indication that it *will* occur.

### B.      ACT and UndocuBlack Have Standing to Sue on Behalf of Their Members

Organizational plaintiffs may establish standing to bring actions on behalf of their members' interests by demonstrating that (1) at least one of the organization's members would have standing to sue on the matter as an individual, (2) the interests at stake are germane to the organization's purpose, and (3) the participation of individual members as plaintiffs is not necessary for either the claim asserted or the relief requested. *Animal Welfare Institute v. Martin*, 623 F.3d 19, 25 (1st Cir. 2010) (citing *Friends of the Earth*, 528 U.S. at 181); see also *College of Dental Surgeons of Puerto Rico v. Conn. General Life Ins. Co.*, 585 F.3d 33, 40 (1st Cir. 2009) (quoting *Hunt v. Washington State Apple Advertising Commission*, 422 U.S. 333, 343 (1977)).

*First*, the individual Plaintiffs, members of ACT and UndocuBlack, Kassa Decl. at ¶ 2; Jayes Decl. at ¶ 2, have standing to bring this action as individuals. (*see* Section I, *supra*).

*Second*, ACT and UndocuBlack seek to protect interests that are critical to their organizational purpose. As the First Circuit noted in *College of Dental Surgeons of Puerto Rico v. Connecticut General Life Insurance Company*, "an association can bring a class action on behalf

of its members in a case (like this one) that seeks class-wide injunctive or declaratory relief. After all, an association, organized for the primary purpose of protecting its members' interests, has a substantial stake in pursuing such remediation." 585 F.3d at 40. There, the requirement of associational standing was satisfied because the plaintiff organization, the College of Dental Surgeons of Puerto Rico, was found to "exist[] mainly to protect its members' interests." *Id.* at 41. Here, the interests that ACT and UndocuBlack seek to protect by bringing this action are not merely germane to their organizational purpose, but absolutely essential. Both ACT and UndocuBlack exist specifically to serve the very population which will be harmed by the end of DED. *See* Dkt. No. 13-40 at ¶ 4; Dkt. No. 13-41 at ¶ 3. The unconstitutional termination of DED has a direct, deleterious effect upon the core interests that ACT and UndocuBlack exist to protect, and thus justifies their standing in this action.

*Third*, even though the individual Plaintiffs are members of ACT and UndocuBlack, the individual members of the organizations are not required to participate in this action so that ACT and UndocuBlack can obtain relief. The participation of ACT and UndocuBlack's members is not a prerequisite to the organizations obtaining relief and thus, the organizations have standing to seek declaratory and injunctive relief. *See also Playboy Enters., Inc. v. Public Serv. Comm'n of Puerto Rico*, 906 F.2d 25, 35 (1st Cir. 1990) (holding that organizational plaintiff's request for declaratory relief did not require individual members' participation because "such declaratory relief turns on a question of law which is not particular to each member . . . and . . . applies equally to all members of the Association"). Members of an organization are required to join as parties alongside their organization when the organizational plaintiff is seeking monetary relief for its members' damages. *Pharmaceutical Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 307 (1st Cir. 2005).

Here, organizational plaintiffs ACT and UndocuBlack do not seek monetary damages, but merely seek equitable relief on behalf of their members. *See* Am. Compl., ¶ 164.

## IV.   <u>Plaintiffs Have Stated a Claim for Violation of Equal Protection</u>

1.   Plaintiffs Have a Cause of Action Against Defendant Trump

Defendants contend that there is no cause of action against Defendant Trump because this Court cannot grant equitable and declaratory relief to Plaintiffs. They are incorrect. This Court has the authority to grant injunctive and declaratory relief to prevent the serious harm facing plaintiffs due to the President's unconstitutional cancellation of DED because of his racial animus. *See* Section II, *supra*

2.   *Arlington Heights* Provides the Applicable
     Standard for Plaintiffs' Equal Protection Claim

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.* ("*Arlington Heights*") supplies the standard applicable to Plaintiffs' Equal Protection claim. 429 U.S. 252 (1977). Under *Arlington Heights*, government actions may violate the equal protection clause of the Constitution if a discriminatory purpose was one motivating factor behind the challenged action. *Arlington Heights*, 429 U.S. at 265-66.

Defendants argue, however, that the Court should apply the rational basis standard under *Trump v. Hawaii* ("*Hawaii*"), 138 S. Ct. 2392 (2018), and that the Court should accord great deference to Defendant Trump's decision to terminate DED. According to Defendants, the Court need not look behind the boilerplate rationale offered in Defendant Trump's memoranda of March 27, 2018, and March 28, 2019. Defendant Trump's boilerplate rationale states that "conditions in Liberia have improved" and "no longer warrant a further extension of DED." Dkt. No. 13-2 at 1. Defendants contend that the *Hawaii* standard applies because unlike *Ramos v. Nielsen* ("*Ramos II*"), 336 F. Supp. 3d 1075 (N.D. Cal. 2018), where there was "no indication that foreign policy

considerations were a reason for the Secretary of DHS to terminate TPS," Defendant Trump's decision to terminate DED was motivated by foreign policy concerns. Dkt. No. 53 at 18-19.

However, Defendants' argument attempts to sidestep the issue at the heart of this case. Plaintiffs allege that discriminatory motive lies behind Defendant Trump's decision to terminate DED. "When there is a proof that a discriminatory purpose has been a motivating factor in the [government's] decision, [] judicial deference is no longer justified." *Arlington Heights*, 429 U.S. at 265-66; *accord Anderson v. City of Boston*, 375 F.3d 71, 83, 90 (1st Cir. 2004); *Hayden v. Grayson*, 134 F.3d 449, 453 (1st Cir. 1998).

Defendants acknowledge *Ramos II's* holding that the *Hawaii* standard did not apply where the plaintiffs alleged that racial animus motivated the termination of TPS designations, Mem. at 19-20. Defendants neglect to mention, however, that at least four other courts reached the same conclusion as *Ramos II* – including this Court in *Centro Presente*. *See Centro Presente v. United States Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 409-13 (D. Mass. 2018); *CASA de Maryland, Inc. v. Trump*, 355 F. Supp. 3d 307, 322-24 (D. Md. 2018); *Nat'l Ass'n for the Advancement of Colored People v. United States Dep't of Homeland Sec.*, 364 F. Supp. 3d 568, 576 (D. Md. 2019); *Ramos v. Nielsen* ("*Ramos I*"), 321 F. Supp. 3d 1083, 1127-32 (N.D. Cal. 2018); *Saget v. Trump* ("*Saget I*"), 345 F. Supp. 3d 287, 301-04 (E.D.N.Y. 2018). Defendants made the same arguments for application of the *Hawaii* standard in each of those cases, which challenged the termination of TPS for El Salvador, Haiti, Honduras, Nepal, Nicaragua, and Sudan. In each case, the court rejected the application of a rational basis standard. *See Centro Presente*, 332 F. Supp. 3d at 409-13; *CASA de Maryland*, 355 F. Supp. 3d at 322-24; *Nat'l Ass'n for the Advancement of Colored People*, 364 F. Supp. 3d at 576; *Ramos I*, 321 F. Supp. 3d at 1127-32; *Saget I*, 345 F. Supp. 3d at 301-04.

As the Court observed in *Centro Presente*, *Hawaii* is distinguishable because two factors were present in that case that are not present here: "the limited due process rights afforded to foreign nationals seeking entry into the United States, and the particular deference accorded to the executive in making national security determinations." *Centro Presente*, 332 F. Supp. 3d at 411 (citations omitted). Here, Plaintiffs have long resided legally in the United States, Defendant Trump's March 2019 Presidential Memorandum terminating DED makes no mention of any national security concerns that justify the termination. S*ee id.*

   3.      Plaintiffs State a Claim Under the *Arlington Heights* Standard

The facts alleged by Plaintiffs in the Amended Complaint show that Defendant Trump's termination of DED was motivated by racially discriminatory animus and is therefore not entitled to deference. *Arlington Heights*, 429 U.S. 252, 265-66; *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979), *aff'd*, 445 U.S. 901 (1980).

"Under *Arlington Heights*, government actions may violate equal protection if a discriminatory purpose was one motivating factor, and Plaintiffs 'need not plead or show the disparate treatment of other similarly situated individuals.'" *Saget I*, 345 F. Supp. 3d at 301 (quoting *Pyke v. Cuomo*, 258 F.3d 107, 109 (2d Cir. 2001)) (internal citation omitted). "Plaintiffs are not required to show that the decision to terminate TPS was 'motivated solely by' racial animus, nor that animus 'was the 'dominant' or 'primary' purpose." *Id.* (quoting *Arlington Heights*, 429 U.S. at 265). "They need only plausibly plead direct or circumstantial evidence of discriminatory intent." *Id.* (citing *Arce v. Douglas*, 793 F.3d 968, 977-78 (9th Cir. 2015)). "[T]he use of racial slurs, epithets, or other racially charged language . . . can be evidence that official action was motivated by unlawful discriminatory purposes." *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 277 (E.D.N.Y. 2018).

The allegations in the Amended Complaint, not least of which are Defendant Trump's repeated public statements, more than satisfy the *Arlington Heights* standard to plead a racially discriminatory purpose underlying the termination of DED.

In order to determine whether discriminatory purpose underlies government action, *Arlington Heights* prescribes a non-exhaustive list of factors for courts to analyze. Under that standard, courts may consider circumstantial evidence of (1) "[t]he impact of the official action whether it bears more heavily on one race than another," which is an important starting point; (2) "[t]he . . . administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports"; (3) "[t]he historical background of the decision"; (4) "[t]he specific sequence of events leading up [to] the challenged decision"; and (5) "[d]epartures from the normal procedural sequence." *Arlington Heights*, 429 U.S. at 266-68 (citations and internal quotation marks omitted).

Each of these factors weighs in favor of Plaintiffs.

First, termination of DED exclusively harms black immigrants. Even ostensibly neutral pretextual racial classifications are presumptively invalid and can be upheld "only upon an extraordinary justification." *Feeney*, 442 U.S. at 272. Accordingly, absent proof of an extraordinary justification for the Defendants' discriminatory acts, the Amended Complaint cannot be dismissed. *See Shaw v. Reno*, 509 U.S. 630, 658 (1993).

Defendants offer no such extraordinary justification. Plaintiffs' allegations are thus sufficient to proceed with the "fact-intensive inquiry needed to determine whether defendants acted with discriminatory intent." *Regents of Univ. of California v. United States Dep't of Homeland Sec.*, 298 F. Supp. 3d 1304, 1315 (N.D. Cal.), *aff'd sub nom. Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476 (9th Cir. 2018), *cert. granted sub*

*nom. Dep't of Homeland Sec. v. Regents of the Univ. of California*, No. 18-587, 2019 WL 2649834
(U.S. June 28, 2019).

For the second and third factors, Defendant Trump has made a series of disparaging
comments that reflect his Administration's open hostility toward immigrants of color. As recently
as mid-July 2019, the President, once again, made racist comments, this time targeted at four
minority congresswomen. *See* Katie Rogers and Nicholas Fandos, *Trump Tells Congresswomen
to 'Go Back' to the Countries They Came From*, N.Y. TIMES (Jul. 14, 2019),
https://www.nytimes.com /2019/07/14/us/politics/trump-twitter-squad-congress.html. In a series
of tweets, Defendant Trump told the congresswomen to "go back" to the countries they came from
and emphasized that the congresswomen are "from countries whose governments are a complete
and total catastrophe, the worst, most corrupt and inept anywhere in the world." *Id*.

In the following days, Defendant Trump singled out one of the congresswomen,
Representative Ilhan Omar who is a Somalian naturalized U.S. citizen. Specifically, he attacked
her at a campaign rally in North Carolina with false claims that she supports Al-Qaeda. Lauren
Aratani, *How Trump Distorts Facts to Make Ilhan Omar Seem Like an Enemy to the US*, THE
GUARDIAN (Jul. 18, 2019), https://www.theguardian.com/us-news/2019/jul/18/trump-ilhan-omar-
attacks-factcheck. He also attacked her religion (Islam) and alleged that she hates this country.
Maureen Groppe and John Fritze, *'It's breaking my heart': Greenville, NC, Wrestles with Fallout
of Donald Trump's Rally*, USA TODAY (Jul. 29, 2019),
https://www.usatoday.com/story/news/politics/elections/2019/07/29/send-her-back-chants-
trump-rally-open-wounds-greenville-nc/1828979001/. Defendant Trump's attacks prompted the
rally's attendees to chant "send her back" in reference to Congresswoman Omar specifically. *Id*.
In response to these chants, President Trump did not disavow the racism of the crowd and instead,

praised them and called the crowd "incredible." Kari Paul and Joan E. Greve, *Trump Praises 'Incredible' Crowd Who Chanted 'Send Her Back' at Ilhan Omar – As It Happened*, THE GUARDIAN (Jul. 22, 2019), https://www.theguardian.com/us-news/live/2019/jul/19/trump-ilhan-omar-news-today-live-latest-send-her-back-racist-attack-updates-. Through this series of events, Trump once again made clear his racial animus towards immigrants of color, specifically African immigrants.

With regard to the fourth factor, the termination of DED is part of a pattern of immigration policies by the Trump Administration that target immigrants of color including the termination of TPS for such immigrants. *See* Am. Compl. at ¶¶ 100-08.

And fifth, when faced with similar circumstances and conditions in Liberia, three previous administrations, on both ends of the political spectrum, extended the DED program for the country. There have been no shifts in the political, economic, or social landscape in the country that warrant Defendants' departure from the normal procedural sequence of extending the DED program. *See* Am. Compl. at ¶¶ 84–99.

Defendants argue that the first factor does not weigh in Plaintiffs' favor because DED is a status granted to a country, rather than a particular individual. This disingenuous argument ignores the simple fact that virtually all of Liberian DED beneficiaries are black. It is immaterial that the designation itself pertains to a country as opposed to an individual; the purported termination of DED for Liberia will have the direct effect of depriving DED beneficiaries—against whom Defendant Trump harbors demonstrable animus based on their race—of the right to live and work in this country.

With regard to the fifth factor, Defendants argue that a difference in outcome does not imply a difference in procedure. Dkt. No. 53, at 23. While that may be true, Plaintiffs need not yet prove a difference in procedure, especially considering that evidence of the procedures leading to

the termination of DED is likely to come from inside the Administration. Having plausibly pleaded their allegations of intentional discrimination, Plaintiffs are entitled to discovery regarding these procedures.

Defendants further contend that Defendant Trump's repeated racist statements "are not probative of the President's motivation because Plaintiffs do not allege any connection between those alleged remarks and the decision at issue in this case." Defendants liken Defendant Trump's extensive catalog of bigoted statements to "stray remarks" with no nexus to the challenged action. *See* Dkt. No. 53, at 22-23. Far from being "stray remarks," Defendant Trump's statements are probative of the President's motivation for terminating DED because they reveal an overarching objective of removing persons of color from the United States on the basis of their race and national origin. *See* Am. Compl. 100-08.

Defendants' arguments are unavailing. By any measure, Plaintiffs have plausibly alleged discriminatory intent by Defendant Trump. These allegations draw support from the holdings of cases such as *Centro Presente*, which concluded that the plaintiffs had made out a *prima facie* case that racial animus motivated the terminations of TPS at issue, 332 F. Supp. 3d at 415; *see also Ramos II*, 326 F. Supp. 3d at 1100-01 (finding both direct and circumstantial evidence "that President Trump harbors an animus against non-white, non-European aliens which influenced his . . . decision to end the TPS designation").

Even under the more onerous summary judgment standard, "a plaintiff need provide very little such evidence to raise a genuine issue of fact; any indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder." *Arce v. Douglas*, 793 F.3d 968, 977-78 (9th Cir. 2015) (internal citation omitted); *see also Ríos-Colón v. Toledo-Dávila*, 641 F.3d 1, 5 (1st Cir. 2011) (holding that the use of "derogatory slurs expressing explicit anti-black

racial bias" with disadvantageous treatment are sufficient to plead an equal protection claim). Plaintiffs exceed even this threshold. The Amended Complaint sets forth specific, factual allegations that Defendants' termination of DED was motivated by racially discriminatory animus. *See* Am. Compl. ¶¶ 100-08.

In sum, Defendant Trump's bigoted and racially charged public statements provide compelling evidence of a "bare [] desire to harm a politically unpopular group." *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973). Plaintiffs thus plausibly allege that Defendant Trump's termination of DED was motivated not by genuine foreign policy concerns, but rather by racial and national-origin animus. These allegations more than suffice to survive a motion to dismiss and proceed to discovery.

4.      Plaintiffs State a Claim Even Under the Inapt *Trump v. Hawaii* Standard

Even the deferential *Trump v. Hawaii* standard advocated by Defendants does not dispose of Plaintiffs' equal protection claim. Plaintiffs still prevail under the standard articulated in *Trump* because termination of DED for Liberia was "not rationally related to a legitimate government purpose." *Mulero-Carrillo v. Román-Hernández*, 790 F.3d 99, 107 (1st Cir. 2015).

Courts applying rational basis review "will uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds," *Hawaii*, 138 S. Ct. at 2420. Courts may consider extrinsic evidence in making this assessment. *Id.* Even in this deferential context, the Constitution forbids policies motivated by "a bare [] desire to harm a politically unpopular group." *Moreno*, 413 U.S. at 534; *Hawaii*, 138 S. Ct. at 2423 (Kennedy, J., concurring) (citing *Romer v. Evans*, 517 U.S. 620 (1996)).

The facts as alleged in the Amended Complaint establish precisely such a "bare [] desire to harm a politically unpopular group." *Moreno*, 413 U.S. at 534. Defendant Trump's long history of racist remarks against persons of color, Am. Compl. at ¶¶ 100-08, combined with his stated

objective of excluding such persons from this country, *Id.*, and the feebleness of the justifications offered in the presidential memoranda, *Id.* at ¶¶ 110-113, lead inexorably to the conclusion that his decision to terminate DED for Liberia was motivated by racial animus.

Even where great deference is due, the Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Commerce v. New York* ("*New York*"), 139 S. Ct. 2551, 2575 (2019) (quoting *United States v. Stanchich*, 550 F.2d 1294, 1300 (2d Cir. 1977) (Friendly, J.)). The boilerplate justifications offered by Defendants cannot obscure the weight of evidence that betrays Defendant Trump's true motive.

Nor is it an isolated event for this Administration to offer a false pretext to achieve an impermissible political objective. Recently, the Supreme Court in *New York* addressed a scenario in which this same Administration offered a false justification as pretext for an otherwise impermissible action. *Id.* at 2573-75. There, the Defendants claimed that improving enforcement of the Voting Rights Act ("VRA") was the primary rationale for reinstating a citizenship question on the census. The Supreme Court held that the evidence showed, however, that contrary to the Defendants' assertion, in reality "the VRA played an insignificant role in the decisionmaking process." *Id.* at 2574. The Court held that the evidence revealed that the Secretary of Commerce assumed office determined to reinstate a citizenship question; he ordered his staff to make it happen; and the Voting Rights Act enforcement rationale was not devised until later. *Id.* at 2574-75.

Here, as in *New York*, Defendants' stated reasons for terminating DED are at odds with the evidence. Defendants claim the termination is justified because conditions in Liberia have improved. But as Plaintiffs allege, this is simply not true. Trump's animus against persons of color provides a far more convincing explanation, as previously confirmed by this Court and courts in

at least four other districts. *See Centro Presente*, 332 F. Supp. 3d at 409-13; *CASA de Maryland*, 355 F. Supp. 3d at 322-24; *Nat'l Ass'n for the Advancement of Colored People*, 364 F. Supp. 3d at 576; *Ramos I*, 321 F. Supp. 3d at 1127-32; *Saget I*, 345 F. Supp. 3d at 301-04. Thus, "[a]ltogether, the evidence tells a story that does not match the explanation." *New York*, 139 S. Ct. at 2575. Accordingly, even if the Court were to apply the deferential *Trump v. Hawaii* standard, the facts as alleged by Plaintiffs suffice to defeat Defendants' motion to dismiss Count One of the Amended Complaint, and Plaintiffs are entitled to proceed to discovery.

## V.     Plaintiffs Have Stated a Claim for Violation of Due Process

Defendants' motion does not address and seemingly concedes the well-settled principles that (1) U.S. citizen Plaintiffs have the right to live in the United States, *Nguyen v. I.N.S.*, 533 U.S. 53, 67 (2001); (2) U.S. citizen Plaintiffs have the right to family integrity, *Moore v. City of E. Cleveland*, 431 U.S. 494, 499 (1977), and; (3) U.S. citizen Plaintiffs have the right to be free from a forced unconstitutional choice, *Simmons v. United States*, 390 U.S. 377, 394 (1968).  Despite this, relying solely on *Payne-Barahona v. Gonzales*, 474 F.3d 1 (1st Cir. 2007), Defendants attempt to paper over the constitutional issues raised by U.S. citizen Plaintiffs by claiming these important rights do not extend to Plaintiffs in this context.  Dkt. No. 53 at 25.  However, *Payne-Barahona* does not stand for the proposition that U.S. citizens lose constitutional interests simply because their parents are non-citizens. *Payne-Barahona* is a narrow ruling and does not control the case at hand.  In *Payne-Barahona*, the Plaintiff was a non-citizen permanent resident who was properly removable after committing an aggravated felony.  He attempted to assert the rights of his children to live permanently with him in the United States.  The Court held that the Plaintiff in that case could not prevail in his assertion of family integrity rights on behalf of his children. *Payne-Barahona*, 474 F.3d at 3.

This case has four substantial differences from *Payne-Barahona* that instruct a different outcome.  First, the plaintiff in *Payne-Barahona* was deportable for committing an aggravated felony, whereas Plaintiffs here have committed no crimes and are being ousted solely because of an unconstitutional government action.  The First Circuit has never addressed the family integrity right, or the weaker interest the government has in overcoming strong constitutional rights, for Plaintiffs who have resided legally for an extended period of time in the United States and who have committed no action as cause for their removal. The only court to address a similar scenario was the Northern District of California in *Ramos I* which allowed the claim for family integrity plead by U.S. citizen children of TPS holders to survive defendants' motion to dismiss in that case. *Ramos I*, 321 F. Supp. 3d at 1117 (Order Denying Defendants' Motion to Dismiss).  Second, the plaintiff in *Payne-Barahona* asserted only the right to family integrity in the United States, he did not assert the right to be free from a forced unconstitutional choice as Plaintiffs do here.  The Court never addressed the merits of that claim in any context and must address that well-plead claim here for the first time.  Third, the plaintiff in *Payne-Barahona* sought to remain in the United States with his children permanently, whereas Plaintiffs here only seek to assert claims on behalf of U.S. citizen children while they are minors.  The government has demonstrated no valid interest in separating these families at this juncture point as opposed to when the children reach the age of majority, a burden that they must meet if they seek to overwhelm constitutional protection.  Fourth, the Plaintiffs in this case risk specific harms not present in *Payne-Barahona*.  If their parents are deported, the young U.S. citizen children here will be forced to make a horrible decision: either move to a country that they have never known and that is manifestly unsafe, or stay in the United States and remain separated from their parents. Further, if U.S. citizen children are forced to abandon their homes and move to Liberia—a country where they have never lived—they risk loss

of their U.S. citizenship on top of losing well-protected constitutional interests.  Liberia does not recognize dual citizenship and a number of important rights in Liberia are only accessible to citizens. See Dkt. No. 40, Ex. 4. The children in this context therefore are not only choosing between their parents and their home, but also between their home and their citizenship.  Freedom from the danger and loss of citizenship that would come with a move to Liberia are important interests and the government has not met its burden by demonstrating a compelling interest that outweighs those Plaintiffs assert here.

Defendants further assert that even if U.S. citizen Plaintiffs' claims are valid, they cannot be brought against the Defendants named here. This argument fails as to the President for the reasons detailed in the previous section. *See* Section IV, *supra*. This argument also fails as applied to DHS because, while the complaint alleges that the animus and decision to cancel DED rests with Defendant Trump, it is undisputed that the administration of the program and enforcement of any cancellation of DED will be executed by DHS and its constituent sub-agencies. U.S. citizen Plaintiffs seek to remain with their parents in their homes, to avoid enjoining those that would execute the decision to separate these families would remove the teeth from any potential relief sought by Plaintiffs.

**VI.   Plaintiffs Have Stated a Claim for Which Relief Is
Available Under the Declaratory Judgment Act**

Defendants have alleged that Plaintiffs have not "plausibly alleged a cognizable claim" that would entitle them to declaratory judgment under the Declaratory Judgment Act. Mem. in Supp. of Mot. to Dismiss the Am. Compl. § VI. While Plaintiffs concede that the Declaratory Judgment Act is not a source of substantive rights in and of itself, Defendants have misconstrued Plaintiffs' claim by suggesting that Plaintiffs are attempting to plead a claim *under* the Declaratory Judgment Act. Count Four of Plaintiffs' Amended Complaint—which sets forth Plaintiffs' request for

declaratory relief—incorporates by reference Plaintiff's constitutional claims for various violations of the Fifth Amendment, described more fully in Counts 1-3. Am. Compl. ¶¶ 141-60. Plaintiff is requesting that, in addition to the relief requested in Counts 1-3, additional relief be granted in the form of a declaratory judgment stating that the actions taken by Defendants did, in fact, violate the U.S. Constitution.

Declaratory judgments are considered to be an available remedy for constitutional violations, and courts in the First Circuit have long issued declaratory judgments for such violations. *See, e.g.*, *S. Bos. Allied War Veterans Council v. City of Boston*, 875 F. Supp. 891, 920 (D. Mass. 1995) (declaring that permitting requirements for St. Patrick's Day parade violated the Constitution); *Mass. Gen. Hosp. v. Sargent*, 397 F. Supp. 1056, 1057, 1063 (D. Mass. 1975) (declaring that state policy of failing to make prompt and full payments under the federal Social Security program violated Article VI of the Constitution). Accordingly, this Court should deny Defendants' request to dismiss Plaintiffs' request for declaratory relief in relation to Defendants' constitutional violations.

## <u>CONCLUSION</u>

The Court should deny Defendants' Motion to Dismiss the Amended Complaint.

Respectfully submitted,

Dated:  August 2, 2019

*/s/ Timothy C. Blank*

Oren Nimni (BBO #691821)
Iván Espinoza-Madrigal (*pro hac vice*)
LAWYERS FOR CIVIL RIGHTS
61 Batterymarch Street, 5th Floor
Boston, MA 02110
Tel: (617) 988-0624
Fax: (617) 482-4392
onimni@lawyerscom.org

Timothy C. Blank
DECHERT LLP
One International Place
100 Oliver Street, 40th Floor
Boston, MA 02110
Tel: (617) 728-7100
Fax: (617) 426-6567
timothy.blank@dechert.com

Dorian L. Spence (*pro hac vice*)
Maryum Jordan (*pro hac vice*)
LAWYERS' COMMITTEE FOR CIVIL
           RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Tel: (202) 662-8600
Fax: (202) 783-0857
dspence@lawyerscommittee.org

Dennis H. Hranitzky (*pro hac vice*)
Michael A. Losco (*pro hac vice*)
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Tel: (212) 641-5647
Fax: (212) 698-3500
dennis.hranitzky@dechert.com

## <u>LOCAL RULE 5.2(B) CERTIFICATE OF SERVICE</u>

I, Timothy C. Blank, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 2, 2019.


<u>*/s/ Timothy C. Blank*</u>
Timothy Blank