**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

_____
                                                          )
AFRICAN COMMUNITIES TOGETHER, *et al.*,    )
                                                          )
                    *Plaintiffs*,                      )
                                                          )
          v.                                           )          Civil Action No. 19-10432 (TSH)
                                                          )
DONALD J. TRUMP, President of the United     )
States, *et al.*,                                       )          Leave to file granted on August 13, 2019
                                                          )
                    *Defendants*.                    )
_____)


**REPLY IN FURTHER SUPPORT OF
<u>MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................................1

ARGUMENT ......................................................................................................................2

    I.   The Individual Plaintiffs Cannot Establish Article III Standing ......................................2

       A.  The Individual Plaintiffs Cannot Establish Redressability ..........................................2

       B.  The Individual Plaintiffs Have Not Suffered Any Injury-In-Fact and Their
           Claims Are Not Ripe ..................................................................................................5

       C.  The Organizational Plaintiffs Cannot Establish Article III Standing.........................7

   II.   Plaintiffs Fail to State a Claim for Violation of Equal Protection...................................10

       A.  There is No Cause of Action Against the President...................................................10

       B.  In the Alternative, Count One Fails Under the Deferential Standard of
           Review......................................................................................................................11

           1.  The Standard of Review is Highly Deferential ...................................................11

           2.  Plaintiffs' Equal Protection Claim Fails Under *Hawaii*.....................................13

           3.  Plaintiffs' Equal Protection Claim Fails Even Under *Arlington Heights*.............15

  III.   Plaintiffs Fail to State a Claim for Violation of Due Process .........................................17

  IV.   Plaintiffs' Claim Under the Declaratory Judgment Act Should be Dismissed ................19

CONCLUSION ...................................................................................................................19

## TABLE OF AUTHORITIES

**Cases**

*American-Arab Anti-Discrimination Committee v. Reno*,
  70 F.3d 1045 (9th Cir. 1995) ............................................................................... 3

*Arlington Heights v. Metropolitan Housing Development Corporation*,
  429 U.S. 252 (1977) ........................................................... 11, 12, 15, 16, 17

*Beatty v. Washington Metro. Area Transit Auth.*,
  860 F.2d 1117 (D.C. Cir. 1988) .......................................................................... 3

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .......................................................................................... 17

*CASA de Md., Inc. v. Trump*,
  355 F. Supp. 3d 307 (D. Md. 2018) .............................................................. 12, 13

*Castañeda v. Souza*,
  810 F.3d 15 (1st Cir. 2015) ................................................................................. 7

*Centro Presente v. Dep't of Homeland Sec.*,
  332 F. Supp. 3d 393 (D. Mass. 2018) ........................................................... 12, 14

*Coll. of Dental Surgs. of P.R. v. Conn. Gen. Life Ins. Co.*,
  585 F.3d 33 (1st Cir. 2009) ............................................................................... 10

*Department of Commerce v. New York*,
  139 S. Ct. 2551 (2019) ...................................................................................... 14

*Detroit Int'l Bridge Co. v. Gov't of Can.*,
  189 F. Supp. 3d 85 (D.D.C. 2016) ...................................................................... 3

*Doe v. Trump*,
  319 F. Supp. 3d 539 (D.D.C. 2018) .................................................................... 5

*Envtl. Working Grp. v. FDA*,
  301 F. Supp. 3d 165 (D.D.C. 2018) ................................................................ 9, 10

*Ernst & Young v. Depositors Econ. Prot. Corp.*,
  45 F.3d 530 (1st Cir. 1995) ................................................................................. 7

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ............................................................................ 8

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ............................................................................................ 2

*Grundy v. HSBC Bank USA, N.A.*,
   No. 17-11449-PBS, 2018 U.S. Dist. LEXIS 155236 (D. Mass. July 16, 2018) ............................5

*Grupo Mexicano De Desarrollo v. All. Bond Fund*,
   527 U.S. 308 (1999) ................................................................................................................10

*Gutierrez-Soto v. Sessions*,
   317 F. Supp. 3d 917 (W.D. Tex. 2018) ....................................................................................14

*Long Term Care Pharmacy All. v. UnitedHealth Grp., Inc.*,
   498 F. Supp. 2d 187 (D.D.C. 2007) ...........................................................................................8

*Lovitky v. Trump*,
   2019 U.S. Dist. LEXIS 116357 (D.D.C. July 12, 2019) ..............................................................5

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ..................................................................................................................4

*Mississippi v. Johnson*,
   71 U.S. (4 Wall) 475 (1866).................................................................................................2, 3

*National Treasury Employees Union v. Nixon*,
   492 F.2d 587 (D.C. Cir. 1974) ...................................................................................................5

*Nat'l Taxpayers Union v. United States*,
   68 F.3d 1428 (D.C. Cir. 1995) .................................................................................................10

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982) ................................................................................................................12

*Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*,
   2010 U.S. Dist. LEXIS 49151 (N.D. Ill. May 17, 2010) ..............................................................9

*Payne-Barahona v. Gonzales*,
   474 F.3d 1 (1st Cir. 2007) .......................................................................................................17

*Pers. Adm'r of Mass. v. Feeney*,
   442 U.S. 256 (1979) ................................................................................................................15

*Ramos v. Nielsen*,
   321 F. Supp. 3d 1083 (N.D. Cal. 2018) ...................................................................................18

*Saget v. Trump*,
   375 F. Supp. 3d 280 (E.D.N.Y. 2019).........................................................................................3

*Simmons v. United States*,
   390 U.S. 377 (1968) ................................................................................................................18

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ...........................................................................................................5

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ................................................................................................*passim*

*United States v. Pollard*,
   416 F.3d 48 (D.C. Cir. 2005) ............................................................................................4

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ...........................................................................................................3

## **Rule**

Fed. R. Civ. P. 12 .....................................................................................................1, 19

## INTRODUCTION

Plaintiffs' Opposition to Defendants' Motion to Dismiss confirms that Plaintiffs' claims seeking extraordinary relief should be dismissed for lack of standing and/or for failure to state a claim. It is well-settled that courts lack the power to issue injunctive relief against the President of the United States. Nonetheless, that is precisely what Plaintiffs are asking this Court to do. Plaintiffs seek to have this Court compel the President to authorize Deferred Enforced Departure ("DED") for Liberia pursuant to his constitutional authority over foreign affairs. Granting such relief would require the Court to overrule a discretionary presidential determination in an area in which courts are ill-suited to proceed. In short, whether United States foreign policy justifies DED in any particular situation is not a question for the courts and it would be inappropriate to second guess the executive's exercise of that constitutional authority. Because the remedy sought by Plaintiffs is unavailable in this or any Court and because Plaintiffs fail to identify any alternative remedy, Plaintiffs' claims should be dismissed for lack of redressability. Those claims also suffer from an absence of injury-in-fact and lack of ripeness, for the reasons discussed below.

Even if the Court does not dismiss this case on standing grounds, it should dismiss under Federal Rule of Civil Procedure 12(b)(6). Plaintiffs' equal protection claim comes nowhere close to meeting the highly deferential legal standard for cases such as this described in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018). And Plaintiffs' arguments against applying a deferential standard of review ignore the many atypical and significant aspects of this case that require heightened deference. But even under Plaintiffs' proposed legal standard, their equal protection claim fails because that claim is ultimately based on speculation about the basis for the President's decision, not plausible allegations of fact. As to Plaintiffs' due process claim based on a right to family integrity, Plaintiffs cannot escape the on-point First Circuit authority foreclosing that claim.

For these reasons, as discussed further below, the Court should dismiss Plaintiffs' Amended Complaint.

## ARGUMENT

### I.    The Individual Plaintiffs Cannot Establish Article III Standing

#### A.  The Individual Plaintiffs Cannot Establish Redressability

Plaintiffs do not deny that their requested relief would require this Court to order the President to authorize DED for Liberia.  Plaintiffs also do not dispute the existence of Supreme Court precedent squarely holding that courts may not "enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall) 475, 501 (1866); *see also* Mot. at 10 & n.5 (citing cases).  Nevertheless, citing no pertinent authority, Plaintiffs insist that courts may grant injunctive relief against the President "when the circumstances are sufficiently extraordinary[.]" Opp'n at 8.  Plaintiffs are mistaken.  The longstanding rule against enjoining the President contains no exception for "extraordinary" circumstances.  Plaintiffs' belief to the contrary appears to be based on their misreading of *Franklin v. Massachusetts*, 505 U.S. 788 (1992), in which the plurality observed that the plaintiffs' request for injunctive relief against the President was "extraordinary" and therefore "should have raised judicial eyebrows." *Id*. at 802. But nothing said by the Court in *Franklin* suggests that relief against the President is ever appropriate, regardless whether a case might be thought of as "extraordinary" by the party that brings it.  Instead, just as in *Franklin*, Plaintiffs' request for such relief should raise judicial eyebrows.

Plaintiffs cannot fit within the *only* exception to the rule against enjoining the President that some lower courts have endorsed—one for purely ministerial duties.  *See Franklin*, 505 U.S. at 802 ("We have left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty[.]").  Plaintiffs do not contend

that the President's DED authority is ministerial, nor could they.  "A ministerial duty . . . is one in respect to which nothing is left to discretion."  *Mississippi*, 71 U.S. at 498; *Beatty v. Washington Metro. Area Transit Auth.*, 860 F.2d 1117, 1127 (D.C. Cir. 1988) ("Generally speaking, a duty is discretionary if it involves judgment, planning, or policy decisions. It is not discretionary [i.e. ministerial] if it involves enforcement or administration of a mandatory duty at the operational level.") (alteration in original and emphasis omitted).  The presidential DED authority involves several discretionary determinations, including whether to authorize DED, for how long, and for which beneficiaries, all of which are based on consultations with executive branch officials and the President's own foreign policy judgment.  *See, e.g.*, Defs' Ex. G.  As such, it is plainly a discretionary duty and in no sense "ministerial."  *See, e.g.*, *Detroit Int'l Bridge Co. v. Gov't of Can.*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) (where President had broad discretionary authority including the freedom "to decide which executive officials to consult, whether to reject the officials' advice and recommendation altogether, . . . and whether to consider any additional factors" there was "nothing ministerial or ceremonial about the President's duties").

None of the decisions cited by Plaintiffs on this topic supports their position on redressability.  The President was not a defendant in either *Zadvydas v. Davis*, 533 U.S. 678 (2001), or *American-Arab Anti-Discrimination Committee v. Reno*, 70 F.3d 1045 (9th Cir. 1995), and those decisions say nothing about whether or when a court may enjoin the President.  And the district court in *Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019), relied on the ministerial exception to hold that it could order limited injunctive relief against the President.  *See id.* at 335 ("Here, injunctive relief against the President does not invade the province of executive discretion" and "is akin to performing a ministerial duty").  Here, in contrast, Plaintiffs have not even argued that the ministerial exception applies.

Accordingly, the Court should reject Plaintiffs' invitation to assert control over the President's Article II powers. Just as a court could not order the President to grant a pardon or nominate someone to a cabinet secretary position or federal judgeship as a remedy for alleged discrimination, *see, e.g.*, *United States v. Pollard*, 416 F.3d 48, 57 (D.C. Cir. 2005) (courts may not intervene in clemency decisions), likewise, courts lack the power to order the President to exercise his DED authority.

Having failed to establish the availability of an injunction requiring the President to authorize DED for Liberia, Plaintiffs also have not identified any alternative relief that is both available and capable of remedying their alleged injuries. They have therefore failed to meet their burden of proof to establish standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing [the elements of standing.]"). Although Plaintiffs' brief makes a vague passing reference to "injunctive relief to prevent Defendants from implementing the termination of DED," Opp'n at 9, they fail to articulate what such relief would entail. No such relief exists because there is no further "implement[ation]" necessary for DED to terminate. A grant of DED lasts only as long as specified by the President. The current DED wind-down period will expire on March 31, 2020, absent action by the President, and there is no further action to enjoin in order to prevent that expiration from occurring.

Next, Plaintiffs claim that they "may obtain declaratory relief" but they fail to say how such relief could possibly remedy their purported injuries. Opp'n at 10. As Defendants have explained, declaring the President's actions "void and without legal force or effect," as Plaintiffs request, will not help Plaintiffs because an affirmative act by the President is required to extend DED. Mot. at 11; *see also id.* at 14 (citing cases holding that redressability was not established where declaratory relief was not likely to lead to government action to remedy injury). Plaintiffs entirely failed to respond to Defendants' argument and thereby waived any argument that

4

declaratory relief will remedy their alleged injuries.  *See Grundy v. HSBC Bank USA, N.A.*, No. 17-11449-PBS, 2018 U.S. Dist. LEXIS 155236, at *17 (D. Mass. July 16, 2018) (waiver results from failure to respond to argument).

In any event, Plaintiffs are incorrect in claiming that they may obtain declaratory relief directed at the President, for the reasons explained previously.  Mot. at 10-11 & n.5.  The only decision cited by Plaintiffs on this question, *National Treasury Employees Union ("NTEU") v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974), predates the Supreme Court's ruling in *Franklin*, which warned against ordering relief against the President.  Courts, therefore, have doubted that *NTEU* remains good law.  *See, e.g.*, *Doe v. Trump*, 319 F. Supp. 3d 539, 543 (D.D.C. 2018); *Lovitky v. Trump*, 2019 U.S. Dist. LEXIS 116357, *27 (D.D.C. July 12, 2019).  And *NTEU* is distinguishable because the "question to be determined" in that case was "whether a court can compel the President to perform a ministerial act."  492 F.2d at 607.  Here, the duties of the President at issue are not "ministerial," and Plaintiffs do not contend otherwise.

Accordingly, the individual plaintiffs' claims should be dismissed for lack of redressability.

## B.  The Individual Plaintiffs Have Not Suffered Any Injury-In-Fact and Their Claims Are Not Ripe

The individual plaintiffs also have not established any injury-in-fact sufficient to support standing.  Those plaintiffs argue that they are likely to suffer such injury in the future because the "termination of DED has already been set in motion."  Opp'n at 5-8.  But claims of future injury do not support standing if they are conjectural.  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).  "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'"  *Id.*  Plaintiffs here have not shown sufficient likelihood of future injury to support Article III standing.

Plaintiffs' theory of injury is premised on the fact that there is currently an expiration date for the DED wind-down period.  *See* Opp'n at 8 ("The only sure thing for the Court to consider

here is the set expiration of DED."). But that has been true of *every* grant of DED for Liberia. Every prior grant of DED was time-limited and set to expire by its own terms. *See, e.g.*, Exs. A-F. Presidents have never provided assurances that additional grants of DED would follow so there has always been the possibility that DED beneficiaries would be subject to removal at the end of any particular DED authorization period. President Trump has done only what his predecessors did – he has evaluated the situation in Liberia and twice extended the protections of DED for Liberians. Am. Compl. ¶ 9. If the mere existence of a currently scheduled end date for the DED wind-down period means that Plaintiffs have already suffered an injury sufficient to confer standing, then DED beneficiaries would have been injured by every prior authorization of DED because every authorization included an end date. Plaintiffs' theory of injury stretches Article III standing too far and should be rejected.

Although not raised in Plaintiffs' opposition, the *amici curiae* brief argues that the U.S. citizen minor plaintiffs have been harmed by concerns that their parents may be removed if they lose the protections of DED. *See* Amici Curiae Br. ("Am. Br."), Dkt. No. 68, at 12-15. This argument fails for reasons similar to those discussed above. Given the temporary nature of DED authorizations, DED beneficiaries and their families will always have reason to be concerned about whether a particular DED authorization period will be the last. The minor plaintiffs' concerns about the end of DED are the result of the nature of DED, not the President's decision. Indeed, instead of simply allowing DED to expire without warning as he could have done, the President has authorized a wind-down period to ease the relocation process for affected individuals.[1]

But even assuming the individual plaintiffs have Article III standing, their claims are not ripe for review. In addition to the contingent nature of Plaintiffs' alleged harm, there are prudential

---

[1] The *amici curiae* devote several pages to arguing about the alleged harm to their state economies that would result from the removal of DED beneficiaries from this country. Am. Br. at 2-12. But alleged harms to non-parties are not relevant to determining whether *Plaintiffs* have standing.

considerations weighing against resolving this dispute now.  First, factual developments may inform the court's consideration of the case.  *See Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 536 (1st Cir. 1995).  For example, any decisions that the President may make in the future to again extend the DED wind-down period or take other actions favorable to DED beneficiaries would further undermine the notion that the President has acted out of animus. Especially given the very substantial separation-of-powers concerns that this case implicates, deferring a ruling until it is more apparent that Plaintiffs will suffer an injury is the best course. Although Plaintiffs argue that the hardship element of ripeness favors adjudicating the dispute now because "[t]hey will be eligible for deportation and separation from their families starting on March 30, 2020," Opp'n at 11, any removal proceedings that might begin at that time would likely take months or years to complete, affording plenty of time for Plaintiffs to litigate their claims.  *See Castañeda v. Souza*, 810 F.3d 15, 19 (1st Cir. 2015) ("removal proceedings can stretch on for months or even years").  Lastly, Plaintiffs argue that Defendants' position on ripeness contradicts Defendants' arguments in response to Plaintiffs' preliminary injunction motion, Opp'n at 11-12, but Defendants have already explained why there is no inconsistency.  Mot. at 9 n.3.

### C.  The Organizational Plaintiffs Cannot Establish Article III Standing

The Court can easily dispose of the organizational plaintiffs' standing arguments because the *only* count those plaintiffs have brought is one for a violation of the Declaratory Judgment Act. *See* Am. Compl. at 44.  Plaintiffs now concede that they are not "attempting to plead a claim *under* the Declaratory Judgment Act" and merely seek declaratory relief through that count.  Opp'n at 29-30 (emphasis in original); *see also* Section IV *infra*.  In other words, the organizational plaintiffs have not actually pled a claim and, therefore, they have no role in this lawsuit.  And even if the organizational plaintiffs had pled a claim, the only relief they seek – declaratory relief – would not remedy their claimed injuries, for reasons Defendants explained previously.  *See* Mot.

at 14.  Plaintiffs did not respond to Defendants' arguments on that point and therefore have conceded the redressability issue.  The organizational plaintiffs' purported claims should be dismissed.

Even assuming the organizations had pled a claim and established redressability, they would still lack standing because they have not suffered a cognizable injury sufficient for Article III standing.  Although the organizational plaintiffs have submitted declarations in an attempt to shore up their deficient standing allegations, those declarations only reinforce the conclusion that they lack standing.  For example, the Declaration of Jonathan Jayes-Green attempts to show that Plaintiff UndocuBlack Network ("UndocuBlack") has suffered an injury as a result of the President's DED decision.  Mr. Jayes-Green states that he has had to redirect his time to "DED advocacy," that another employee had to divert a portion of his time "to support our DED advocacy," and that UndocuBlack spent money on "DED advocacy."  Decl. of Jonathan Jayes-Green, Dkt. No. 67-3, ¶¶ 5, 7, 8; *see also* Opp'n at 14 (claiming injury because the organizations have had to commit resources to "DED advocacy").  But it is "clear that an organization's use of resources for . . . advocacy is not sufficient to give rise to an Article III injury."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015); *see also* Mot. at 12-13 (citing cases).  Accordingly, the organizations' time and money spent on advocacy does not establish an injury sufficient to confer standing.

In addition, Plaintiffs concede that an injury-in-fact is not established simply because an organization has had to "divert[] resources from one priority to another[.]"  Opp'n at 13 (quoting *Long Term Care Pharmacy All. v. UnitedHealth Grp., Inc.*, 498 F. Supp. 2d 187, 192 (D.D.C. 2007)).  But that is precisely the purported injury that the organizational plaintiffs claim.  They contend that the DED decision has forced them "to drop other priorities to continue their DED advocacy[.]"  Opp'n at 14; *see also* Declaration of Amaha Kassa, Dkt. No. 67-2 ¶ 5 ("a significant

8

amount of my time has been diverted from other priorities"); *id.* ¶ 8 ("responding to DED . . . has meant that she has had less time to advance ACT's other legislative priorities"). In other words, the "injury" that the organizational plaintiffs claim here is nothing more than a self-inflicted choice to prioritize activities related to DED over other activities. And because those DED-related activities are simply part of the organizations' ordinary work, *see* Mot. at 13-14, their missions have not been frustrated and their work has not been impeded by the President's decision. *See Envtl. Working Grp. v. FDA*, 301 F. Supp. 3d 165, 172 (D.D.C. 2018) (organization's "educational efforts" did not suffice to confer standing "because this type of work is exactly what these organizations always do"); *Pa. Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n*, 2010 U.S. Dist. LEXIS 49151, at *60-61 (N.D. Ill. May 17, 2010) (finding no associational standing where the expenditure of resources to assist members in dealing with the defendants' actions was "not something that has forced them to divert resources away from their ordinary work"). For example, Plaintiff African Communities Together ("ACT") states that its "core mission is 'to advocate for civil rights, opportunities, and a better life for African immigrants and their families in the United States[.]" Opp'n at 15. That is exactly what ACT is doing in its efforts responding to the DED decision. *See* Am. Compl. ¶ 26. Accordingly, the work undertaken in response to the DED decision does not show a diversion of resources away from the organizations' missions – it is part of those missions.[2]

For the same reasons, the organizations' expenditures in response to the DED decision do not constitute an injury-in-fact. Opp'n at 13. The organizations allegedly spent money on "DED

---

[2] Plaintiffs argue that "[i]t is impossible for UndocuBlack and ACT to advocate for the rights of African immigrants protected under the DED program if those immigrants are subject to deportation early next year." Opp'n at 15. But the organizations have not shown any legally protected interest in continuing to serve particular immigrants. They also have not shown that the loss of DED beneficiaries as clients would harm their ability to perform their missions. On the contrary, the organizations' declarations make clear that they serve immigrant communities more broadly than just Liberian DED beneficiaries. *See, e.g.*, Jayes-Green Decl. ¶ 2.

advocacy," Jayes-Green Decl. ¶ 8, but, again, diverting resources for advocacy does not constitute an Article III injury.  And costs in the form of "staff time related to inquiries from DED holders" and other costs "related to travel, hosting meetings with DED holders, etc.," Kassa Decl. ¶ 9, are for precisely the types of activities that the organizations ordinarily engage in and are therefore consistent with their missions.  *See* Mot. at 13 (discussing organizations' missions and activities). The organizations do not claim to have incurred "costs beyond those normally expended" to carry out their missions.  *See Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995).  Rather, they allegedly shifted costs from other activities.  *See Envtl. Working Grp.*, 301 F. Supp. 3d at 172 (organizational standing lacking where the plaintiffs "offer[ed] no evidence that the [the government's] alleged inaction required them to spend anything beyond their typical annual expenditures").

Lastly, the organizations lack standing to sue on behalf of their DED beneficiary members because the members themselves lack standing, for the reasons discussed above.  *See Coll. of Dental Surgs. of P.R. v. Conn. Gen. Life Ins. Co.*, 585 F.3d 33, 40 (1st Cir. 2009).

For these reasons, all of Plaintiffs' claims should be dismissed for lack of standing.

## II.   Plaintiffs Fail to State a Claim for Violation of Equal Protection

### A.   There is No Cause of Action Against the President

Defendants' Motion argued that each of the claims against the President should be dismissed because Plaintiffs lack a cause of action, *see* Mot. at 15, 25 n.11, 26, and Plaintiffs' three-sentence response fails to rebut the point, *see* Opp'n at 18.  Plaintiffs do not dispute that there is no express cause of action to sue the President.  And Plaintiffs do not dispute that the availability of an equitable cause of action depends on whether it "was traditionally accorded by courts of equity," *Grupo Mexicano De Desarrollo v. All. Bond Fund*, 527 U.S. 308, 319 (1999).  Plaintiffs' only argument on this issue is that the Court allegedly "has the authority to grant injunctive and

declaratory relief" in this case.  Opp'n at 18.  But that is incorrect for the reasons discussed above.

*See* Section I(A).  And even if that were true, it still would not establish that such relief was

traditionally accorded by courts of equity.  Accordingly, Plaintiffs lack a cause of action to sue the

President and their claims against him should be dismissed.

### B.   In the Alternative, Count One Fails Under the Deferential Standard of Review

#### 1.   The Standard of Review is Highly Deferential

Plaintiffs' arguments against a deferential standard of review treat this case as if it were a

run-of-the-mill discrimination suit, and Plaintiffs simply ignore the many atypical and significant

aspects of this case that call out for deference.  Opp'n at 18-20.  This is a suit to enjoin the nation's

highest elected official in the exercise of his constitutional authority to conduct the foreign affairs

of the United States.  At issue is a decision made personally by the President himself, and Plaintiffs

seek to probe into that example of core presidential decision-making and to overrule the

President's discretionary determination.  If there is to be any judicial review here, the weighty

separation-of-powers concerns presented by this case warrant significant judicial deference and

application of the legal standard described in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018).  *See* Mot.

at 16-17.

Plaintiffs offer little to support their argument that an ordinary standard of review should

apply here.  They point out that various courts have applied the less deferential standard from

*Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), to

cases challenging the termination of Temporary Protected Status ("TPS") designations.  Opp'n at

19.  But Defendants have already shown why the TPS rulings, even assuming they are correct, are

distinguishable in material respects.  Mot. at 18-20.  First, courts in the TPS cases found that the

agency decisions challenged there did not implicate foreign policy, but there is no question that

the President's DED decision was a foreign policy determination.  *See* Mot. at 18-19.  Indeed,

Plaintiffs do not dispute, and therefore concede, Defendants' argument that this case implicates significant matters of foreign policy. *Id*. Second, courts in the TPS cases found that the Secretary of Homeland Security's discretion to terminate TPS designations was limited by statute, but that is not the case here, where the President maintains extraordinary discretion over DED decisions. *See* Mot. at 20. Again, Plaintiffs do not dispute this point. Third, the TPS cases challenge decisions by the Secretary of Homeland Security, whereas Plaintiffs in this case target a decision by the President himself. Suits challenging presidential decisions uniquely implicate the President's constitutional authority and call for added "judicial deference and restraint." *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982). Accordingly, the TPS decisions do not suggest that the *Arlington Heights* standard applies to this case.

Next, Plaintiffs attempt to distinguish *Trump v. Hawaii* because it allegedly involved "the limited due process rights afforded to foreign nationals seeking entry into the United States, and the particular deference accorded to the executive in making national security determinations." Opp'n at 20 (quoting *Centro Presente v. Dep't of Homeland Sec.*, 332 F. Supp. 3d 393, 411 (D. Mass. 2018)). Defendants have already explained why the *Hawaii* standard applies more broadly than just to cases involving foreign nationals seeking entry to the United States, and Plaintiffs failed to respond to those arguments. *See* Mot. at 19. And although Plaintiffs argue that the President's memorandum "makes no mention of any national security concerns," Opp'n at 20, Plaintiffs do not disagree that this case implicates the President's foreign affairs authority. Under *Hawaii*, cases implicating *either* national security *or* foreign affairs are subject to a deferential standard of review. *See, e.g.*, *Hawaii*, 138 S. Ct. at 2419 ("'Judicial inquiry into the national-security realm raises concerns for the separation of powers' by intruding on the President's constitutional responsibilities in the area of foreign affairs."). The TPS decisions cited by Plaintiffs recognize this point. *See, e.g.*, *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307, 323 (D. Md.

2018) ("[N]one of the national security *or foreign policy concerns* implicated in *Hawaii* are present here.") (emphasis added).

Thus, if Plaintiffs' extraordinary claims against the President are not dismissed for lack of standing or for lack of a cause of action, the highly deferential legal standard from *Hawaii* would be the applicable standard.

## 2.   **Plaintiffs' Equal Protection Claim Fails Under *Hawaii***

Plaintiffs' equal protection claim should be dismissed under the *Hawaii* standard.   That standard considers, at most,[3] whether the policy is "plausibly related to the Government's stated objective[.]"   *Hawaii*, 138 S. Ct. at 2420.   Courts "will uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii*, 138 S. Ct. at 2420.   Stated differently, a policy is unconstitutional only where "it is impossible to discern a relationship to legitimate state interests" or where "the policy is inexplicable by anything but animus."   *Id*. at 2420-21 (internal quotation marks omitted).   Here, the President's decision not to re-authorize DED but to permit a wind-down period was "expressly premised on legitimate purposes" and easily passes muster.   *Id*. at 2421; *see also* Mot. at 20-21.

Plaintiffs criticize the supposed "feebleness of the justifications offered in the presidential memoranda[,]" Opp'n at 26, but fail to allege facts that would support that characterization of the President's justifications.   For example, as Defendants noted previously, the President's decision was supported by specific findings concerning the situation in Liberia, and Plaintiffs offer no allegations to suggest any of those findings are inaccurate.   *See* Mot. at 24.   Plaintiffs have alleged only that some problems remain in Liberia, but that is not inconsistent with the President's justifications.   *Id*.   And Plaintiffs make no attempt whatsoever to explain how their position can

---

[3] As noted previously, the *Hawaii* decision discussed two different standards, both of which are highly deferential to the government.   *See* Mot. at 20 n.8.

be squared with the fact that the United Nations Secretary-General also found that conditions had significantly improved in Liberia by March 2018.  *See* Mot. at 24-25.  The fact that the Secretary-General assessed the situation in strikingly similar terms as the President undercuts any notion that the President's determination was somehow pretextual.[4]

Plaintiffs also point to certain statements allegedly made by the President as a basis to meet the demanding *Hawaii* standard.  Opp'n at 25-26.  But the plaintiffs in *Hawaii* premised their case on similar statements and those statements did not undermine the legitimacy of the justification provided by the President.  *Hawaii*, 138 S. Ct. at 2417-23.  Likewise, here, the statements do not undermine the President's justifications, especially considering the lack of nexus between the statements and the decision at issue in this case.  *See Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 931 (W.D. Tex. 2018) (equal protection claim failed under *Hawaii* standard where the petitioners' "extrinsic evidence, President Trump's statements, lack anything more than a tenuous connection to Respondents' actions").

Lastly, the TPS decisions cited by Plaintiffs do not suggest Plaintiffs here have met the *Hawaii* standard.  Opp'n at 27.  As discussed above, the courts in those inapposite cases applied the less deferential *Arlington Heights* standard.  Opp'n at 27.  Although one of those decisions applied a rational basis standard in the alternative, that court relied on its finding that there was "no justification, explicit or otherwise, for Defendants'" decision.  *Centro Presente*, 332 F. Supp. 3d at 416.  Here, the President provided justifications for his decision, and those justifications are unrebutted.

---

[4] Plaintiffs' discussion of the Supreme Court's decision in *Department of Commerce v. New York*, 139 S. Ct. 2551 (2019) has no relevance to this case because, *inter alia*, it did not involve a decision by the President and does not suggest that any decision by the President, including the decision at issue here, was in any way false or pretextual.

Accordingly, Plaintiffs have failed to state an equal protection claim under the *Hawaii* standard and the claim should be dismissed.

### 3.   Plaintiffs' Equal Protection Claim Fails Even Under *Arlington Heights*

Even assuming that the *Arlington Heights* standard applies to this suit, Plaintiffs still have not pled a viable equal protection claim.  The Amended Complaint does not plausibly allege that the President's decision was motivated by racial animus.  The President's stated justifications are strong, unrebutted by Plaintiffs, and in fact corroborated by statements of the United Nations Secretary-General.

As to the first *Arlington Heights* factor, Plaintiffs argue that the President's decision "exclusively harms black immigrants" and is therefore a "racial classification" that is "presumptively invalid."  Opp'n at 21 (citing *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979)).  But the rule Plaintiffs cite applies only to explicit racial classifications or classifications that are ostensibly neutral but are an "obvious pretext for racial discrimination."  *Feeney*, 442 U.S. at 272.  The President's DED decision is neither.  Indeed, the absurdity of Plaintiffs' argument is apparent.   If correct, it would mean that *any* decision about DED for Liberia would be "presumptively invalid" because any such decision will primarily affect black immigrants.  Even decisions *authorizing* DED for Liberia would be, in Plaintiffs' view, "racial classifications" that are "presumptively invalid."   And no President could *ever* terminate DED for Liberia without offering an "extraordinary justification."   Plaintiffs' clearly incorrect argument only highlights why the first *Arlington Factor* is so ill-suited to this case.  *See* Mot. at 22 n.9.

Next, relying extensively on material outside their Amended Complaint, Plaintiffs argue that various alleged statements show racial animus by the President.  Opp'n at 22-23.  Defendants previously explained that relevant statements under *Arlington Heights* are those made in the "legislative or administrative history," which the statements alleged by Plaintiffs are not, Mot. at

23, and Plaintiffs do not dispute that point.  Moreover, Plaintiffs do not dispute that *none* of the alleged statements has any direct connection to the President's DED decision.  *See* Mot. at 22-23; Opp'n at 24 (arguing only that the statements reveal "an overarching objective of removing persons of color from the United States").  If the alleged statements are deemed sufficient to plead a plausible claim of discrimination here, where no nexus to the challenged decision is alleged, that would open the door to discrimination lawsuits anytime a non-white plaintiff claims to have suffered harm by a decision of the President.

Plaintiffs also have not shown that the "sequence of events leading up to the challenged decision," *Arlington Heights*, 429 U.S. at 267, supports a finding of racial animus.  Plaintiffs argue that the DED decision is "part of a pattern" of immigration decisions targeting immigrants of color "including the termination of TPS for such immigrants," Opp'n at 23, but Plaintiffs have not alleged that President Trump made any of these other immigration decisions.  Rather, they allege that DHS, not the President, cancelled TPS.  Am. Compl. ¶ 108.  Actions by DHS can hardly be probative of the *President's* motivation concerning DED.

Plaintiffs also argue that there "have been no shifts in the political, economic, or social landscape" in Liberia since prior administrations that would justify not re-authorizing DED, Opp'n at 23, but that argument is neither supported by the complaint nor persuasive.  As an initial matter, the Amended Complaint does not actually allege that conditions in Liberia are the same as during prior administrations, only that the situation there "remains dire."  Am. Compl. ¶ 112.  And Plaintiffs argument fails to account for the findings of the United Nations Secretary-General discussed in Defendants' motion.  Mot. at 24-25.  In any event, Plaintiffs' argument incorrectly assumes that all presidents must exercise their discretion over foreign affairs decisions identically. But given a president's wide discretion over DED decisions, it is to be expected that different presidents will have different views on whether U.S. foreign policy warrants an authorization of

DED in a particular instance.  Accordingly, the mere fact that President Trump came to a different conclusion than his predecessors does not show any "[d]epartures from the normal procedural sequence," *Arlington Heights*, 429 U.S. at 267.  Although Plaintiffs note that they "need not yet prove a difference in procedure," Opp'n at 23, the relevant point is that they have not even *alleged* one.  *See* Mot. at 23-24.

For these reasons, even under the *Arlington Heights* standard, Plaintiffs have not plausibly alleged that the President was motivated by animus when he announced that he would not re-authorize DED for Liberia but would instead authorize a wind-down period.  Plaintiffs' speculation about the President's intentions are insufficient to state a claim.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").

### III.    Plaintiffs Fail to State a Claim for Violation of Due Process

Defendants' Motion explained why Plaintiffs' due process claim on the basis of family integrity is foreclosed by the First Circuit's decision in *Payne-Barahona v. Gonzales*, 474 F.3d 1, 2 (1st Cir. 2007), holding that "a parent's otherwise valid deportation does not violate a child's constitutional right."  *Id.* at 2; *see* Mot. at 25-26; *see also, e.g.*, *Gebhardt v. Nielsen*, 879 F.3d 980, 988 (9th Cir. 2018) ("[T]he generic right to live with family is 'far removed' from the specific right to reside in the United States with non-citizen family members.").  Plaintiffs' opposition attempts, but fails, to distinguish *Payne-Barahona*.  Plaintiffs note that the plaintiff in *Payne-Barahona* had committed a crime whereas Plaintiffs here allegedly have not, that the plaintiff did not raise the theory of "unconstitutional choice" that Plaintiffs here raise, that he sought to remain in the United States permanently whereas Plaintiffs here "only seek to assert claims on behalf of U.S. citizen children while they are minors," and that if the U.S. citizen children want to remain with their parents, they will have to choose to return to an allegedly unsafe country.  *Id.* at 28.  But

Plaintiffs' own cited authority considered arguments identical to these and held that "these factors do not appear to have been material to the analysis in" the cases rejecting family integrity claims. *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1119 (N.D. Cal. 2018).  Indeed, nothing in *Payne-Barahona* suggests the outcome would have been different if any of these factors were different.

As to Plaintiffs' theory that the U.S. citizen children face an unconstitutional choice, the *Ramos* court found that doctrine "inapt." *Id.*  To hold that the unconstitutional choice doctrine, derived from the criminal law context, could bar a removal "could have the effect of circumventing" the holdings in decisions rejecting family integrity claims in the immigration context. *Id.* at 1120.  Moreover, the choice that Plaintiffs face here is materially different from the choices held to be unconstitutional in the criminal law context.  In that context, the assertion of one right necessarily extinguished the other.  *See Simmons v. United States*, 390 U.S. 377, 394 (1968).  But a U.S. citizen child who moves to Liberia would retain the right to return to and live in the U.S.[5]  Thus, it "is not clear that the forced-choice doctrine would extend to this situation, where the government is not forcing a person to irretrievably relinquish one right in order to exercise another." *Ramos*, 321 F. Supp. 3d at 1120.[6]

---

[5] Plaintiffs claim that the children "risk loss of their U.S. citizenship" if they move to Liberia because "Liberia does not recognize dual citizenship and a number of important rights in Liberia are only accessible to citizens." Opp'n at 28-29 (citing Dkt. No. 40, Ex. 4).  But children moving to Liberia would not be compelled to renounce their U.S. citizenship, Dkt. No. 40, Ex. 4 ¶ 10, and they would have no reason to do so voluntarily because the benefits associated with becoming a Liberian citizen are irrelevant to children, *id.* ¶¶ 13-14 (benefits of becoming a Liberian citizen include owning land and voting).  Accordingly, U.S. citizen children could remain U.S. citizens while living in Liberia and then return to the U.S. at a later time.

[6] Plaintiffs note that the *Ramos* court allowed a due process claim to proceed past the pleading stage.  Opp'n at 28.  But that was only because the court determined that the plaintiffs had adequately pled violations of the Administrative Procedure Act ("APA") and equal protection, and the due process claim could be premised on those alleged violations. *Ramos*, 321 F. Supp. 3d at 1120.  In other words, the claim sustained in *Ramos* was akin to the due process claim Plaintiffs assert in Count Two (claiming irrational government action), not the claim in Count Three based on the right to family integrity.

Plaintiffs' opposition also confirms another basis for dismissing this claim against DHS and the Acting Secretary of Homeland Security.  Defendants' Motion noted that Plaintiffs had failed to allege any action by either DHS or the Acting Secretary that violated the rights of any plaintiff, Mot. at 26, and Plaintiffs conceded the point, Opp'n at 29 (agreeing that "the complaint alleges that the animus and decision to cancel DED rests with Defendant Trump").  Plaintiffs argue that the agency defendants should nevertheless remain in the lawsuit so that an injunction could be applied to them, *id.*, but the desire to obtain relief against a particular person or entity is not a substitute for actually pleading a viable claim against that person or entity.  Claims against a defendant that lack a legal and factual basis are subject to dismissal.  *See* Fed. R. Civ. P. 12(b)(6).  Additionally, Plaintiffs did not respond to Defendants' argument that any constitutional claim against the agency defendants would have to be brought pursuant to the APA, Mot. at 26, and therefore have conceded that issue.

### IV.     Plaintiffs' Claim Under the Declaratory Judgment Act Should be Dismissed

Plaintiffs expressly acknowledge that they are not "attempting to plead a claim *under* the Declaratory Judgment Act" and describe Count Four of their Amended Complaint as a "request for declaratory relief[.]"  Opp'n at 29-30 (emphasis in original).  Accordingly, Plaintiffs seek only a declaratory remedy, not a claim under the Declaratory Judgment Act.  To the extent Plaintiffs wish to seek declaratory relief, or any other relief, the proper place to describe such relief is their Prayer for Relief.  *See* Am. Compl. at 45.  Therefore, Count Four should be dismissed.

### CONCLUSION

The Court should dismiss the Amended Complaint with prejudice.

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JOHN TYLER

19

Assistant Branch Director, Federal Programs Branch

/s/  *Joshua Kolsky*
JOSHUA KOLSKY
Trial Attorney
D.C. Bar No. 993430
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW Washington, DC 20005
Tel.: (202) 305-7664
Fax: (202) 616-8470
E-mail: joshua.kolsky@usdoj.gov

*Attorneys for Defendants*

**<u>Certificate of Service</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the
registered participants as identified on the Notice of Electronic Filing (NEF) on August 23, 2019.

*/s/* Joshua Kolsky
Joshua Kolsky