**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                         )
**AFRICAN COMMUNITES TOGETHER,** a )
membership organization;                      )         **CIVIL ACTION**
**UNDOCUBLACK NETWORK,** a              )
membership organization; **DAVID**           )         **NO. 19-10432-TSH**
**KROMA; MOMOLU BONGAY;**              )
**OTHELLO A.S.C. DENNIS; YATTA**     )
**KIAZOLU; CHRISTINA WILSON;**      )
**JERRYDEAN SIMPSON; C.B., AL. K.,** )
**D.D., D.K., AI. K., AD. K.** by and through )
their father and next friend **OTHELLO**    )
**A.S.C. DENNIS; O.S.** by and through his )
mother and next friend **JERRYDEAN**    )
**SIMPSON,**                                      )
                                         )
                  **Plaintiffs,**               )
                                         )
                      v.                     )
                                         )
**DONALD J. TRUMP,** President of the   )
United States in his official capacity;     )
**UNITED STATES DEPARTMENT OF**  )
**HOMELAND SECURITY; KEVIN**      )
**MCALEENAN,** Acting Secretary of the )
Department of Homeland Security in his )
official capacity,                       )
                                         )
                  **Defendants.**             )
_____

**ORDER AND MEMORANDUM ON DEFENDANTS' MOTION FOR TO DISMISS**
**(Docket No. 52)**

**October 25, 2019**

      President Trump announced plans to terminate Deferred Enforced Departure ("DED") for Liberians effective March 31, 2020. Plaintiffs filed this action seeking to declare unlawful and/or enjoin that termination because they believe President Trump based his decision on racial animus rather than existing conditions in Liberia. Defendants move to dismiss for lack of jurisdiction.

(Docket No. 52). While the Court finds that the Plaintiffs have suffered an injury in fact, the Court unfortunately sees no way to redress that injury. In order to renew DED, the President must take affirmative action, and this Court cannot compel the President to take that action under the circumstances of this case. Thus, the Court ***grants*** Defendants' motion to dismiss. (Docket No. 52).

## Background

Since the 1980s, Liberia has experienced armed conflicts that have claimed the lives of over 250,000 civilians and devastated its economy. Four previous Administrations have granted humanitarian relief to Liberians lawfully residing in the United States through Temporary Protected Status ("TPS") and DED. TPS is a statutory status that the Secretary of the Department of Homeland Security ("DHS") may extend to foreign nationals who cannot return to their country of origin due to armed conflict, natural disaster, or temporary conditions. *See* 8 U.S.C. § 1254a(b)(1). DED is a temporary, discretionary stay of removal granted to foreign nationals from designated countries generated by the President. Unlike TPS, DED does not have a statutory basis; it emanates from the President's constitutional authority to conduct foreign relations.

In 1991, Attorney General[1] Dick Thornburgh first granted TPS to Liberians due to "ongoing armed conflict within Liberia" and the "extraordinary and temporary conditions in Liberia that prevent . . . nationals of Liberia from returning to Liberia in safety." (Docket No. 46 at 20). In 1999, Attorney General Reno terminated TPS. Shortly thereafter, President Clinton granted Liberian nationals DED, citing fragile conditions and the significant risk that deporting Liberians "would cause other countries in West Africa to repatriate involuntarily many thousands

---

[1] Prior to March 1, 2003, the Attorney General held immigration-related authority (including the authority to designate countries for TPS). On March 1, 2003, this authority was transferred to the Secretary of the newly created DHS.

of Liberian refugees, leading to instability in Liberia and potentially threatening peace along the Liberian border." (Docket No. 53-1 at 2).  President George W. Bush continued DED, citing similar concerns. (Docket No. 53-3 at 2).

In 2002, Attorney General Ashcroft granted TPS to Liberians after the country relapsed into civil war.  DHS extended TPS in 2004 and 2005 even though the armed conflict had ended because there were "extraordinary and temporary conditions that prevent the safe return of nationals of Liberia." (Docket No. 46 at 23).

In 2006, after assessing conditions in Liberia, DHS terminated TPS.  Before TPS expired on October 1, 2007, however, President Bush again granted DED relief to Liberians because "the political and economic situation" continued to justify deferring deportation.  (Docket No. 46 at 24).

On March 23, 2009, President Obama, citing "compelling foreign policy reasons," followed the precedent of previous administrations by extending DED for Liberians immediately after President Bush's extension expired. (Docket No. 53-4 at 2).  President Obama continued to extend DED relief to Liberians in the United States until 2014 when he granted a 24-month extension. (Docket No. 46 at 24).

In 2014, the Ebola epidemic hit Liberia.  The virus spread rapidly throughout the country and infected over ten-thousand people in two years.  In response, DHS again granted TPS for Liberians, noting that the epidemic had overwhelmed Liberia's already weak health care system and that Liberians could not safely return to Liberia. (Docket No. 46 at 25).  When the Ebola outbreak was finally contained, DHS terminated TPS.  On September 28, 2016, however, President Obama again granted DED to Liberians for 18 months beginning on October 1, 2016. (Docket No. 53-6 at 2–3).

On March 27, 2018, President Trump announced plans to terminate DED for Liberians effective March 31, 2019.  In his memorandum, President Trump noted:

> Liberia is no longer experiencing armed conflict and has made significant progress in restoring stability and democratic governance.  Liberia has also concluded reconstruction from prior conflicts, which has contributed significantly to an environment that is able to handle adequately the return of its nationals.  The 2014 outbreak of Ebola Virus Disease caused a tragic loss of life and economic damage to the country, but Liberia has made tremendous progress in its ability to diagnose and contain future outbreaks of the disease.

(Docket No. 53-7 at 1–2).  On March 28, 2018, President Trump extended the wind-down period to March 31, 2020.  (Docket No. 53-9 at 2).

## Legal Standard

When a party moves to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, "the party asserting jurisdiction has the burden to establish through competent proof that jurisdiction exists."  *White v. Comm'r*, 899 F. Supp. 767, 771 (D. Mass. 1995).  In evaluating whether the party has met its burden of proof, the court "may consider extrinsic materials and, to the extent it engages in jurisdictional factfinding, is free to test the truthfulness of the plaintiff's allegations." *Dynamic Image Techs., Inc. v. United States*, 221 F.3d 34, 37 (1st Cir. 2000).

## Discussion

### 1. Individual Plaintiffs

Defendants contend that the Individual Plaintiffs lack Article III standing to challenge President Trump's DED determination.  "Article III of the Constitution limits federal courts' jurisdiction to certain 'Cases' and 'Controversies.'"  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Standing is an element of the case-or-controversy requirement.  *Id.*  To have Article III standing, a plaintiff must show (1) a "concrete, particularized, and actual or

imminent" injury; (2) a causal link between the challenged action and that injury; and (3) redressability. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).

    a. <u>Injury-in-Fact</u>

Defendants allege that the Individual Plaintiffs have not suffered an injury in fact because deportation is not sufficiently imminent. According to Defendants, the Individual Plaintiffs have pled only a *potential* harm, because anything could happen between now and March 31, 2020, which might prevent their deportation. (Docket No. 53 at 7). For example, the Individual Plaintiffs may gain citizenship or President Trump may again extend the wind-down period. (Docket No. 53 at 8–9).

The Court rejects this argument. "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5). An injury is certainly impending if it is imminent and not too speculative. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.2 (1992). Deportation, "certainly impending" and a "substantial risk," has been stayed under DED, and DED is set to expire on March 31, 2020. Absent any affirmative action on the part of Defendants to extend the wind-down period,[2] the Individual Plaintiffs face forcible removal from this country on that date. And while President Trump may choose to extend the wind-down period again at some point in the next eight months, Defendants' ability to voluntarily take action to postpone the harm does not destroy the imminence of the injury at stake. *Cf. Adarand*

---

[2]    Defendants contend that Plaintiffs' theory of injury is speculative because it relies on the assumption that Congress will not enact any law affecting Liberians, that these plaintiffs will not receive citizenship, etc. But Defendants offer no evidence that any of the Individual Plaintiffs qualify for citizenship or that Congress likely will enact a law relative to the Liberians before the wind-down period ends.

*Constructors, Inc. v. Slater*, 528 U.S. 216, 222 (2000) (noting that voluntary cessation does not render a case moot unless it is "*absolutely* clear that the allegedly wrongful behavior could not reasonably be expected to recur" (internal quotation marks omitted) (emphasis in original)).

  b. *Redressability*

Defendants argue that, even if the Individual Plaintiffs have suffered an injury in fact, this Court lacks authority to redress that injury. To meet the redressability requirement, the case "must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 241 (1937). This implicates "two *jurisdictional* concerns." *City of Los Angeles v. Lyons*, 461 U.S. 95, 129 n.20 (1983) (emphasis in original). "First, a court must have the power to fashion *some* appropriate remedy." *Id.* (emphasis in original). "Second, a court must determine that there is an available remedy which will have a 'substantial probability' of redressing the plaintiff's injury." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 508 (1975)) (internal citations omitted).

"Enjoining the President from certain action is 'extraordinary' relief, but it may nonetheless be available in certain circumstances." *Saget v. Trump*, 375 F. Supp. 3d 280, 334 (E.D.N.Y. 2019) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992)). For example, the Supreme Court has "left open the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." *Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (quoting *Mississippi v. Johnson*, 4 Wall. 475, 498–499 (1867)). And some courts suggest that "[t]he correction of an unlawful act 'far more closely resembles the performance of "a mere ministerial duty," where "nothing [is] left to discretion,"

6

than the performance of a "purely executive and political" duty requiring the exercise of discretion vested in the President.'" *Saget*, 375 F. Supp. 3d at 334 (quoting *Knight First Amendment Inst. v. Trump*, 302 F.Supp.3d 541, 578 (S.D.N.Y. 2018)).  Thus, in *Saget*, the Eastern District of New York denied the President's motion to dismiss an action for injunctive relief regarding the decision to terminate TPS for Haiti because "enjoining the President to ensure executive officials operate in accordance with the law is appropriate in this case and well within the Court's power." *Id.* at 334–35.

The Court finds that there is no available remedy that it can award which will have a substantial probability of redressing the Individual Plaintiffs' injury. *See City of Los Angeles v. Lyons*, 461 U.S. at 129 n.20.  Even assuming the Court could declare the termination decision void as the product of an unlawful process and/or enjoin enforcement of it, DED only continues if the President renews it.  DED, in other words, will still expire on March 31, 2020, absent any affirmative action by President Trump.  And this Court lacks the authority to compel the President to take that action.  The authority for the DED program comes from the executive branch's constitutional power to conduct foreign affairs,[3] and "the conduct of foreign affairs" is a realm entrusted to the President.[4]  *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982).  Given the inherently executive nature of DED, the Court does not see any way it may lawfully compel the

---

[3]  *Saget*, in contrast, deals with TPS, a statutory designation.  *See* 375 F. Supp. 3d at 334–35.

[4]  While courts may sometimes exercise jurisdiction over realms entrusted to the President, the Supreme Court has cautioned "that a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch." *Nixon*, 457 U.S. at 754.  Given the discretion a sitting president has over foreign affairs, the Court cannot say that other interests outweigh the danger of intrusion here.

President to act under these circumstances. Thus, the Court is compelled to grant the motion to dismiss against the Individual Plaintiff.

### 2. *Organizational Plaintiffs*

Defendants also contend that the Organizational Plaintiffs lack Article III standing to challenge the termination. The Court finds that the Organizational Plaintiffs, like the Individual Plaintiffs, can establish an injury-in-fact.[5] But as explained above, this Court has no power to redress that injury. The Organizational Plaintiffs request declaratory relief, and a declaration that the termination decision is void for racial animus will not renew DED status past March 31, 2020. The Court therefore grants the motion to dismiss against the Organizational Plaintiffs.

### **Conclusion**

For the reasons stated above, Defendants' motion to dismiss for lack of jurisdiction (Docket No. 52) is ***granted***.

**SO ORDERED**

                                                                        ***/s/ Timothy S. Hillman***
                                                                        **TIMOTHY S. HILLMAN**
                                                                         **DISTRICT JUDGE**

---

[5] They face (1) financial harm due to the diversion of their resources to advocacy efforts and (2) damage to their ability to serve their missions of protecting African immigrants, and in the First Circuit, "[i]t is a bedrock proposition that a relatively small economic loss -- even an identifiable trifle -- is enough to confer standing." *Massachusetts v. United States Dep't of Health & Human Servs.,* 923 F.3d 209, 222 (1st Cir. 2019) (internal quotation marks omitted); *see also Long Term Care Pharmacy All. v. UnitedHealth Grp., Inc.*, 498 F. Supp. 2d 187, 192 (D.D.C. 2007) ("The pivotal inquiry is therefore not whether the organization has diverted resources from one priority to another, but whether its activities have been directly impeded by defendant's activities, thus necessitating the diversion of resources.").